UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
ABBOTT LABORATORIES et al.,

                        Plaintiffs,

       -against-

ADELPHIA SUPPLY USA et al.,

                        Defendants.
------------------------------------------------------------x

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
15-CV-5826 (CBA) (LB)

**AMON, United States District Judge:**

Plaintiffs Abbott Laboratories, Abbott Diabetes Care Inc., and Abbott Diabetes Care Sales Corp. (collectively, "Abbott") initiated this action against pharmacies, distributors, importers, and online sellers who sell the international version of Abbott's FreeStyle diabetes test strips within the United States. In addition to its trademark claims, Abbott brings claims for importation of infringing goods under 15 U.S.C. § 1124; for unjust enrichment, fraud, and aiding and abetting fraud under New York common law; and for civil RICO and RICO conspiracy under 18 U.S.C. § 1962(c) and (d). Before the Court are motions to dismiss the RICO and fraud claims, the unjust-enrichment claim, the importation claim, and (by three individual defendants only) the trademark claims. For the following reasons, the Court dismisses the RICO claims and the unjust-enrichment claim, but denies the motions to dismiss the fraud, importation, and trademark claims.

## BACKGROUND

Abbott owns the family of trademarks that appear on FreeStyle and FreeStyle Lite blood glucose test strips. (See D.E. # 307 ("Second Am. Compl.") ¶ 2.) Individuals with diabetes use FreeStyle blood glucose strips to monitor their blood-sugar levels. Abbott sells FreeStyle strips in the United States and around the world. The differences between the packaging and instructional

inserts, Abbott argues, make the domestic sale of the international product a violation of its trademark.

The defendants are motivated to sell the international product within the United States because of the complex insurance-reimbursement scheme underpinning the domestic market. In the United States, ninety-five percent of the diabetic patients who receive test strips from pharmacies pay through their insurance company. (Id. ¶ 369.) When the pharmacies disperse a box of domestic test strips, they scan a National Drug Code ("NDC") number on the box, which informs the insurance company of the sale. (Id. ¶ 370.) The insurance company makes a reimbursement payment to the pharmacy. (Id. ¶ 371.) The insurance company then notifies Abbott, who pays a pre-negotiated rebate amount to the insurance company. (Id. ¶ 372.) Abbott's revenue for the sale of a box of domestic test strips to a patient with insurance therefore constitutes the list price minus the amount rebated to the insurance company. (Id.) Because of this pricing scheme, the list price for a domestic test strip is significantly higher than the list price abroad. (Id. ¶¶ 372, 382.) This pricing differential creates an incentive to acquire international test strips and sell them in the domestic market.

In order to profit from this pricing differential, however, defendants allegedly must defraud the insurance companies and Abbott. In order to be reimbursed for a box of test strips, pharmacies must scan a valid NDC number. (Id. ¶¶ 371, 373.) International boxes do not have NDC numbers, however. (Id. ¶ 355.) Abbott alleges that pharmacies therefore scan the NDC number on a domestic box of FreeStyle test strips when they actually disperse an international box. (Id. ¶ 373.) The pharmacy is reimbursed by the insurance company for the price of a domestic box even though

2

it paid the far-lower international list price, and Abbott then rebates the insurance company accordingly. (Id. ¶ 374.)

A scheme to defraud Abbott has emerged from this practice. According to Abbott, the defendant distributors and pharmacies "have a long-standing relationship, through which they agreed to purchase diverted FreeStyle test strips from foreign countries at these lower prices and then dispense them to consumers at higher U.S. retail prices for the purpose of receiving fraudulent reimbursement payments from the consumers' insurers." (Id. ¶ 7.) "Defendants (and others like them) are buying large quantities of international FreeStyle test strips, importing them into the United States, and selling them to U.S. consumers with insurance." (Id. ¶ 382.) The resulting fraudulent reimbursement requests "are then forwarded on to Abbott," which "Defendants know, as it is fundamental to their scheme." (Id. ¶ 388; see also id. ¶ 372 ("As Defendants are well aware, Abbott pays substantial rebates to the insurers for reimbursements they pay out on sales of U.S. FreeStyle test strips.")). Abbott alleges that "[e]ach Defendant participated in and/or aided and abetted the scheme just described and conspired with others to further the scheme." (Id. ¶ 393). Each defendant had "a necessary connection and participation in the conspiracy. This cannot be done alone. The importers, the distributors, and the pharmacies are all necessary to the success of the conspiracy. They must work together to make their conspiracy successful—i.e., profitable." (Id. ¶ 542.)

## STANDARD OF REVIEW

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must state "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). A complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertions devoid of further factual enhancement." Id. (citing Twombly, 550 U.S. at 555, 557) (internal quotation marks omitted)). Additionally, allegations of fraud or mistake have a heightened pleading requirement. Under Federal Rule of Civil Procedure 9(b), "a party must state with particularity the circumstances constituting fraud or mistake." In deciding a motion to dismiss, the Court accepts all well-pleaded allegations as true, construes these allegations in the light most favorable to the plaintiff, and draws all reasonable inferences in the plaintiff's favor. Doe v. Columbia Univ., 831 F.3d 46, 48 (2d Cir. 2016).

## DISCUSSION

### I.     Civil RICO

Defendants argue that Abbott fails to state a civil RICO claim because, for among other reasons, it fails to allege facts showing an enterprise existed or that any defendant engaged in the conduct of such an enterprise.[1] The Court finds this a persuasive argument.

The RICO statute is meant to protect "legitimate businesses from infiltration by organized crime," United States v. Porcelli, 865 F.2d 1352, 1362 (2d Cir. 1989), and should "be liberally construed to effectuate its remedial purposes," Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 498 (1985) (internal quotation marks omitted). In the civil context, however, courts "strive to flush out frivolous RICO allegations at an early stage of the litigation" because "the mere assertion of a

---

[1] Because the Court determines that Abbott's allegations of the "enterprise" and "conduct" elements are deficient, it does not reach defendants' arguments concerning the other elements of a RICO claim.

4

RICO claim has an almost inevitable stigmatizing effect on those named as defendants." Westchester Cty. Indep. Party v. Astorino, 137 F. Supp. 3d 586, 599 (S.D.N.Y. 2015) (internal quotation marks and citations omitted). Consequently, "courts must always be on the lookout for the putative RICO case that is really nothing more than an ordinary fraud case." Nasik Breeding & Research Farm Ltd. v. Merck & Co., 165 F. Supp. 2d 514, 537 (S.D.N.Y. 2001) (quoting Schmidt v. Fleet Bank, 16 F. Supp. 2d 340, 346 (S.D.N.Y. 1998)). Indeed RICO claims based on fraud receive especially careful scrutiny because "virtually every ordinary fraud is carried out in some form by means of mail or wire communication," and thus there is "the potential for transforming garden-variety common law actions into federal cases." Gross v. Waywell, 628 F. Supp. 2d 475, 493 (S.D.N.Y. 2009); see also Cont'l Petroleum Corp. v. Corp. Funding Partners, LLC, No. 11-CV-7801 (PAE), 2012 WL 1231775, at *4 (S.D.N.Y. Apr. 12, 2012) (collecting cases).

To sufficiently plead a civil RICO claim, a plaintiff must allege "(1) a substantive RICO violation under [18 U.S.C.] § 1962, (2) injury to the plaintiff's business or property, and (3) that such injury was by reason of the substantive RICO violation." Sykes v. Mel S. Harris & Assocs. LLC, 780 F.3d 70, 83 (2d Cir. 2015) (internal quotation marks and citation omitted). To establish a substantive RICO violation under 18 U.S.C. § 1962(c), a plaintiff must allege "that a person engaged in '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" Cruz v. FXDirectDealer, LLC, 720 F.3d 115, 120 (2d Cir. 2013) (quoting DeFalco v. Bernas, 244 F.3d 286, 306 (2d Cir. 2001)).

## A. RICO Enterprise

A RICO enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An association-in-fact enterprise, as alleged here, is "any union or group of individuals associated in fact although not a legal entity," id. § 1961(4)—in other words, "simply a continuing unit that functions with a common purpose," Boyle v. United States, 556 U.S. 938, 948 (2009). "In determining whether plaintiffs have alleged the existence of an association-in-fact RICO enterprise, courts analyze the 'hierarchy, organization, and activities of the alleged association to determine whether its members functioned as a unit.'" BWP Media USA Inc. v. Hollywood Fan Sites, LLC, 69 F. Supp. 3d 342, 359–60 (S.D.N.Y. 2014) (quoting First Capital Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 174 (2d Cir. 2004)). Specifically, "[t]he concept of 'associat[ion]' requires both interpersonal relationships and a common interest" to show that an alleged group "function[s] as a continuing unit." Boyle, 556 U.S. at 946. At a minimum, such an association in fact must have "at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." Id. at 946. "To satisfy the first 'purpose' feature, the individuals that [compose] the enterprise 'must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes." New York v. United Parcel Serv., Inc., No. 15-CV-1136 (KBF), 2016 WL 4203547, at *3 (S.D.N.Y. Aug. 9, 2016) (quoting First Capital, 385 F.3d at 174); see also Cruz, 720 F.3d at 120. "To satisfy the second [relationship] feature, a plaintiff must demonstrate the relationships between the various members and their roles in the purported RICO scheme." United Parcel Serv., Inc., 2016 WL 4203547, at *3 (collecting

cases). "A plaintiff's conclusory naming of a string of entities does not adequately allege an enterprise." First Capital, 385 F.3d at 175.

With these requirements in mind, the Court turns to the specifics of the "enterprise" Abbott alleges. According to Abbott, "Defendants"—all 300 or so of them—"formed an association-in-fact for the purpose of defrauding Abbott and insurers." (Second Am. Compl. ¶ 607.) This enterprise not only "consists of Defendants," but it also includes "other importers, distributors, and pharmacies who have yet to be discovered." (Id.) Abbott supports this sweeping allegation with a string of conclusory assertions, such as "Defendants organized their RICO enterprise into a continuing and cohesive unit with specific and assigned responsibilities," and "[a]ll Defendants participated in the operation and management of the enterprise." (Id.) The factual allegations supporting these conclusions are similarly nonspecific. Abbott broadly asserts that distributors "import, market, and distribute large volumes of diverted international FreeStyle test strips" and pharmacies "market[] and sell[] [them] . . . to U.S. consumers and submit[] fraudulent reimbursement claims." (Id. ¶ 4.)

Such conclusory allegations "fail[] to satisfy the well-established pleading standards as to an enterprise comprised of an association-in-fact." Cont'l Petroleum Corp., 2012 WL 1231775, at *6. Besides clustering dozens of defendants by the nature of their businesses—the "Pharmacy Defendants" and the "Distributor Defendants," (Second Am. Compl. ¶¶ 24–330)—Abbott alleges no facts concerning the "hierarchy" or "organization . . . of the alleged association." First Capital, 385 F.3d at 174. As for the "activities of the alleged association," Abbott alleges distributors sold to pharmacies (and other distributors) and pharmacies sold to consumers, but it fails to allege facts showing how these are the actions of "members function[ing] as a unit." Id. Rather, no alleged facts support an inference that the entities were acting in any way but in their own independent

interests. Glaringly absent are allegations of "interpersonal relationships or common interest." Boyle, 556 U.S. at 946. Although some defendants sold to or bought from others, Abbott's allegations fail to support an inference that the defendants here—distributors from dozens of states as well as overseas and small, independent pharmacies similarly widespread—had a relationship amounting to a RICO enterprise. Without factual allegations showing these 300 defendants had an interpersonal relationship in which they worked together for a common illicit interest, Abbott's pleadings constitute nothing more than the "conclusory naming of a string of entities" combined with legal conclusions. First Capital, 385 F.3d at 175.

Courts routinely reject allegations of RICO enterprises of this type. For example, in Town of Mamakating, three defendants allegedly instigated dozens of others to fraudulently induce the plaintiff to annex and re-zone land for a housing development. See Town of Mamakating, N.Y. v. Lamm, No. 15-CV-2865 (KBF), 2015 WL 5311265 (S.D.N.Y. Sept. 11, 2015), aff'd sub nom. Town of Mamakating, New York v. Lamm, 651 F. App'x 51 (2d Cir. 2016). The court held that plaintiff's association-in-fact allegations failed because, as here, there were no specific facts alleged from which the court could infer that "the defendants formed an ongoing organization or that defendants formed a coherent entity," only conclusory assertions. Id. at *9. Any basis for inferring an entity existed was "lacking, in part, because the Amended Complaint alleges in conclusory fashion that various individuals and entities are alleged to have taken acts to further the scheme despite not having any apparent connection to most (or all) of the defendants." Id. The same defect exists here, where many of Abbott's far-flung defendants are not alleged to have any connections to most of the others.

In another similar case, Continental Petroleum, plaintiffs alleged that a series of purchase agreements failed due to the five defendants' fraudulent misrepresentations. Cont'l Petroleum

Corp., 2012 WL 1231775, at *1. Even though the five defendants—two entities and three individuals—were alleged to have known each other and worked on the purchase agreements at issue, the court found it "fatal" that plaintiffs "fail to make any concrete factual assertions as to the mechanics of the interactions among defendants, including facts indicating that the disparate defendants functioned as a unit, or supporting the inference that defendants had a common interest in the success of the so-called enterprise." Id. at *6. Similarly, Abbott's factual allegations—which include even fewer details of defendants' interactions than those in Continental Petroleum—cannot support an inference that over 300 "disparate defendants" formed an enterprise.

To give a final example, the plaintiffs in BWP Media USA sued six companies and two individuals for allegedly operating a network of websites dedicated to celebrities that, as part of its business model, posted copyrighted photographs. BWP Media USA Inc. v. Hollywood Fan Sites, LLC, 69 F. Supp. 3d 342, 348 (S.D.N.Y. 2014). Plaintiffs alleged that defendants' "entire business" was sustained by displaying improperly licensed photographs. Id. But the court found allegations of independent illicit acts, even by participants in a market predicated upon such acts, were insufficient because "[t]he complaint provides no concrete information on the group's organization or hierarchy . . . [or any] information from which it could be concluded that Defendants function as a unit or that they shared a common purpose, in the absence of any mention of the roles each Defendant played and the actions they took" beyond their separate predicate acts. Id. at 360. In the closely analogous situation here, Abbott alleges defendants' independent frauds as part of a market built on trademark infringement and fraud; but without factual allegations that the defendants cooperated to form a continuing unit working toward a common purpose, their mere independent, uncoordinated participation in this market does not create a RICO enterprise. See Boyle, 556 U.S. at 947 n.4 (stating that the fact that "several individuals, independently and

without coordination, engaged in a pattern of crimes listed as RICO predicates" does not by itself show an enterprise existed and the defendants worked on its behalf).

Abbott apparently recognized this deficiency at some point after submitting its opposition to the motions to dismiss. At oral argument, Abbott claimed for the first time that it had <u>not</u> pleaded one RICO enterprise consisting of all defendants, despite the plain language of its second amended complaint to the contrary. (<u>See, e.g.</u>, Second Am. Compl. ¶ 607 ("Defendants formed an association-in-fact for the purpose of defrauding Abbott and insurers, including private insurers and Medicare and Medicaid. This association-in-fact was an "enterprise" within the meaning of RICO, 18 U.S.C. § 1961(4). This enterprise consists of Defendants as well as other importers, distributors, and pharmacies who have yet to be discovered.").) Instead, Abbott asserted that it alleged—or at least it had meant to allege—many smaller RICO enterprises consisting of a distributor (who bought international test strips from an importer) and each pharmacy the distributor sold to (who distributed international test strips to insured patients and fraudulently sought reimbursement). Abbott did not claim to have any additional factual allegations that would describe the interpersonal relationships and common purpose of these smaller enterprises. Nevertheless, Abbott proposed amending its complaint to "reshuffle the paragraphs"—presumably by placing the allegations concerning a particular distributor and its pharmacy purchasers next to one another—in order to make these more specific "enterprises" manifest.

This proposed amendment would not resuscitate Abbott's conclusory RICO allegations, however, and would therefore be futile. Even "reshuffled" to tie a particular distributor to various pharmacies, Abbott's allegations would fail to show any continuing units with common purposes that would constitute associations in fact under RICO.

At most, Abbott's proposed amendment would convert a single 300-defendant worldwide enterprise into a series of hub-and-spoke entities. Each distributor would sit at the hub of one alleged enterprise, surrounded by the importer from which it bought and the (typically many) pharmacies to which it sold international test strips. But consistently, both before and after Boyle, "courts have held that allegations of a 'hub-and-spokes' structure . . . do not satisfy the enterprise element of a RICO claim." Cedar Swamp Holdings, Inc. v. Zaman, 487 F. Supp. 2d 444, 450 (S.D.N.Y. 2007). And for good reason. When there is "parallel conduct of the same nature in the same timeframe by different actors in different locations," Elsevier Inc. v. W.H.P.R., Inc., 692 F. Supp. 2d 297, 306–07 (S.D.N.Y. 2010), it is all too facile for plaintiffs to claim a RICO violation. But after Boyle, it is clear that an association in fact "requires both interpersonal relationships and a common interest," not mere parallel conduct. Boyle, 556 U.S. at 946. Boyle expressly recognized that the fact that "several individuals, independently and without coordination, engaged in a pattern of crimes listed as RICO predicates . . . would not be enough to show that the individuals were members of an enterprise." Id. at 947 n.4. The parallel conduct of a number of "spokes," even through a central "hub," is not a RICO enterprise without more—that is, without a "rim" that connects the spokes.

The Third Circuit's decision in In re Insurance Brokerage Antitrust Litigation, 618 F.3d 300 (3d Cir. 2010), clarifies this requirement. There, the defendant insurance brokers allegedly funneled particular clients to particular groups of insurers in a scheme intended to control prices and improperly curtail competition. RICO associations in fact were allegedly formed by each hub-and-spoke conspiracy surrounding a particular insurance broker. The Third Circuit rejected all but one alleged enterprise. In the deficiently pleaded enterprises, "plaintiff had failed to plead facts plausibly suggesting collaboration among the insurers," meaning the "asserted hub-and-spoke

structures therefore lack a 'unifying rim.'" Id. at 374. Since plaintiff's allegations "[did] not plausibly imply concerted action—as opposed to merely parallel conduct—by the insurers," they "fail[ed] the basic requirement that the components function as a unit, that they be 'put together to form a whole,'" "[e]ven under the relatively undemanding standard of Boyle." Id. (quoting Boyle, 556 U.S. at 945). Were a rimless hub-and-spoke configuration to constitute a RICO enterprise, the Third Circuit opined, "competitors who independently engaged in similar types of transactions with the same firm could be considered associates in a common enterprise," a result that would "contravene Boyle's definition of 'enterprise.'" Id. at 375. In contrast, however, the one hub-and-spoke conspiracy that did have a "rim" was sufficiently alleged to constitute an enterprise. In that group, the broker-hub had also engaged his insurer-spokes in "bid rigging," by which they would submit fraudulent inflated bids to give the appearance of competitive pricing and with the expectation that others would submit such bids for them in return. These "allegations of bid rigging provide the 'rim' to [that] enterprise's hub-and-spoke configuration, satisfying Boyle's requirements" by "plausibly evinc[ing] an expectation of reciprocity and cooperation among the insurers." Id. In re Insurance Brokerage therefore helpfully distinguishes between insufficient, rimless hub-and-spoke formations—such as those made up of competitors engaging in parallel conduct with a common firm—and hub-and-spoke configurations in which the spokes coordinated and cooperated such that an enterprise was formed.

Cases in this Circuit reflect this reasoned distinction. In Cedar Swamp Holdings, the court rejected the plaintiff's allegation that his two asset managers formed a RICO association in fact with each of the organizations and individuals with which they had committed fraudulent transactions because "no participant is alleged to have acted for the benefit of any other participant," the participants "appear to have had no relationship to one another," and "their actions

and involvement in [the asset managers'] schemes appear to have been isolated and independent." 487 F. Supp. 2d at 451. The court expressly rejected the suggestion that these uncoordinated and independent frauds somehow constituted a "smaller 'implementing scheme' that formed part of a single 'master scheme'" without further factual allegations supporting that inference. Id. Similarly, in New York Automobile Insurance Plan v. All Purpose Agency & Brokerage, Inc., No. 97-CV-3164 (KTD), 1998 WL 695869 (S.D.N.Y. Oct. 6, 1998), the court rejected allegations of an association-in-fact enterprise in which insurance broker "hubs" submitted automobile-insurance applications with false information on behalf of a number of insured "spokes" because each insured "committed similar but independent frauds with the aid of the [broker]" and each insured "acted on a particular occasion to benefit himself or herself and not to benefit any other insured." Id. at *6. The court concluded that "[s]uch a series of discontinuous independent frauds is not an 'enterprise.'" Id.

In the distributor-centered conspiracy Abbott proposes, there is no "rim" connecting the pharmacy-spokes. In the scheme as alleged, no "interpersonal relationship" or "common purpose" ties the pharmacies together; they are merely "several individuals" that, "independently and without coordination, engaged in a pattern of crimes listed as RICO predicates." Boyle, 556 U.S. at 946, 947 n.4. Boyle expressly stated that this kind of uncoordinated parallel conduct does not create a RICO enterprise. Abbott's failure to allege any facts showing cooperation or connection is especially fatal since the alleged co-conspirators are, in fact, competitors. The Court could reasonably infer that competitor pharmacies act against the others' interest, not for it, and Abbott alleges no facts showing cooperation, interpersonal connection, or common purpose to rebut this obvious conclusion. For these reasons, Abbott's allegations—as written and as proposed to be amended—fail to state a RICO claim.

## B. Conduct of the Enterprise

To plead a RICO violation, Abbott must allege not only the existence of an enterprise, but also the defendants' engagement in the "conduct" of that enterprise. Cruz, 720 F.3d at 120; see also 18 U.S.C. § 1962(c). Abbott also fails to establish this latter element. The Supreme Court has held that "[i]n order to 'participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in directing those affairs," that is, "one must participate in the operation or management of the enterprise itself." Reves v. Ernst & Young, 507 U.S. 170, 185 (1993); see also United States v. Praddy, 725 F.3d 147, 155 (2d Cir. 2013). RICO liability, therefore, "depends on showing that the defendants conducted or participated in the conduct of the 'enterprise's affairs,' not just their own affairs." Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 163 (2001) (quoting Reves, 507 U.S. at 185) (internal quotation marks omitted). Based on Reves's "operation and management" test, courts have found various actions insufficient to trigger RICO liability. "[S]imply aiding and abetting a violation is not sufficient to trigger liability." United States v. Viola, 35 F.3d 37, 40 (2d Cir. 1994), abrogated on other grounds by Salinas v. United States, 522 U.S. 52 (1997)); see also Goldfine v. Sichenzia, 118 F. Supp. 2d 392, 403 (S.D.N.Y. 2000) ("[T]he mere fact that a defendant may have aided in the alleged scheme to defraud, even if that aid was intentional, does not give rise to liability under § 1962(c)." (emphasis in original)). "Performing tasks necessary or helpful to the enterprise does not itself meet the requirements of § 1962(c)." United Parcel Serv., 2016 WL 4203547, at *4 (citing Viola, 35 F.3d at 41). "Nor is it enough to simply provide goods and services that ultimately benefit the enterprise." U.S. Fire Ins. Co. v. United Limousine Serv., Inc., 303 F. Supp. 2d 432, 451–52 (S.D.N.Y. 2004) (internal quotation marks and citations omitted). And "[a] defendant does not 'direct' an enterprise's affairs under § 1962(c) merely by engaging in wrongful conduct that assists

the enterprise." United Parcel Serv., 2016 WL 4203547, at *4 (quoting Redtail Leasing, Inc. v. Bellezza, No. 95-CV-5191 (JFK), 1997 WL 603496, at *5 (S.D.N.Y. Sept. 30, 1997)).

Abbott alleges no facts from which the Court could reasonably infer that either the distributors or the pharmacies operated or managed the alleged enterprise. Considering the distributors first, the allegations suggest they did nothing more than conduct "just their own affairs." Cedric Kushner, 533 U.S. at 163. In the classic hub-and-spoke scenario, "a common defendant perpetrate[s] various independent frauds, each with the aid of a different co-defendant." Cedar Swamp Holdings, 487 F. Supp. 2d at 450. But here, the "common defendant," the distributor, was not the defendant that perpetuated the fraud with the "aid" of a co-defendant. Instead, the co-defendant pharmacies actually perpetuated the fraud that Abbott alleges, by seeking reimbursement for the sale of a domestic box of test strips while actually distributing an international box. The distributor, supposedly the lynchpin fraudster, is at most a facilitator. But such action falls outside the scope of RICO liability.

The most the Court could infer is that the distributors knowingly aided and abetted the downstream fraud. But that alone is insufficient to establish the "conduct" prong of a RICO violation. See Viola, 35 F.3d at 41; United Parcel Serv., 2016 WL 4203547, at *4; Goldfine, 118 F. Supp. 2d at 403. Equally insufficient is the distributors' providing the international test strips to the pharmacies, without further allegations showing how doing so constituted directing the enterprise. U.S. Fire Ins. Co., 303 F. Supp. 2d at 451–52. This is the case even if the distributors' actions themselves—selling international test strips within the United States—are ultimately found to be infringements on Abbott's trademarks. United Parcel Serv., 2016 WL 4203547, at *4 ("A defendant does not 'direct' an enterprise's affairs under § 1962(c) merely by engaging in wrongful conduct that assists the enterprise.").

The decision in United Parcel Service, is instructive. There, United Parcel Service ("UPS") was alleged to have knowingly facilitated illegal cigarette trafficking by knowingly and intentionally delivering tens of thousands of contraband cigarettes. Like here, plaintiffs there "assert[ed] that the predicate . . . violations underlying their RICO claims could not have happened without UPS's participation and therefore . . . they have presented evidence of the highest possible level of operation or management over the cigarette-dealer enterprises." United Parcel Serv., 2016 WL 4203547, at *6 (internal quotation marks omitted). But the court found that "plaintiffs have offered no evidence to support a reasonable inference that UPS offered anything other than ordinary business services (even if illegal under the circumstances) to its customer." Id. Here, Abbott has failed to allege facts suggesting that the distributors offered anything other than ordinary wholesale-distributor services, even if doing so may have violated the Lanham Act under the circumstances. Abbott's only allegation concerning the distributors—that they sold international test strips within the United States in violation of the Lanham Act—is insufficient to allege that they operated and managed a RICO enterprise formed to procure fraudulent insurance reimbursements.

Abbott's allegations against the pharmacies are also insufficient to establish the "conduct" element. Unlike the distributors, the pharmacies are alleged to have themselves requested fraudulent reimbursements. But "engag[ing] in predicate offenses in furtherance of the defendants' own affairs or purposes, as opposed to the affairs or purposes of their common 'enterprise,'" fails to meet the requirements of RICO, Gross, 628 F. Supp. 2d at 498. Defendants must have "conducted or participated in the conduct of the enterprise's affairs,' not just their own affairs." Cedric Kushner Promotions, 533 U.S. at 163. Without allegations showing the cooperation or coordination of the pharmacies with each other or with any distributor, "the alleged

scheme Plaintiffs portray suggests individual acts . . . by each of the [defendants] . . . each in furtherance of his or her own affairs rather than the affairs of the enterprise Plaintiffs allege." Gross, 628 F. Supp. 2d at 499 (dismissing RICO claim where plaintiffs alleged three corporate managers, the so-called "Management Defendants," formed an enterprise to loot the corporation because "Plaintiffs' factual allegations demonstrate that the Management Defendants were participating in or conducting their own affairs rather than the affairs of an illegal enterprise constituted of the Management Defendants as Plaintiffs defined it"). Indeed, as mentioned above, without allegations showing how the pharmacies acted for the benefit of an organization, not merely themselves, Abbott cannot overcome the obvious inference that these entities were competitors, not collaborators. Even assuming the truth of Abbott's conclusory allegations that the pharmacies and defendants "have a long-standing relationship," no factual allegations suggest that that relationship was other than an arm's-length business relationship between a buyer and a seller. Courts reject such RICO allegations, in which the conduct alleged was taken only for the defendants' benefit, not a separate enterprise's. See, e.g., In re Gen. Motors LLC Ignition Switch Litig., No. 14-MC-2543 (JMF), 2016 WL 3920353, at *13 (S.D.N.Y. July 15, 2016) (rejecting RICO allegations where plaintiff "failed to distinguish this association of entities from the typical and ordinary participants who act separately for the purpose of distributing any product"); In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Products Liab. Litig., 826 F. Supp. 2d 1180, 1202–03 (C.D. Cal. 2011) (finding RICO allegations insufficient where "Plaintiffs merely allege that the Defendants are associated in a manner directly related to their own primary business activities" even though plaintiffs alleged that this "primary business activity . . . was conducted fraudulently"); Kaczmarek v. Int'l Bus. Machines Corp., 30 F. Supp. 2d 626, 630 (S.D.N.Y. 1998) ("Plaintiffs do not describe the role, if any, of IBM in the operation

or management of this Enterprise. IBM was simply conducting its own 'affairs' in distributing its product.").

A recent Seventh Circuit case rejected a RICO claim for this reason based on similar facts—indeed, facts far more suggestive of parties' conducting the affairs of an enterprise than exist in this case. In United Food and Commercial Workers Union and Employers Midwest Health Benefits Fund v. Walgreen Co., plaintiff (the "Fund") alleged that defendant Walgreens had exploited a disparity between the insurance reimbursement formulas for different dosage forms of two drugs by filling all prescriptions written for one form with the more profitable alternative form, without physician approval. 719 F.3d 849, 852 (7th Cir. 2013). Walgreens allegedly acted at the urging of defendant Par Pharmaceuticals, which manufactured the more profitable dosage forms of the two drugs. Id. at 851. The Fund alleged that Walgreens and Par conducted an association-in-fact RICO enterprise for the purpose of overcharging insurers by switching dosage forms. Id. at 853. The Seventh Circuit affirmed the district court's dismissal of the RICO claim for failure to allege that Walgreens and Par conducted the affairs of an enterprise. Id. The Seventh Circuit held that "nothing in the complaint reveals how one might infer that these communications or actions were undertaken on behalf of the enterprise as opposed to on behalf of Walgreens and Par in their individual capacities, to advance their individual self-interests." Id. at 854.

The Seventh Circuit reached this conclusion despite alleged interactions between Par and Walgreens far more substantial than Abbott alleges here. As the court put it, "Walgreens and Par were not strangers." Id. at 855. In addition to manufacturing the expensive dosage form, Par pitched the profitable drug-switching scheme to Walgreens and other pharmacies. Id. at 851. There were "various communications between Par and Walgreens in which Par proposed the drug-switching program and Walgreens agreed to implement it . . . [by] rigg[ing] its internal computer

18

systems automatically to switch all . . . prescriptions to the expensive dosage forms." Id. at 854. "Representatives from the companies regularly communicated with one another," and Walgreens purchased the expensive dosage form from Par. Id. But these allegations, the court held, "show[ed] only that the defendants had a commercial relationship, not that they had joined together to create a distinct entity." Id. The Seventh Circuit noted the absence of other, potentially sufficient allegations—allegations similarly absent from Abbott's complaint. "The complaint does not allege, for instance, that officials from either company involved themselves in the affairs of the other" or "that profits from the illegal drug-switching scheme were siphoned off to the [alleged] enterprise or to individual enterprise members." Id. at 855. Since the complaint did not plausibly establish that "Walgreens and Par were acting in concert on behalf of a shadow enterprise while maintaining the outward appearance of a normal commercial relationship," the Seventh Circuit affirmed the dismissal of the RICO claim. Id.

In reaching this conclusion, the Seventh Circuit rejected a number of arguments Abbott raises here. First, the fact that the conduct alleged was fraudulent or infringing does not mean it was the activity of a RICO enterprise. See id. ("A corporation . . . is perfectly capable of breaking the law on its own behalf . . . . RICO does not penalize parallel, uncoordinated fraud."). Second, defendants do not conduct the affairs of an enterprise just because "neither company could have implemented the [alleged] scheme without the other" unless "the defendants could not have achieved their [fraudulent] goals . . . without cooperation that fell outside the bounds of the parties' normal commercial relationships." Id. at 856. Here as in Walgreen, "[t]he allegations in the complaint do not indicate how the cooperation in this case exceeded that inherent in every commercial transaction between a drug [distributor or importer] and pharmacy." Id. The only cooperation alleged—distributors distribute and pharmacies dispense—"describes virtually every

prescription pharmaceutical distribution chain." Id. These conclusions apply with equal force to the allegations here.[2]

The Court therefore concludes that Abbott fails to allege that the defendants engaged in the conduct of an enterprise, not simply their own affairs, and accordingly fails to state a RICO claim.

## II. RICO Conspiracy

Defendants argue that, since Abbott's RICO claim fails, so must its RICO conspiracy claim. The Court agrees.

Section 1962(d) of Title 18 makes it "unlawful for any person to conspire to violate any of the [substantive RICO provisions]." A RICO "conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense." Salinas v. United States, 522 U.S. 52, 65 (1997); see also Crawford v. Franklin Credit Mgmt. Corp., 758 F.3d 473, 487 (2d Cir. 2014) ("To establish a violation of § 1962(d), a plaintiff must show that the defendant agreed with at least one other entity to commit a substantive RICO offense."). "In the civil context, a plaintiff must allege that the defendant 'knew about and agreed to facilitate the scheme.'" Baisch v. Gallina, 346 F.3d 366, 376–77 (2d Cir. 2003) (quoting Salinas, 522 U.S. at 65).

Abbott's RICO conspiracy claim fails first because its underlying RICO claims are deficient. The facts as alleged do not "satisfy all of the elements of a substantive criminal [RICO]

---

[2] Although Walgreens is not binding on this Court, it is considerably persuasive given its factual similarities, and it has been relied upon by, and in, the Second Circuit. See D. Penguin Bros. v. City Nat. Bank, 587 F. App'x 663, 664 (2d Cir. 2014); United Parcel Serv., 2016 WL 4203547. Its reasoning is also reflected in numerous cases within this Circuit. See, e.g., In re Gen. Motors LLC Ignition Switch Litig., 2016 WL 3920353 (S.D.N.Y. July 15, 2016); Kaczmarek, 30 F. Supp. 2d 626 (S.D.N.Y. 1998).

offense." Salinas, 552 U.S. at 65. As discussed above, Abbott fails to allege that a RICO enterprise existed and that defendants committed the conduct of that enterprise. Because of these deficiencies, an agreement to commit the acts alleged would not constitute a RICO conspiracy. See BWP Media USA Inc., 69 F. Supp. 3d at 363 ("Where a complaint does not adequately plead a substantive RICO violation, the conspiracy claim under § 1962(d) also fails." (citing First Capital, 385 F.3d at 182 (holding that RICO conspiracy claims are properly dismissed where substantive RICO violations are inadequately alleged))). Abbott's RICO conspiracy claim is therefore properly dismissed.

Abbott's RICO conspiracy claim also fails for a second reason: Abbott has made no nonconclusory allegations about an agreement. Abbott must "demonstrate that each defendant 'knew about and agreed to facilitate' a pattern of racketeering activity." Cont'l Petroleum Corp., 2012 WL 1231775, at *8 (quoting Baisch, 346 F.3d at 377). This standard requires Abbott to allege "as to each alleged co-conspirator: (1) an agreement to join the conspiracy; (2) the acts of each co-conspirator in furtherance of the conspiracy; (3) that the co-conspirator knowingly participated in the same." Id. (quoting Nasik Breeding, 165 F. Supp. 2d at 541). Indeed "[b]ecause the core of a RICO civil conspiracy is an agreement to commit predicate acts, a RICO civil conspiracy complaint, at the very least, must allege specifically such an agreement." Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 25 (2d Cir. 1990). Abbott has failed to do so here. Instead, Abbott includes only conclusory allegations that defendants knew, agreed, or conspired to commit the predicate acts of fraud. (See, e.g., Second Am. Compl. ¶¶ 393 ("Each Defendant . . . conspired with others to further the scheme."), 619 ("Each Defendant . . . agreed and conspired to violate 18 U.S.C. § 1962(c) . . . .").) Such conclusory allegations of knowledge and agreement are insufficient. See, e.g., Wood, 2015 WL 1396437, at *10 (rejecting RICO conspiracy claim

where "Plaintiffs have alleged no facts to show specifically that Defendants had any 'meeting of the minds' with respect to the alleged violations or otherwise violating the law"); Nasik Breeding, 165 F. Supp. 2d at 541 (dismissing RICO conspiracy claim because plaintiff's pleadings were "devoid of factual assertions concerning the existence and nature of an agreement and unspecific as to the participants therein"); NCA Holding Corp. v. Ernestus, No. 97-CV-1372 (LMM), 1998 WL 229510, at *3 (S.D.N.Y. May 7, 1998) ("General allegations that the defendants 'conspired' in the scheme do not sufficiently attribute responsibility for fraud to each individual defendant."). Even if Abbott's allegations gave rise to the inference that the defendants knew about the scheme, "mere knowledge of the scheme, even coupled with personal benefit, is not enough to impose liability for a RICO conspiracy." Congregacion de la Mision Provincia de Venezuela v. Curi, 978 F. Supp. 435, 451 (E.D.N.Y. 1997). Abbott's conclusory allegations of an agreement to violate RICO therefore cannot sustain its RICO conspiracy claim.

For these reasons, the RICO conspiracy claim under 18 U.S.C. § 1962(d) is dismissed.

## III.    Fraud, Fraudulent Inducement, and Aiding and Abetting Fraud

Defendants also argue that Abbott's common-law fraud claims are insufficiently pleaded. The Court disagrees.

### A. Fraud

Abbott's three fraud claims all have similar pleading requirements under New York law. "The elements of a fraud cause of action consist of a misrepresentation or a material omission of fact which was false and known to be false by [the] defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or

material omission, and injury." Pasternack v. Lab. Corp. of Am. Holdings, 27 N.Y.3d 817, 827 (2016) (internal quotation marks and citations omitted); see also Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC, 783 F.3d 395, 402 (2d Cir. 2015) (same). "A party has made out a claim of fraudulent inducement if it has pled (i) a material misrepresentation of a presently existing or past fact; (ii) an intent to deceive; (iii) reasonable reliance on the misrepresentation by appellants; and (iv) resulting damages." Ipcon Collections LLC v. Costco Wholesale Corp., 698 F.3d 58, 62 (2d Cir. 2012) (citing Ross v. Louise Wise Servs., Inc., 868 N.E.2d 189 (N.Y. 2007)).

Federal Rule of Civil Procedure 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." In general, "[t]o satisfy this Rule, a complaint alleging fraud must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." United States ex rel. Ladas v. Exelis, Inc., 824 F.3d 16, 26 (2d Cir. 2016) (internal quotation marks and citation omitted). Courts will apply "slightly relaxed pleading standards," however, "where matters are 'peculiarly within the [defendants'] knowledge.'" S.E.C. v. Payton, 97 F. Supp. 3d 558, 564 (S.D.N.Y. 2015) (quoting Segal v. Gordon, 467 F.2d 602, 608 (2d Cir. 1972)). Abbott's fraud allegations are sufficient. Abbott alleges that the pharmacies knowingly and materially misrepresent the type of test-strip box they distribute, intending the insurance company and Abbott to rely on that misrepresentation, justifiably and to their injury. See Pasternack, 27 N.Y.3d at 827; Ipcon Collections LLC, 698 F.3d at 62.

Although defendants argue that Abbott fails to specify precisely when any particular fraudulent reimbursement requests were made, such identifications are not required to effect the "salutary purposes" of Rule 9(b)—specifically, the purpose "to provide a defendant with fair notice

of a plaintiff's claim." Exelis, 824 F.3d at 25–26; see also Michaels Bldg. Co. v. Ameritrust Co., N.A., 848 F.2d 674, 680 (6th Cir. 1988) ("Rule 9(b) does not require omniscience; rather, the Rule requires that the circumstances of the fraud be pled with enough specificity to put defendants on notice as to the nature of the claim."). The defendants here have sufficient notice of Abbott's claim. Abbott has alleged the underlying fraudulent scheme with great detail. (See Second Am. Compl. ¶¶ 374–92.) The pricing mechanism for domestic test strips is explained, as is its relation to the overseas pricing. This mechanism explains the motive for the fraudulent scheme. Then Abbott details why fraud is required not merely occasionally, but in a full ninety-five percent of sales. (See id. ¶ 369.) Abbott has therefore (1) specified the fraudulent statements (any reimbursement requests for international test strips); (2) identified the speakers (the pharmacies); (3) stated at least generally where (at the pharmacies) and when (whenever an international test strips was dispersed to an insured patient) the statements were made; and (4) explained in detail why the statements were fraudulent. See Exelis, 824 F.3d at 25–26. Identifying specific reimbursement requests by date and time would add little to defendants' understanding of the claims against them, particularly since Abbott alleges that almost any sale of international test strips in the United States would bring about a fraudulent statement.

### B. Aiding and Abetting

Abbott invokes an aiding and abetting theory to establish liability for the non-pharmacy defendants, the importers and distributors. "To establish liability for aiding and abetting fraud under New York law, the plaintiffs must show (1) the existence of a fraud; (2) the defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission." Krys v. Pigott, 749 F.3d 117, 127 (2d Cir. 2014) (internal quotation marks

and citation omitted); see also In re Woodson, 24 N.Y.S.3d 706, 707–08 (App. Div. 2016) (same). Abbott alleged that the defendants who are not pharmacies import or distribute the international test strips to the pharmacies, allegedly knowing that those test strips could not be sold without a material misrepresentation. See Krys, 749 F.3d at 127; see also Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.").

Abbott therefore sufficiently states claims for common-law fraud and aiding and abetting fraud under New York law. Defendants' motions to dismiss Abbott's fraud claims are therefore denied.

## IV.     Unjust Enrichment

Defendants argue that Abbott's unjust-enrichment claim is insufficiently pleaded and duplicative of the fraud claims. In order to plead an unjust-enrichment claim under New York law, a plaintiff must allege "that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." Georgia Malone & Co. v. Rieder, 19 N.Y.3d 511, 516 (2012); see also Bigio v. Coca-Cola Co., 675 F.3d 163, 176–77 (2d Cir. 2012) (same). The New York Court of Appeals has made clear, however, that "unjust enrichment is not a catchall cause of action to be used when others fail." Corsello v. Verizon New York, Inc., 18 N.Y.3d 777, 790 (2012). Instead, "[i]t is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff. . . . An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim." Id.

Here, Abbott's unjust-enrichment claim duplicates its fraud claims. This is not the "unusual situation" where the defendant "has not . . . committed a recognized tort." Corsello, 18 N.Y.3d at 790. Therefore, "an unjust enrichment claim is not available" because it is based on the same facts as, and therefore "simply duplicates," Abbott's fraud claims. Id.; see Weisblum v. Prophase Labs, Inc., 88 F. Supp. 3d 283, 297 (S.D.N.Y. 2015) (dismissing unjust-enrichment claim as duplicative of tort claims, including fraud); Allstate Ins. Co. v. Nazarov, No. 11-CV-6187 (PKC) (VMS), 2015 WL 5774459, at *16 (E.D.N.Y. Sept. 30, 2015) ("Plaintiffs' unjust enrichment claims are based on the same facts as, and thus duplicate, Plaintiffs' claims for common law fraud. Following Corsello, the unjust enrichment claims are therefore unavailable to Plaintiffs."). This claim is accordingly dismissed.

## V.    Importation

Abbott also brings claims against all defendants for importing goods bearing infringing marks in violation of 15 U.S.C. § 1124. (See Second Am. Compl. ¶¶ 623–25.) Section 42 of the Lanham Act, 15 U.S.C. § 1124, provides that "no article of imported merchandise . . . which shall copy or simulate a trademark registered in accordance with the provisions of this chapter or shall bear a name or mark calculated to induce the public to believe that the article is manufactured in the United States . . . shall be admitted to entry at any customhouse of the United States." Defendants Absolute Freight Services (and Luis Soto, its principal), H&H (and Howard Goldman, its principal), and Lori Goldman move to dismiss this claim. (See Lori Goldman Mem. at 8–9; H&H Mem. at 12; Absolute Freight Services Mem. at 11–12.) For the following reasons, these motions are denied.

First, H&H argues that Abbott alleges only that H&H obtained test strips domestically. (See H&H Mem. at 14; H&H Reply at 8.) This is incorrect. Although the complaint does identify domestic transactions by H&H, (see Second Am. Compl. ¶¶ 422, 430, 436–39), it also identifies foreign entities from which H&H received international test strips, (see id. ¶¶ 477, 480). Abbott therefore sufficiently alleges that H&H imported international test strips.[3]

Second, both Lori Goldman and Absolute Freight Services argue that importing international test strips does not violate § 1124 because the international test strips are genuine goods. (See Lori Goldman Mem. at 11–12; Absolute Freight Mem. at 12; Absolute Freight Reply at 4–5.) But as the Court explained in detail in its memorandum and order granting the first preliminary injunction, (see D.E. # 131 ("First Preliminary Injunction M&O") at 8–15), "goods are not genuine if they do not conform to the trademark holder's quality control standards, . . . or if they differ materially from the product authorized by the trademark holder for sale." Zino Davidoff SA v. CVS Corp., 571 F.3d 238, 243 (2d Cir. 2009). Here, the parties argue this point in terms of whether a so-called Katzel situation is present, citing A. Bourjois & Co. v. Katzel, 260 U.S. 689 (1923), an early case suggesting that in some circumstances an otherwise "genuine" good could support a trademark-infringement action. (See Abbott Mem. at 22–23; Absolute Freight Mem. at 12; Absolute Freight Reply at 4–5.) The Second Circuit has held, in a case with closely analogous facts, that importing materially different goods not intended for sale in the United States constitutes such a "Katzel situation" in which "even though the goods do bear [plaintiff's] trademark and were manufactured [by plaintiff], they are not 'genuine' goods because they differ

---

[3] Abbott also argues that conspiring to import international test strips is sufficient. (See Abbott Mem. at 21–22.) Since Abbott does allege purchases by H&H from international entities, however, the Court need not reach this alternative argument. Additionally, Lori Goldman argues that she herself did not import infringing goods. (See Lori Goldman Mem. at 11.) The Court addresses Lori Goldman's liability for H&H's alleged infringing activity below, when addressing her motion to dismiss all of the trademark claims.

from the [domestic product] and were not authorized for sale in the United States," Original Appalachian Artworks, Inc. v. Granada Electronics, Inc., 816 F.2d 68, 73 (2d Cir. 1987). (See also First Preliminary Injunction M&O at 9–12 (citing Original Appalachian Artworks).) Defendants' contention that the goods here are "genuine," already rejected by the Court in the context of the preliminary injunction, is without merit with respect to the importation claim.

The motion to dismiss the importation claim under 15 U.S.C. § 1124 is therefore denied.

## VI.    Individual Defendants

Individual defendants Lori Goldman, Brian Mesika, and Luis Soto (together, the "Individual Movants") move to dismiss the entire complaint, including the trademark claims,[4] for failure to state a claim under Rule 12(b)(6). (See Lori Goldman Mem. at 8–9; Medical Discount Services Mem. at 8; Absolute Freight Services Mem. at 11–12.) For the following reasons, the Individual Movants' motion to dismiss the trademark claims is denied.

"In the Second Circuit, it is well-established that 'under the Lanham Act, a corporate officer may be held personally liable for trademark infringement and unfair competition if the officer is a moving, active[,] conscious force [behind the defendant corporation's] infringement.'" Innovation Ventures, LLC v. Ultimate One Distrib. Corp, 176 F. Supp. 3d 137, 155 (E.D.N.Y. 2016) (quoting KatiRoll Co. v. Kati Junction, Inc., 33 F. Supp. 3d 359, 367 (S.D.N.Y. 2014)); see also Bambu Sales, Inc. v. Sultana Crackers, Inc., 683 F. Supp. 899, 913 (E.D.N.Y. 1988). "A corporate officer is considered a 'moving, active, conscious force' behind a company's infringement when the officer 'was either the sole shareholder and employee, and therefore must

---

[4] The trademark claims are Count 1 (Federal Trademark Infringement), Count 2 (Federal Unfair Competition), Count 3 (Common Law Unfair Competition), Count 4 (Federal Trademark Dilution), Count 5 (State Law Trademark Dilution), Count 6 (State Law Deceptive Business Practices), and Count 13 (Contributory Trademark Infringement).

have approved of the infringing act, or a direct participant in the infringing activity.'" Innovation Ventures, LLC, 176 F. Supp. 3d at 155 (quoting Chloe v. Queen Bee of Beverly Hills, LLC, No. 06–CV–3140, 2011 WL 3678802, at *4 (S.D.N.Y. Aug. 19, 2011)).

In addition to liability for their direct infringement, corporate officers may also be liable for their contributory or vicarious infringement. "One infringes contributorily by intentionally inducing or encouraging direct infringement . . . and infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it." Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd., 545 U.S. 913, 930–31 (2005) (citations omitted). "[T]hese doctrines of secondary liability emerged from common law principles and are well established in the law." Id. at 931. Because "the lines between direct infringement, contributory infringement and vicarious liability are not clearly drawn," however, "reasoned analysis of [an infringement claim] necessarily entails consideration of arguments and case law which may also be forwarded under the other labels." Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 435 n.17 (1984). Further, "[w]hile knowledge—either constructive or actual—is a required element of contributory copyright infringement, it is not required to state a claim for vicarious copyright infringement." Premier Fabrics, Inc. v. Woodland Trading Inc., 42 F. Supp. 3d 549, 555 (S.D.N.Y. 2014). But, of course, "[f]or a defendant to be held contributorily or vicariously liable, a direct infringement must have occurred." Matthew Bender & Co. v. W. Pub. Co., 158 F.3d 693, 706 (2d Cir. 1998) (internal quotation marks and citation omitted); see also Faulkner v. Nat'l Geographic Enterprises Inc., 409 F.3d 26, 40 (2d Cir. 2005) ("[T]here can be no contributory infringement absent actual infringement.").

The Court concludes that Abbott's allegations against the Individual Movants are, at a minimum, sufficient to allege their vicarious liability. First, Abbott sufficiently alleges a direct

trademark infringement (indeed, the Court has held that Abbott is likely to succeed on its trademark claims, (see First Preliminary Injunction M&O)). Second, Abbott's allegations that the Individual Movants were officers of infringing corporations as well as conscious, active forces behind the infringement permits the reasonable inference that the Individual Movants profited from that infringement while declining to exercise their authority to stop or limit it. (See, e.g., Second Am. Compl. ¶ 600 ("Each individual Defendant personally benefitted as a result of the additional profits the Defendants reaped as a result of the diversion scheme."). Lori Goldman is allegedly "the marketing manager of H&H" who "exercises control over H&H and is a moving, conscious, active force behind H&H's unlawful conduct." (Id. ¶ 35.) Brian Mesika is allegedly "a principal of Medical Discount Services" who "exercises control over Medical Discount Services and is a moving, conscious, active force behind Medical Discount Services' unlawful conduct." (Id. ¶ 55.) And Luis Soto is allegedly "a principal of Absolute Freight Services" who "exercises control over Absolute Freight Services and is a moving, conscious, active force behind Absolute Freight Services' unlawful conduct," who "provided customs broker services . . . by facilitating the importation of over 100,000 boxes of diverted international FreeStyle test strips into the United States." (Id. ¶¶ 249, 481.) The Court can reasonably infer that these corporate officers profited from, and could have but did not stop, the infringing activity. See, e.g., Live Face on Web, LLC v. Five Boro Mold Specialist Inc., No. 15-CV-4779 (LTS) (SN), 2016 WL 1717218, at *1 (S.D.N.Y. Apr. 28, 2016) (denying motion to dismiss trademark claims against defendant alleged to be "the owner and/or president of [the infringing company]" who had "control of [the company]" because those allegations "support plausible inferences that [the defendant] profited from infringement by [the company], had the right as owner and/or president to stop [the company] from engaging in infringement, and declined to exercise this right"); Broad. Music, Inc. v. Prana

Hosp., Inc., 158 F. Supp. 3d 184, 193 (S.D.N.Y. 2016) (holding vicariously liable the "officers and owners" of the infringing company who "had the right and ability to supervise the persons employed by [the infringing company], and had a direct financial interest in [it]").

Abbott may well demonstrate individual liability through other theories after discovery. Similarly, the Individual Movants may ultimately show that they did not profit from the infringement or did not have the right to stop it. See, e.g., BWP Media USA Inc. v. Polyvore, Inc., No. 13-CV-7867 (RA), 2016 WL 3926450, at *3 (S.D.N.Y. July 15, 2016) (granting summary judgment on vicarious liability after denying motion to dismiss). But at this stage, Abbott's pleadings sufficiently allege at least the vicarious liability of the Individual Movants. The Individual Movants' motion to dismiss the trademark-related claims against them is therefore denied.

With respect to the other claims raised by the Individual Movants, the Court's analysis above applies equally to the Individual Movants as it does to the other defendants.

## CONCLUSION

For the reasons set forth above, the Court dismisses Abbott's RICO claims and the unjust-enrichment claim, but denies the motions to dismiss the fraud, importation, and trademark claims.

SO ORDERED.

Dated: January 4, 2017
     Brooklyn, New York

                        S/ Carol Bagley Amon

                        Carol Bagley Amon
                        United States District Judge