UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————————X

ABBOTT LABORATORIES, *et al.,*

          Plaintiffs,

    - against -

ADELPHIA SUPPLY USA, *et al.,*

          Defendants.

———————————————————————X

**REPORT & RECOMMENDATION**
15 CV 5826 (CBA) (LB)

**BLOOM, United States Magistrate Judge:**

      Plaintiffs, Abbott Laboratories, Abbott Diabetes Care Inc., and Abbott Diabetes Care Sales Corp. (collectively "plaintiffs"), file a Motion for case ending sanctions against H&H Wholesale Services, Inc. (H&H), Howard Goldman, and Lori Goldman (collectively the "H&H defendants"). ECF No. 1521. The Honorable Carol B. Amon referred plaintiffs' motion to me for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b)(1), and the Court held oral argument on February 27, 2019. For the following reasons, it is respectfully recommended that plaintiffs' motion for sanctions should be granted, and the Court should enter a default judgment against H&H Wholesale Services, Inc., Howard Goldman, and Lori Goldman.

## OVERVIEW

This motion presents a cautionary tale about how not to conduct discovery in federal court. Plaintiffs' motion for sanctions is based on the discovery conduct of Howard Goldman, President of H&H; Lori Goldman, Howard Goldman's wife and an H&H employee; Andrew Sweet, H&H's General Manager who was responsible for the original response to the Court's production order; and David Gulas, H&H's 30(b)(6) witness and diabetes test strip buyer.

On October 5, 2015, plaintiffs filed the instant trademark diversion action against hundreds of defendants, including pharmacies, distributors, importers, and online sellers alleging defendants had violated Abbott's rights by selling the international version of Abbott's FreeStyle Diabetes test strips in the United States. ECF No. 1. On January 13, 2017, I held the first of many conferences with the parties to address various discovery issues.[1] On January 17, 2017, I ordered all defendants to "review all formal and informal communications regarding defendants' purchases and sales of International FreeStyle test strips in 2014, including emails, text messages, purchase orders, delivery invoices, and check/wire transfers." ECF No. 925. On January 25, 2017, counsel for H&H wrote to the Court and stated that H&H "has conducted a review of all formal and information [*sic*] communications regarding the purchase and sale of International FreeStyle test strips for the year of 2014 . . . Individual Defendants Howard Goldman and Lori Goldman do not have any responsive documents. As to H&H, there are approximately 6,000 responsive documents[.]" ECF No. 933.

On January 27, 2017, I held a telephone conference. In light of H&H's claim that producing more than one year of responsive documents would be unduly burdensome, I directed H&H to produce only the 2014 documents due to the high number of responsive documents they had

---

[1] The case had originally been assigned to Magistrate Judge Go before being reassigned to me.

identified. ECF No. 963. Only H&H was granted this modification of the Court's order to produce. All other defendants produced responsive documents for the years 2013-2015 by February 10, 2017 as the Court directed.

H&H's production was coordinated by Andrew Sweet, H&H's General Manager, and Jason Yert, H&H's counsel from Kerr, Russell and Webber PLC ("Kerr Russell").[2] On February 10, 2017, defendants produced 314 emails and a separate collection of invoices. Plaintiffs' Memorandum of Law at 10; Declaration of Timothy Waters ("Waters Decl.") ¶¶ 2–3. On March 23, 2017, plaintiffs raised objections to defendants' February 10, 2017 production, including that the documents defendants produced were printed "in hard copy, scanning them all together, and producing them as a single, 1941-page PDF file." ECF No. 1075. On March 24, 2017, the Court ordered defendants to "produce an electronic copy of the 2014 emails (1,941 pages)" including metadata. ECF No. 1080. The H&H defendants electronically produced 4,074 pages of responsive documents on April 5, 2017. Waters Decl. ¶ 2; Declaration of Tal S. Benschar, esq. ("Benschar Decl.") ¶ 9.

On May 25, 2017, plaintiffs commenced a counterfeiting action against the H&H defendants, alleging that defendants were selling International FreeStyle test strips repackaged into counterfeit U.S. boxes. Abbott Laboratories et al v. H&H Wholesales Services, Inc. et al, No. 17-CV-3095, (hereinafter "Abbott II"). The Court entered a seizure order in the new action on May

---

[2] Jason Yert was terminated as counsel for H&H on August 14, 2017. ECF No. 1173. H&H and the Goldman defendants have since terminated and retained new counsel five times in this lawsuit. Fox Rothschild LLP and Kerr Russell were H&H's original counsel on this matter. On June 6, 2017, Alan Levine of Cooley LLP ("Cooley") substituted to replace Fox Rothschild LLP. ECF No. 1131. On August 3, 2017, Cohen & Gresser LLP ("C&G") substituted to replace Cooley. ECF No. 1163. On August 14, 2017, C&G also replaced Kerr Russell. ECF No. 1173. On January 10, 2018, C&G moved to withdraw as counsel, and Milton Springut of Springut Law, P.C. filed a notice of appearance on defendants' behalf. ECF No. 1249. On January 21, 2019, defendants requested a stay of the proceeding so that they could obtain new counsel, and on February 5, 2019, Gottlieb & Janey LLP appeared on behalf of the H&H defendants replacing Springut Law, P.C.

24, 2017 authorizing Abbott to seize, *inter alia*, a copy of H&H's email server. <u>Abbott II</u>, ECF No. 11. Once plaintiffs had seized H&H's email server, plaintiffs had the proverbial smoking gun and raised its concerns anew that defendants had failed to comply with the Court's Order to produce responsive documents in the instant action (hereinafter "<u>Abbott I</u>"). <u>Abbott I</u>, ECF No. 1147; Waters Decl. On July 12, 2017, the Court ordered the H&H defendants to "re-run the document search outlined in the Court's January 17 and January 21 Orders," "produce the documents from the re-run search to Abbott," and to produce "an affidavit of someone with personal knowledge" regarding alleged technical errors that affected the production.[3] ECF No. 1156. Pursuant to the Court's July 12, 2017 Order to re-run the search, The H&H defendants produced 3,569 responsive documents. Waters Decl. ¶¶ 2–3.[4]

## DISCUSSION

### I. The Court's Inherent Power

Plaintiffs move for case ending sanctions under Federal Rule of Civil Procedure 37 and invoke the Court's inherent power to hold defendants in default for perpetrating a fraud upon the Court. Plaintiffs move to strike the H&H defendants' pleadings, to enter a default judgment against them, and for an order directing defendants to pay plaintiffs' attorney's fees and costs, for investigating and litigating defendants' discovery fraud. The Court has the inherent power to "fashion an appropriate sanction for conduct which abuses the judicial process." <u>Chambers v. NASCO, Inc.</u>, 501 U.S. 32, 44–45 (1991). In addition to the Court's inherent power, Rule 37 applies to instances where a party "fails to obey an order to provide or permit discovery." Fed. R.

---

[3] The Court's Order stated that the H&H defendants were to re-run the document search from the January 17 and 21, 2017 Orders; however, the reference to January 21 was an error; the Court's Order was dated January 27, 2017.
[4] On August 21, 2018, Abbott and the H&H defendants stipulated to matters regarding discovery, including that the H&H defendants would "produce for the years 2013 and 2015 all documents concerning International FreeStyle as set forth in the Court's January 17, 2017 and January 27, 2017 Orders." ECF No. 1189.

Civ. P. 37(b)(2). Under Rule 37, plaintiffs' request for sanctions would be limited to my January 17, 2017 and January 27, 2017 Orders which directed defendants to produce documents as set forth therein. Abbott I, ECF Nos. 925, 963. While sanctions under Rule 37 would be proper under these circumstances, defendants' misconduct herein is more egregious and goes well beyond defendants' failure to comply with the Court's January 2017 discovery orders.

> As stated by the Second Circuit:
>
> It would be excessively formalistic to view the defiance of the order in isolation rather than against the background of [plaintiff's] prolonged and vexatious obstruction of discovery . . . through perjurious testimony of its top officials and false representations to the court by its counsel.

Penthouse Int'l v. Playboy Enterprises, 663 F.2d 371, 388 (2d Cir. 1981).

Rather than viewing the H&H defendants' failure to comply with the Court's January 2017 Orders in isolation, plaintiffs' motion is more properly considered in the context of the Court's broader inherent power, because such power "extends to a full range of litigation abuses," most importantly, to fraud upon the court. Chambers, 501 U.S. at 46; see also Skywark v. Isaacson, 1999 WL 1489038, at *14 n. 27 (S.D.N.Y. Oct. 14, 1999), aff'd 2000 WL 145465 (S.D.N.Y. Feb. 9, 2000) (considering defendants' motion "in the more inclusive context of fraud upon the court" because plaintiffs' conduct could not be viewed solely under Rule 37).

## II. Fraud upon the Court [5]

A fraud upon the court occurs where it is established by clear and convincing evidence "that a party has set in motion some unconscionable scheme calculated to interfere with the judicial

---

[5] The Court held oral argument on the instant motion on February 27, 2019. After oral argument, the Court directed the parties to file letters with the Court addressing their positions regarding the need for an evidentiary hearing. However, considering the parties' positions and their voluminous submissions, the Court finds that an evidentiary hearing "could serve no useful function" and would likely "raise problems of privilege that would outweigh any probative value such a hearing could have." Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp., 602 F.2d 1062 n.7 (2d Cir. 1979).

system's ability impartially to adjudicate a matter by . . . unfairly hampering the presentation of the opposing party's claim or defense." New York Credit & Fin. Mgmt. Grp. v. Parson Ctr. Pharmacy, Inc., 432 Fed. Appx. 25 (2d Cir. 2011) (summary order) (quoting Scholastic, Inc. v. Stouffer, 221 F. Supp. 2d 425, 439 (S.D.N.Y. 2002)) (internal quotation marks omitted); McMunn v. Mem'l Sloan–Kettering Cancer Ctr., 191 F. Supp. 2d 440, 445 (S.D.N.Y. 2002); see also Hargrove v. Riley, No. 04 CV 4587, 2007 WL 389003, at *11 (E.D.N.Y. Jan. 31, 2007); Shangold v. Walt Disney Co., No. 03 Civ. 9522, 2006 WL 71672, at *4 (S.D.N.Y. Jan. 12, 2006) (dismissing plaintiff's case with prejudice where plaintiff fabricated evidence and manipulated the judicial process); Intelli–Check, Inc. v. TriCom Card Techs., Inc., No. 03 CV 3706, 2005 WL 3533153, at *11 (E.D.N.Y. Dec. 22, 2005).

The basic tenet of a fraud upon the court is "when a party lies to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process." McMunn, 191 F. Supp. 2d at 445. "[A]n isolated instance of perjury, standing alone, will not constitute a fraud upon the court." Id.; see also Jung v. Neschis, No. 01 Civ. 6993, 2009 WL 762835, at *21 (S.D.N.Y. Mar. 23, 2009); Skywark, 1999 WL 1489038, at *14. "Rather, fraud upon the court 'occurs where a party has acted knowingly in an attempt to hinder the fact finder's fair adjudication of the case and his adversary's defense of the action.'" McMunn, 191 F. Supp. 2d at 445 (quoting Skywark, 1999 WL 1489038, at *14).

A movant claiming fraud upon the court bears the burden of proving the sanctionable conduct by "clear and convincing evidence." Passlogix, Inc. v. 2FA Tech., LLC, 708 F. Supp. 2d 378, 393–94 (S.D.N.Y. 2010). Under this high standard, the Court may only find a fraud upon the court based on evidence that "produce[s] in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and

convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." Blair v. Inside Ed. Prods., 7 F. Supp. 3d 348, 358 (S.D.N.Y. 2014). Thus, the proof must be "highly probable" and "leave[ ] no substantial doubt." Waran v. Christie's Inc., 315 F. Supp. 3d 713, 718–19 (S.D.N.Y. 2018) (quoting Dongguk Univ. v. Yale Univ., 734 F.3d 113, 123 (2d Cir. 2013)).

If it is shown by clear and convincing evidence that a party perpetrated a fraud upon the court, the Court considers the following five factors to determine the appropriate sanction: (i) whether the misconduct was the product of intentional bad faith; (ii) whether and to what extent the misconduct prejudiced the injured party; (iii) whether there is a pattern of misbehavior rather than an isolated instance; (iv) whether and when the misconduct was corrected; and (v) whether further misconduct is likely to occur in the future. See Shangold, 2006 WL 71672, at *4; Intelli– Check, 2005 WL 3533153, at *11; Scholastic, 221 F. Supp. 2d at 444; McMunn, 191 F. Supp. 2d at 461. When faced with a fraud upon the court, "[t]he available sanctions at a court's disposal . . . range from the issuance of a jury charge on falsehoods under oath, to the imposition of attorney's fees occasioned by the conduct in question, and finally to the entry of judgment against the offending party." Skywark, 1999 WL 1489038, at *14 (internal citations omitted).

### a. Defendants' Failure to Comply with the Court's Orders to Produce

The H&H defendants originally represented to the Court that for the year of 2014 there were "approximately 6,000 responsive documents." ECF No. 933. The H&H defendants then clarified at the January 27, 2017 conference that there were "6,000 pages," not 6,000 responsive documents. See defendants' Ex. 10, Tr. of the January 27, 2017 conference. Given this large number, the Court modified its order issued to all defendants and directed the H&H defendants to produce documents only for the year 2014. ECF Nos. 933, 963. However, on February 10, 2017,

the H&H defendants produced 314 documents amounting to 2,034 pages. According to defendants, the original Sweet search produced 1,540 emails (or 3,296 documents including attachments). Defendants' Memorandum of Law at 14. After the seizure order in Abbott II, and after plaintiffs again raised issues regarding defendants' original production, the Court ordered the H&H defendants to re-run the original search. Thereafter, the H&H defendants produced 3,569 documents. Plaintiffs' Memorandum of Law at 8.

Cooley, counsel for H&H at the time, retained the services of an outside vendor Transperfect, to re-run the original search. The H&H defendants filed a declaration from Joseph Pochron, Director in the Forensic Technology and Consulting Division at Transperfect, ("Pochron Decl."), which states that H&H utilized an email archiving system called Barracuda and that there are two types of Barracuda accounts, Administrator and Auditor. Pochron Decl. ¶ 13. Pochron's declaration states that the H&H employee who ran the original search, Andrew Sweet, H&H's general manager, used the Auditor account to run the original search ("Sweet search"). Id. at ¶ 19. When Mr. Pochron replicated the Sweet search using the Auditor account, he obtained 1,540 responsive emails. Id. at ¶ 22. When Mr. Pochron replicated the Sweet search using the Administrator account, he obtained 1,737 responsive emails. Id. Thus, Mr. Pochron attests that 197 messages were not viewable to Mr. Sweet when the original production was made. Id. Plaintiffs state that they have excluded those 197 messages, deemed technical errors, from their instant motion for sanctions. Plaintiffs' Memorandum of Law at 9; Waters Decl. ¶ 8. However, even when those 197 messages are excluded, defendants' numbers do not add up. In fact, H&H has repeatedly given plaintiffs and the Court different numbers that do not add up.

Moreover, plaintiffs argue that the H&H defendants purposely used search terms designed to fail, such as "International" and "FreeStyle," whereas H&H's internal systems used item

8

numbers and other abbreviations such as "INT" and "INTE" for International and "FRL" and "FSL" for FreeStyle. Plaintiff's Memorandum of Law at 10–11. Plaintiffs posit that defendants purposely designed and ran the "extremely limited search" which they knew would fail to capture responsive documents, and still reported that there were 6,000 responsive documents for year 2014 which they used to claim an undue burden to obtain a modification of the Court's Order. Id. at 11.

The H&H defendants argue that their original number of 6,000 documents represented 6,000 pages, which the H&H defendants clarified at a Court conference. Defendants' Memorandum of Law at 20–22. The H&H defendants further explain that the 314 documents/2,034 pages that were produced can be explained by "the elimination of emails from email user accounts of persons who worked for other H&H divisions that do not sell test strips . . . elimination of duplicates; and consolidation of multiple email exchanges into a single email containing the entire chain."[6] Id. Regarding plaintiffs' assertion that defendants designed and used search terms to fail, defendants proffer that their former counsel, Mr. Yert, formulated and directed the use of the search terms. Id. at 15. The H&H defendants state that "any problems with the search terms was the result of H&H's good faith reliance on counsel who . . . decided to use parameters that were less robust than those later used[.]" Id. at 18. The H&H defendants further state that the Sweet search results were limited because of Mr. Yert's incompetence. Id.

From the very start of discovery in this case, the H&H defendants have proffered serial representations to the Court, many of which have been proven to be false. Defendants first represented to the Court that there were 6,000 responsive documents to the Court's discovery orders. Then defendants subsequently represented that the 6,000 documents were actually 6,000

---

[6] Defendants produced 314 documents, amounting to 4,047 pages in April 2017 after the Court ordered them to "produce an electronic copy of the 2014 emails . . . including metadata." ECF No. 1080. Defendants note that the second production of 314 documents is double the pages "because it contains many pages where the entire page was redacted" and omitted from the original production. Benschar Decl. ¶ 9.

pages. However, neither number the H&H defendants proffered makes sense. The original Sweet search produced 1,540 responsive emails which amounted to 3,296 documents. Conspicuously absent is H&H's total page count for the 3,296 documents. However, the H&H defendants state, "the initial number [6,000 pages] Mr. Yert conveyed to the Court was predicated on the *search results* before certain documents were removed." Thus, if the H&H defendants' position were correct, the 1,540 responsive emails (3,296 documents) represented approximately 6,000 pages, but the H&H defendants have offered no plausible explanation for this number.[7] Accordingly, given defendants wholly unsubstantiated serial explanations, the Court finds that the H&H defendants materially misrepresented the number of responsive documents/pages to the Court, which facilitated their objective: the Court's modification of its Order to limit their search for responsive documents. See Penthouse, 663 F.2d at 391 (considering the material misrepresentations by counsel in affirming the entry of default.)

Similarly, the H&H defendants' attempt to lay blame on former counsel regarding the design and use of search terms is equally unavailing. It is undisputed that numerous responsive documents were not produced by the H&H defendants that should have been produced. Defendants' prior counsel conceded as much. See generally plaintiffs' Ex. B, Tr. Of July 11, 2017 telephone conference.

Mr. Yert was asked at his deposition about the terms that H&H used to identify their products and he testified as follows:

Q. Tell me about the general discussions you had with the client in terms of what informed you what search terms you should be using.

---

[7] The H&H defendants assert that separate and apart from the email production, defendants produced invoices totaling 2,094 pages in February 2017, which would amount to approximately 6,000 pages produced in February 2017. Benschar Decl. ¶ 10. However, the H&H defendants memorandum of law makes clear that defendants' original representations to the Court about the page numbers were based on the emails yielded from the search, not invoices. See defendants' memorandum of law at 21; See Yert Dep. 16:11-16:24, June 12, 2018.

A. Those were the terms consistently used by H&H to identify the particular product.

Q. So the client told you that FreeStyle and International are the terms they consistently used to refer to International FreeStyle test strips; is that correct?

A. That's what I recall.

Q. Did the client tell you that they used the abbreviation FSL to refer to FreeStyle?

A. I don't recall.

Q. If they had told you that, you would have included that as a search term, correct?

A. I don't recall if it was or was not included as a search term, sir.

Yert Dep. 30:5-30:20, June 12, 2018.

At Mr. Sweet's deposition, he testified as follows:

Q. Okay. Sitting here today, you would agree with me, would you not, that there were many H&H documents that refer to International FreeStyle by the abbreviation I-N-T without spelling out the word "International"?

A. Only because I've seen how the different searches have been done with -- with an outside company.

Q. Yeah, but in your day-to-day business with H&H, you've certainly seen many emails where the abbreviation I-N-T is used in lieu of the full word "International"; correct?

A. This is kind of misleading, of course I've seen different abbreviations used, but in creating a filter, I was doing what I was directed to do.

Q. Okay. So putting aside what you did with the filter. I'm just asking, in your day-to-day business with H&H, you are aware that H&H routinely uses the abbreviation I-N-T in lieu of the full word "International"; correct?

A. I am aware of that, yes.

Sweet Dep. 81:2-81:24, Mar. 13, 2018.

Mr. Sweet's declaration in opposition to plaintiffs' instant motion ("Sweet Decl."), states that the original search parameters were determined by Mr. Yert and that he "relied on Mr. Yert's expertise as counsel to direct the parameters and methods for a proper search that would fulfill the Court's Order." Sweet Decl. ¶ 3–4.

As will be discussed below, the crux of defendants' arguments throughout their opposition to the instant motion seeks to lay blame on Mr. Yert for their actions; however, defendants cannot absolve themselves of liability here by shifting blame to their former counsel. In Chevron Corp. v. Donzinger, 833 F.3d 74, 149–50 (2d Cir. 2016), defendants argued that they were improperly

11

"punished . . . for their Ecuadorian lawyers' failure to respond to [plaintiff's] discovery demands[.]" It has long been held that a client-principal is "bound by the acts of his lawyer agent." Id. (quoting Link v. Wabash RR. Co., 370 U.S. 626, 634 (1962)).  As the Second Circuit stated, "even innocent clients may not benefit from the fraud of their attorney." Id.

Both parties cite Mr. Yert and Mr. Sweet's conflicting testimony. Despite this conflicting testimony, both sides agree that H&H's search terms were inadequate and failed to capture the documents responsive to the Court's Orders. However, notwithstanding defendants' assertion that the search terms "FreeStyle" and "International" were used in lieu of more comprehensive search terms at the behest of Mr. Yert, it is undisputed that Mr. Sweet, H&H's general manager, knew that H&H used abbreviations for these terms. Mr. Sweet admitted this at his deposition. See Sweet Dep. 81:2-81:24, Mar. 13, 2018. Plaintiff's counsel asked, "[s]o putting aside what you did with the filter. I'm just asking, in your day-to-day business with H&H, you are aware that H&H routinely uses the abbreviation I-N-T in lieu of the full word "International"; correct?" Mr. Sweet answered, "I am aware of that, yes." Id. The Court need not speculate as to why defendants did not use these search terms to comply with defendants' obligation to produce pursuant to the Court's Order. Mr. Sweet, by his own admission, states that "on several occasions he contacted Mr. Yert with specific questions about whether to include certain emails in production." Sweet Decl. ¶ 7. It is inconceivable that H&H's General Manager, who worked closely with Mr. Yert to respond to the Court's Order, never mentioned that spelling out the terms used, "International" and "FreeStyle", would not capture the documents in H&H's email system. Mr. Sweet knew that H&H was required to produce documents regarding International FreeStyle test strips, regardless of whether H&H's documents spelled out or abbreviated the terms. Had plaintiffs not seized H&H's

email server in the counterfeiting action, plaintiffs would have never known that defendants failed to produce a trove of responsive documents. H&H would have gotten away with it.

Accordingly, the Court finds that H&H's original misrepresentations to the Court and use of search terms that were designed to fail are just the first evidence of defendants' bad faith. H&H's failure to produce responsive documents in accordance with the January 2017 Court Orders is in and of itself sanctionable conduct. Standing alone, misrepresentations to the Court and the designed to fail search terms would not warrant case ending sanctions; however, as enumerated below, this conduct is but one brush stroke in the composition of discovery abuses that has colored this litigation. Moreover, plaintiffs would have never discovered the extent of defendants' withheld documents and defendants' fraud upon the court but for the seizure order entered in the subsequent counterfeiting case.

**b. Documents H&H Withheld from the February 10, 2017 Production**

*Holland Trading, Howard Goldman, and Lori Goldman Documents*

Plaintiffs allege that defendants withheld all documents regarding Holland Trading, a Dutch company, revealing that "at the time the H&H defendants were collecting and reviewing documents, they were buying and selling tens of thousands of boxes of International FreeStyle test strips that had been repackaged into counterfeit U.S. retail packaging."[8] Plaintiffs' Memorandum of Law at 17. H&H purchased test strips from Holland Trading beginning in November 2016 and stopped when plaintiffs filed their counterfeit action in May 2017. Id. Moreover, plaintiffs state that the H&H defendants negotiated purchases of International FreeStyle test strips from Holland Trading in 2013 and 2014 and emails were exchanged with Holland Trading concerning International FreeStyle test strips in 2014. Id. at 19. The 2014 Holland Trading documents should

---

[8] The H&H defendants deny that they knew they were buying counterfeits. That is the central issue in Abbott II.

have been produced in response to the January 27, 2017 Order. Plaintiffs posit that the H&H defendants intentionally withheld all documents concerning Holland Trading from the February production. Id. Plaintiffs cite to Exhibit Z and AA as examples of withheld Holland Trading documents.[9]

Perhaps even more troubling than the removal of all the Holland Trading documents was defendants' failure to produce a single document that referenced Howard Goldman, owner and president of H&H. Plaintiffs allege that defendants intentionally withheld "[e]very document referring to Howard Goldman." Plaintiffs' Memorandum of Law at 11. Mr. Sweet testified that he wouldn't have removed Howard Goldman documents as nonresponsive. Sweet Dep. 98:3-108:10, Mar. 13, 2018. Mr. Yert testified that all of the documents Mr. Sweet provided were produced. Yert Dep. 47:8-48:23, June 12, 2018. Plaintiffs argue that the only explanation for defendants' failure to produce any Howard Goldman documents is that the H&H defendants "intentionally removed, by hand, every single document referencing Howard Goldman." Plaintiffs' Memorandum of Law at 12.

Like the Holland Trading and Howard Goldman documents, plaintiffs allege that the H&H defendants removed all responsive documents concerning Lori Goldman. No documents concerning or referencing Lori Goldman were produced in the February 10, 2017 production. Both Lori Goldman and Howard Goldman's declarations deny Lori Goldman's involvement with H&H's business regarding diabetic test strips and stated that Lori Goldman "is not involved in and does not direct or control any of the business activities of H&H." ECF Nos. 50, 51.[10] Nonetheless,

---

[9] Exhibit Z contains emails between David Gulas and a representative from Holland Trading; Exhibit AA is an H&H purchase order from the Holland Trading Group.

[10] Lori Goldman states in her declaration "I am not involved in [H&H's] day to day operations and have no involvement in its buying and selling of diabetic test strips. I am more a stay at home mom who is active with my family, the PTA, etc." ECF No. 51.

when defendants reran the search pursuant to the Court's July 12, 2017 Order, there were 16 responsive documents referencing Lori Goldman, such as emails with suppliers and an offer forwarded to Mr. Sweet concerning International FreeStyle test strips that Howard Goldman had received. Plaintiffs' Memorandum of Law at 23; plaintiffs' Ex. AK; Ex. AL. The documents in the reproduction prompted plaintiffs to move for the production of additional emails from Ms. Goldman's H&H account in the counterfeiting action. Id.; Abbott II, ECF No. 104. The H&H defendants were ordered to produce emails from Ms. Goldman's account from "2014 through 2015[.]" Abbott II, April 27, 2018 Order. According to plaintiffs, in response to the Court's Order, the H&H defendants produced 6,291 documents from Ms. Goldman's account. Id.

The H&H defendants contend that the missing Holland Trading, Howard Goldman, and Lori Goldman documents were either removed from the production by Mr. Sweet at the direction of Mr. Yert, were not in Mr. Sweet's original search results, or were not within the scope of the Court's discovery Order. The H&H defendants maintain that Ms. Goldman's involvement in H&H's business activities was limited and that Ms. Goldman's emails do not evidence fraud by H&H. Defendants' Memorandum of Law at 44–52.

The H&H defendants intentionally withheld all documents concerning Holland Trading, Howard Goldman, and Lori Goldman from their original production. Decisions in several cases by Courts within this circuit, namely Penthouse, McMunn, and Cerruti, are instructive here. In Penthouse, the Second Circuit affirmed dismissal of a libel suit where plaintiff failed to produce financial records relevant to the case. Penthouse, 663 F.2d at 391. Although the district court held those records were relevant and thus should have been produced, plaintiff produced only part of the records and refused to turn over the balance of its financial statements. Id. at 383. Defendant moved for Rule 37(b) sanctions, including dismissal of the action, based on plaintiff's failure to

comply with the Court's production order. The Second Circuit observed that the district court "exercised enormous patience and conscientiousness" before imposing the sanction of dismissal. Id. at 391. The Second Circuit stated:

> The financial records which Penthouse refused to furnish were relevant. Its defiance of the order climaxed a sordid pattern of prolonged and vexatious obstruction of legitimate discovery sought by Playboy, in which false testimony, material misrepresentations by [counsel] and foot-dragging were used in an effort to prevent Playboy from getting at Penthouse records that were relevant to the central issue in this case, which was whether Penthouse suffered any [pecuniary] damages...

Id. at 391.

 "Where justified . . . the imposition of sanctions for discovery abuse is essential to the sound administration of justice." Id. at 392. Thus, the Second Circuit affirmed the entry of default in Penthouse where there was an abundance of evidence that plaintiff disobeyed an "order to produce in full all of [their] financial statements," engaged in "prolonged and vexatious obstruction of discovery with respect to closely related and highly relevant records," gave "false testimony and representations that [financial records] did not exist," and provided the data only when "the scent had become too fresh and the trail too hot to risk further non-compliance." Id. at 376–90.

In McMunn, a terminated employee brought an ADA claim against her former employer. McMunn, 191 F. Supp. 2d at 440. The Court found that plaintiff lied during her deposition which led to the spoliation of potentially critical evidence, repeatedly lied and mislead defendants to prevent depositions of key witnesses, edited audio recordings of telephone conversations she had with various employees following her termination to strengthen her case, and engaged in a sham sale of her apartment in order to unfairly bolster her claim that her termination left her destitute and in extreme emotional distress. Id. at 446–60. The Court found that plaintiff's actions were intentional and done in bad faith, prejudiced defendants by impeding their ability to obtain relevant discovery, and constituted a pattern of misbehavior that would certainly continue and "nullify the

chance for a fair adjudication of the merits of her claim." Id. at 461–62.  Accordingly, the Court found that the harshest sanction, dismissal of the action with prejudice was appropriate. Id.

Similarly, in Cerruti 1881 S.A. v. Cerruti, Inc., 169 F.R.D. 573 (S.D.N.Y. 1996), plaintiffs moved to strike defendants' answer and counterclaims based on defendants' use of fabricated documents and false testimony to "establish their factual position in this lawsuit." Id. at 574. Plaintiffs relied upon "hard-copy printouts of sales records kept on computer disk[s]," which contained several inaccuracies that were the subject of inconsistent testimony by defendants' principal, who claimed that the inaccuracies related to a "computer disk error" in transferring the records from the computer hard drive to a removable hard disk. Id. at 576–78. The court appointed an expert who examined the hard disk and the source computer. Id. at 582. The expert found that random numbers were manually inserted into the data in the hard disk and that despite defendants' 14,000 records, defendants produced 2,622 separate records. The court concluded that the records were fabricated, defendants' principal's testimony was designed to prevent the detection of the fabrication, and the random numbers were designed to prevent an accurate survey of customers. Id. The Court held that given the extreme and repeated abuses, proven lies, defective and fabricated records, entry of judgment for plaintiffs was warranted. Id. at 853–584.

In the instant action, defendants attempt to minimize their part in failing to produce the Holland Trading, Howard Goldman, and Lori Goldman documents. According to defendants, the cited Holland Trading documents were not within the Sweet search directed by Mr. Yert (plaintiffs' Exs. Z Bate Nos. HHW000000025-29, AA) or were removed by Mr. Sweet per Mr. Yert's instructions (plaintiffs' Ex. Z Bate Nos. HHW000005274, HHW000005588).[11] Defendants' Memorandum of Law at 26–27.

---

[11] The H&H defendants, in what seems to be a last-ditch effort, assert that they were not required to produce the Holland trading documents because the discovery order required H&H to produce "communications regarding the

Plaintiffs proffer seven Howard Goldman emails that were withheld. See plaintiffs' Exs. N, O, P, Q, V, W, X.  Defendants, again, seek to minimize their failure to produce the emails through Mr. Sweet's declaration. The H&H Defendants allege that plaintiffs' exhibits O, P, Q, V reflect "emails from David Gulas to Howard Goldman discussing business goals for coming months" which Mr. Sweet removed from the production (Sweet Decl. ¶ 10); exhibit N reflects an offer that H&H never followed up on and thus Mr. Sweet removed the document from the production per Mr. Yert's instructions (Sweet Decl. ¶ 9); and exhibits W and X were not within the search results and thus were not produced.

Likewise, no Lori Goldman documents were produced pursuant to the Court's Order despite 16 documents in the reproduction, and 6,291 total emails from Ms. Goldman's H&H email account from 2014-2015. The H&H defendants try to paint Ms. Goldman as a housewife who dropped in and out of the office with little to no responsibilities within the company. However, the record suggests otherwise.[12] While many of the Lori Goldman emails do not specifically involve the buying and selling of diabetic test strips, other emails do and should have been produced in defendants' original production. See plaintiffs' Exs. AK, AL. The H&H defendants, however, through Mr. Sweet's declaration assert that Exhibit AK (an email to Lori Goldman about open unpaid invoices of FreeStyle strips) was not captured in the original Sweet search results, and Exhibit AL (an email to Ms. Goldman from a representative of Veenak International regarding an offer for test strips that the representative wanted to make sure Mr. Goldman saw) represents an

---

purchase and sale of International FreeStyle Test Strips for the year of 2014." Id. at 38. According to the H&H defendants, the Holland Trading documents in 2014 concerned a transaction that was not consummated. Id. Lastly, the H&H defendants argue that Mr. Yert's instructions regarding the Court's Order was privileged and could not be revealed "until the Court's Order on the Crime-fraud motion[.]" Id.  at 26.

[12] See plaintiffs' Exs. AK, AL, AO, AP, AQ, AT, AU, AW, AV

offer from a company that H&H never did business with and was removed by Mr. Sweet. Defendants' Memorandum of Law at 50.[13]

The Court first notes that defendants were ordered to produce "all formal and informal communications regarding defendants' purchases and sales of International FreeStyle test strips in 2014, including emails, text messages, purchase orders, delivery invoices, and check/wire transfers." ECF No. 963. The Court's Order did not specify that the purchases or sales must have been consummated as defendants suggest. Even if the Court credits defendants' position that it understood the Court's Order to be limited to completed sales, defendants contradict their own position by producing incomplete purchases and sales. See plaintiffs' Ex. BQ. In so far as defendants argue that they believed the Court's Order limited what needed to be produced to actual purchases or sales, their argument is belied by their own production. See Ford v. ABC, 101 F.R.D. 664, 666–668 (S.D.N.Y. 1983) (the court rejected plaintiff's position that he withheld the documents because he believed they were not responsive where the evidence contradicted plaintiff).

Moreover, the H&H defendants' account of the withheld Holland Trading, Howard Goldman, and Lori Goldman documents, again, attempts to shift the blame to Mr. Yert for their failure to produce Court ordered discovery. As discussed *supra*, defendants cannot absolve themselves of their failure to produce by blaming their former counsel. See Chevron 833 F.3d at 149–50. While defendants' effort to shift blame to Mr. Yert is unconvincing at best, even if defendants' effort could be credited, counsel's actions, even if they were found to be negligent,

---

[13] The H&H defendants make much of plaintiffs' failure to move for summary judgment against Ms. Goldman; however, plaintiff's decision not to move for summary judgment against Lori Goldman has no bearing on plaintiffs' instant motion regarding fraud upon the court. Plaintiffs' instant motion requires a different showing than the motion for summary judgment; specifically, that there is clear and convincing evidence of a scheme calculated to interfere with the judicial process. Scholastic, 221 F. Supp. 2d at 439. Ms. Goldman need not be the moving force to be part of the scheme.

would not shield the H&H defendants from responsibility for their bad faith conduct. In Penthouse,

while recognizing that counsel's actions may have been grossly negligent, the Court upheld the

District Court's dismissal of the action and stated:

> [I]t is questionable whether [counsel for plaintiffs] intentionally . . . misrepresented
> to the court material facts with respect to the existence of the relevant . . . records. It
> is conceivable that [counsel] was misled by his client. However, the record does
> support . . . [the] finding that [counsel] . . . was grossly negligent in not pursuing
> the matter more diligently to ascertain the facts from his client.

Penthouse 663 F.2d at 388.

See also McMunn, 191 F. Supp. 2d at 451 (finding plaintiff's attempts to blame her former

attorney "unavailing . . . as she is held accountable for the acts or omissions of her freely-chosen

attorney."). Furthermore, the H&H defendants never objected to production of these documents

on the basis of any privilege. The H&H defendants' entirely new attorney-client privilege

argument falls flat based on the record. The H&H defendants consistently proffered that no

documents were intentionally withheld. At the July 11, 2017 conference, defendants' former

counsel stated:

> We [Cooley LLP] have in the days that we've been looking into this not seen
> evidence of deliberate withholding. What we have seen is a variety of ways in
> which the collection process left gaps and I can't tell the Court definitively one way
> or the other exactly what all those gaps are because we're still doing it and I don't
> want to represent something that's wrong but there were domain names that were
> not properly searched because they were stored as old domain names. Whether that
> explains the large gaps completely, I can't tell you but I have not seen any evidence
> of somebody excluding something.

Plaintiffs' Ex. A (Tr. Of July 11, 2017 conference) at 66:24-67:11.

Moreover, C&G, the H&H defendants' next counsel, conducted their own internal

investigation and found that outside of documents not provided due to technical errors (197

documents), no documents were intentionally withheld. See plaintiffs' Ex. BP. Even more

damning is Mr. Yert's deposition testimony, which is consistent with the positions proffered by

Cooley and C&G. Mr. Yert testified as follows:

> Q. At any time prior – do you recall any conversations with Mr. Sweet regarding Holland Trading documents and whether they should be included or not in the document production?
> A. I don't recall any conversations with Mr. Sweet regarding Holland Trading.

Yert Dep. 54:15-55:7, June 12, 2018.

> However, Mr. Sweet testified as follows:

> Q. Did you remove, at any point, any documents that had the name Holland Trading in them?
> A. We never purchased International FreeStyle from Holland Trading.
> Q. Did you remove any documents that were to or from Holland Trading?
> A. If those were in there, those would have been removed because I know that we never bought International FreeStyle from them.

Sweet Dep. 43:18-44:9, Mar. 13, 2018.

> Mr. Sweet's deposition continued:

> Q. And one of the reasons that a document would be pulled from that production is that it discussed a potential sale or purchase of International FreeStyle from someone who you knew, in fact, never purchased or sold International FreeStyle with H&H; right?
> A. All right . . . . I don't remember the specifics of it, but I do remember [Mr. Yert] saying early on, that if we didn't do business with them, buy or sell, that that's not the documents we were looking to produce. So in the course of going through the filter, I realized that there was some people in there, only because I recognized the names, so those ones, I would flag and then I would ask him, you know, you sure these don't need to be in there, and he would say, remove them.
> Q. So what – what names did you recognize as you were going through?
> A. Well, one of the bigger ones that sticks out now, because of the course of the case, would have been Holland Trading.

Sweet Dep. 130:24-131:23, Mar. 13, 2018.

> Mr. Sweet's declaration in opposition to the instant motion is at odds with his deposition

testimony where he testified as follows:

Q. Was Howard Goldman one of the custodians that you left in Outlook as someone who potentially had something to do with the purchase and sale of FreeStyle test strips.
A. That's not how we did it. We said that we removed custodians that – as you call them, custodians that didn't have anything to do with the test strips.
Q. Was Howard Goldman one of the people you removed.
A. No.

Sweet Dep. 99:18-100:4, Mar. 13, 2018.

Mr. Sweet testified as follows regarding an email between David Gulas and Howard Goldman:

Q. Okay. I take it from your testimony that this is not the type of document that you would have removed from production if you reviewed it; is that correct?
A. I don't believe so, no.
Q. Because it discusses H&H's sale of International FreeStyle, it says it right there; correct?
A. Well, because I'm seeing the two words together there, "International FreeStyle."
Q. So this would have hit your search terms, you would have expected that correct?
A. That's what I would have expected, yes.
Q. And you would have not removed this email because it's an email discussing H&H's sale or purchase of International FreeStyle from 2014; correct?
A. I don't believe this email would have been removed.

Sweet Dep. 103:8-104:8, Mar. 13, 2018.

Contradicting counsel's assertions that documents were not intentionally removed, Mr. Sweet now admits that he intentionally removed documents relating to Holland Trading, Howard Goldman, and Lori Goldman. See Sweet Decl. ¶¶ 9–10. Moreover, despite Mr. Sweet's testimony that he wouldn't have removed the Howard Goldman document discussed above, it was removed from the original production, as was every other document referencing Howard Goldman, which could have only been removed by Mr. Sweet. The document discussed in Mr. Sweet's deposition was not one of the 197 documents identified by Mr. Pochron that Mr. Sweet using his auditor account didn't have access to, and it is undisputed that this document would have been identified by H&H's search terms "International" and "FreeStyle", yet defendants still did not produce it.

22

Thus, the H&H defendants' explanations regarding the Holland Trading, Howard Goldman, and Lori Goldman documents continue to change as the scent "becomes too fresh and the trail too hot to risk further non-compliance." Penthouse, 663 F.2d at 389. After three different law firms asserted that the H&H defendants did not remove documents, the H&H defendants now contend that the Holland Trading, Howard Goldman, and Lori Goldman documents were either not within the Sweet search results, or when faced with a document that was clearly in the search results that went unproduced, they now say the documents were removed at the direction of Mr. Yert. The H&H defendants' position contradicts the arguments made to the Court by three of their former counsel. Mr. Sweet's testimony contradicts H&H's position throughout this litigation. Moreover, Mr. Sweet's declaration, which the H&H defendants argue accounts for many of the withheld documents, is incredible at best. Mr. Sweet states, "I am aware that during the deposition, I testified that I 'believed' [I] would not have removed such documents. But during that deposition, I was attempting to recall what was a complicated event . . . that had taken place over a year before, and in which I had no previous experience." Sweet Decl. ¶ 10.

There is no credible explanation for why the Holland Trading, Howard Goldman, and Lori Goldman documents were not produced except that the documents were willfully withheld. Defendants' explanation that there were no documents withheld, then that any documents that weren't produced were due to technical glitches, then that the documents didn't appear in Mr. Sweet's original search, then that if documents were intentionally removed, they were removed per Mr. Yert's instructions cannot all be true. The H&H defendants have always had one more excuse up their sleeve in this "series of episodes of nonfeasance," which amounts to "deliberate tactical intransigence." Cine, 602 F.2d at 1067. In light of the H&H defendants' ever-changing explanations as to the withheld documents, Mr. Sweet's inconsistent testimony, and assertions of

former counsel, the Court finds that the H&H defendants have calculatedly attempted to manipulate the judicial process. See Penthouse, 663 F.2d 376–390 (affirming entry of default where plaintiffs disobeyed an "order to produce in full all of [their] financial statements," engaged in "prolonged and vexatious obstruction of discovery with respect to closely related and highly relevant records," and gave "false testimony and representations that [financial records] did not exist.").

### c.  The H&H Defendants' Perjured and Inconsistent Testimony

*David Gulas' Deposition Testimony*

Plaintiffs allege that the withheld documents freed David Gulas to commit perjury at his deposition. The Court agrees. David Gulas was the only person who bought FreeStyle test strips at H&H and was employed "for a long time, a decade plus." Gulas Dep. 198:18, April 28, 2017; Goldman Dep. 23:22-23:25, Nov. 2, 2015.  Mr. Gulas' deposition is riddled with conflicting testimony. The Court need not point out every lie to find that Gulas' testimony at his deposition is sanctionable conduct. As a clear example of his bad faith, Mr. Gulas testified that he could not recall whether he ever worked with Mr. Goldman directly. Gulas Dep. 178:2-178:8, Apr. 28, 2017. Mr. Gulas' testimony is belied by monthly emails with Mr. Goldman regarding sales goals (plaintiffs' Exs. O, P, Q, V); an email where Mr. Gulas obtained Mr. Goldman's approval to purchase International FreeStyle test strips (plaintiffs' Ex. M); and less than two weeks before Mr. Gulas' deposition on April 18 and 19, 2017,[14] Mr. Gulas and Mr. Goldman met with two representatives from Holland Trading. See plaintiffs' Ex. AF (an email from Mr. Gulas setting up dinner between two Holland Trading representatives, himself, and Howard Goldman).

---

[14] Mr. Gulas' deposition took place on April 28, 2017.

Mr. Gulas further testified under oath that he could not recall who H&H had bought retail FreeStyle test strips from in the past year. Gulas Dep. 51:7-52:6, Apr. 28, 2017. Plaintiffs point out that Holland Trading was H&H's biggest supplier of FreeStyle test strips, and approximately two weeks prior to Mr. Gulas' deposition, H&H received a shipment of over 10,000 boxes of International FreeStyle test strips from Holland Trading. Plaintiffs' Memorandum of Law at 20. Moreover, seven days before Mr. Gulas' deposition, he exchanged several emails with Holland Trading. Plaintiffs' Ex. AE.

The H&H defendants argue that H&H has done business with over 200 vendors and if Mr. Gulas wanted to hide the business that they had with Holland Trading, it would have made more sense for Mr. Gulas to name some other vendor rather than to say he couldn't recall any vendor. Defendants' memorandum of Law at 41. The H&H defendants also argue that "Mr. Gulas was nervous and could not recall something when put on the spot." Id. The H&H defendants state that the monthly goals emails between Mr. Gulas and Mr. Goldman (plaintiffs' Exs. O, P, Q, V) "do not reflect oral conversations, and do not reflect [that Gulas worked] with Mr. Goldman 'directly.'" Conspicuously, the H&H defendants make no mention of Mr. Gulas and Mr. Goldman's two-day meeting with Holland Trading or Exhibit AF (discussed *supra*) in their memorandum of law.

Generally, "[p]erjury alone does not constitute fraud upon the court." Skywark, 1999 WL 1489038 at *14, aff'd, 2000 WL 145465 at *3 (S.D.N.Y. Feb. 9, 2000). "[N]either perjury nor nondisclosure, by itself, amounts to anything more than fraud involving injury to a single litigant," and, moreover, "'[p]erjury and fabricated evidence are evils that can and should be exposed at trial.'" Gleason v. Jandrucko, 860 F.2d 556, 560 (2d Cir. 1988). Nevertheless, perjury can be considered fraud upon the court "'when a party lies to the court and his adversary intentionally,

repeatedly, and about issues that are central to the truth-finding process.'" Passlogix, Inc., 708 F. Supp. 2d at 393.

First, it is inconceivable that Mr. Gulas, H&H's diabetes test strip buyer, could not recall any vendor from whom H&H had bought retail FreeStyle test strips from in the past year. The H&H defendants, by their own assertion, state that there are over 200 vendors. It is not plausible that Mr. Gulas could not name a single vendor. Likewise, there is no explanation why Mr. Gulas would not recall Holland Trading, one of, if not H&H's biggest vendor. Moreover, the Court cannot credit the H&H defendants' argument that Mr. Gulas never worked directly with Mr. Goldman. The record demonstrates that a little more than a week before Mr. Gulas' deposition, he and Mr. Goldman had a two day in person meeting with two representatives from Holland Trading. Also, seven days before his deposition, Mr. Gulas exchanged several emails with Holland Trading. The H&H defendants' explanation that this testimony was due to Mr. Gulas' nerves has hit a nerve. The H&H defendants did not just tell one lie, but they repeatedly lied— most likely in an effort to insulate Howard Goldman. Here, as in Cerruti, defendants repeatedly lied under oath in an effort to (i) conceal their fabrication once it became apparent, (ii) establish other facts helpful to their position, and (iii) account for defendants' repeated failure to produce or locate documents. Cerruti, 169 F.R.D. at 574. Accordingly, I find that David Gulas' deposition testimony is clear and convincing evidence of a fraud upon the Court.

*Howard Goldman's Deposition Testimony*

Plaintiffs also argue that the H&H defendants withheld all Holland Trading and Howard Goldman documents to allow Howard Goldman to commit perjury at his deposition. Id. Like Mr. Gulas, Howard Goldman's deposition testimony is riddled with evasion, inconsistencies, and contradictions. Even on the simplest matter, Mr. Goldman could not give a straight answer.

26

Literally on the first question, Howard Goldman was asked, "Are you president of H&H." He replied, "I'm not certain of my corporate title." Plaintiffs' counsel then asked, "If you are not the president of H&H, who might be the president of H&H?" Howard Goldman replied, "Well, if—I'm not aware of anybody that would be, so I may hold that title." <u>See</u> Goldman Dep. 9:19-9:24, Nov. 2, 2015. Then when asked, "Who own's H&H?" Mr. Goldman replied, "I do." In fact, the record makes clear that Mr. Goldman owns one hundred percent of H&H.  <u>See</u> Goldman Dep. 32:21-32:24, June 28, 2017.[15]

Plaintiffs allege Mr. Goldman testified that he didn't have an office at H&H. Goldman Dep. 114:24-115:12, June 28, 2017. However, Mr. Gulas and Lori Goldman testified that he did. When Mr. Gulas was asked, "and how far is [Mr. Goldman's] office from your office?", he answered, "maybe 30 feet." "Ms. Goldman does your husband have an office at H&H?" Ms. Goldman answered, "Yes, he does." Lori Goldman Dep. 28:9-28:13, June 13, 2018. What Mr. Goldman actually testified was, "My office is wherever they have room for me," and "I'm the only guy that if somebody else needs an office, I will get kicked to the curb and I will find someplace else." Goldman Dep. 115:13-115:15, June 28, 2017. Plaintiffs also point out other instances where Mr. Goldman feigned ignorance: he claimed he did not know about prior law suits filed against H&H or claimed not to know his job responsibilities at H&H. <u>See</u> Goldman Dep. 37:15-48:23, June 28, 2017; 49:10-49:15; 152:8-153:5. While plaintiffs allege that Mr. Goldman's testimony amounts to "serial perjury", that may be a bit overstated. Mr. Goldman's testimony was certainly less than forthcoming and at times inconsistent, but his testimony alone would not warrant case

---

[15] The Court notes that defendants' responses and objections to plaintiffs' second set of interrogatories state "[o]wnership of all shares of H&H Wholesale Holdings, Inc. were transferred from Howard Goldman to the Howard B. Goldman Living Trust on or about April 30, 2018." Defendants' Ex. 28.

ending sanctions. However, Howard Goldman's testimony cannot be considered in isolation. "[S]anctions must be weighed in light of the full record of the case." <u>Cine.</u>, 602 F.2d at 1068.

### III. Appropriate Sanction

Based on the full record of the case, there is clear and convincing evidence that defendants have perpetrated a fraud upon the court. Defendants' initial conduct of formulating search terms designed to fail in deliberate disregard of the lawful orders of the Court allowed H&H to purposely withhold responsive documents, including the Holland Trading, Howard Goldman, and Lori Goldman documents. Defendants proffered inconsistent positions with three successive counsel as to why the documents were withheld. Mr. Sweet's testimony is clearly inconsistent if not perjured from his deposition to his declaration in opposition to the instant motion. Mr. Goldman's deposition testimony is evasive and self-serving at best. Finally, Mr. Gulas' deposition testimony is clearly perjured. Had plaintiffs never seized H&H's server pursuant to the Court's Order in the counterfeiting case, H&H would have gotten away with their fraud upon this Court. H&H only complied with the Court's orders and their discovery obligations when their backs were against the wall. Their email server had been seized. There was no longer an escape from responsibility for their bad faith conduct. This is, again, similar to <u>Cerruti</u>, where the "defendants did not withdraw the [false] documents on their own. Rather, they waited until the falsity of the documents had been detected." <u>Cerruti.</u>, 169 F.R.D. at 583. But for being caught in a web of irrefutable evidence, H&H would have profited from their misconduct.

The Court must consider the five factors discussed earlier in considering what sanction should be imposed: (1) whether the misconduct was the product of intentional bad faith; (2) whether and to what extent the misconduct prejudiced the other party; (3) whether there is a pattern of misbehavior, rather than an isolated instance; (4) whether and when the misconduct was

corrected; and (5) whether further misconduct is likely to continue in the future. See Skywark, 1999 WL 1489038, at *15 (collecting cases). "Bad faith can be inferred when the actions taken are 'so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose.'" Schlaifer Nance & Co. v. Estate of Warhol, 194 F.3d 323, 338 (2d Cir. 1999) (quoting People of the State of New York v. Operation Rescue Nat'l, 80 F.3d 64, 72 (2d Cir. 1996).

Several factors weigh in favor of imposing a case ending sanction in this action. First, the H&H defendants' bad faith can be inferred from the H&H defendants' deliberate and strategic non-compliance with discovery, their selective withholding of responsive documents, and their perjury as well as deceptive and evasive deposition testimony. Similar to Schlaifer, the actions taken by the H&H defendants throughout discovery in this case have been completely without merit. Schlaifer, 194 F.3d at 338; See also Penthouse, 663 F.2d at 387 (inferring bad faith from the party's long-term, repeated non-compliance with court orders). Plaintiffs have clearly been prejudiced by incurring the costs for having to conduct duplicative depositions while investigating defendants' fraud upon the court. In addition, plaintiffs have had to brief and argue this motion at the same time as they were preparing a motion for summary judgment. Even after the seizure of defendants' servers, the record in this case is still riddled with inconsistent and perjured testimony. Plaintiffs' progress in this litigation was significantly impeded by defendants' discovery fraud. See Skywark 1999 WL 1489038, at *16 ("despite the unraveling of plaintiff's scheme . . . the evidentiary record continues to be tainted, impairing the defendants' ability to mount a defense as well as the fact finder's capacity to adjudicate the case.") Moreover, as discussed *supra*, this was not an isolated instance of perjury or one withheld document, rather it was a calculated pattern of pervasive misconduct that started early on and continued even after defendants were caught red

handed. H&H's misconduct was egregious. The record herein when taken as a whole exposes defendants' fraud upon the court. H&H has had five different law firms represent them in this action and their current position directly contradicts prior counsels' arguments. As much as H&H seeks to lay blame on its counsel, the truth is H&H is responsible. But for the seizure of the server in Abbott II, H&H's fraud upon the court may never have come to light.

Defendants' discovery misconduct must be appropriately punished to deter such abuse of the Court's process. If the Court fails to impose an appropriate sanction, this "would encourage dilatory tactics, and compliance with discovery orders would come only when the backs of counsel and the litigants were against the wall." Cine, 602 F.2d at 1068; see also Nat'l Hockey League v. Metro. Hockey Club, Inc., 427 U.S. 639, 643 (1976) (noting that dismissal is "not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a sanction"). Thus, although the Court recognizes the strong preference for resolving disputes on the merits and not by default, this is an extreme case "because we are dealing here with repeated rather than with isolated or discrete abuses" and judgment against the offending party is the only appropriate sanction. Cerruti., 169 F.R.D. at 583; Cf. Marfia v. T.C. Ziraat Bankasi, New York Branch, 100 F.3d 243, 248–49 (2d Cir. 1996) (collecting cases).

The Court finds that the H&H defendants have committed a fraud upon the court, and that the harshest sanction is warranted. Therefore, plaintiffs' motion for sanctions should be granted and a default judgment should be entered against H&H Wholesale Services, Inc., Howard Goldman, and Lori Goldman.[16]

---

[16] As discussed at oral argument, it is unlikely that plaintiffs would obtain any real relief by holding only the company liable. Thus, the Court properly looks to the "people who are the active and moving force behind this case." ECF No. 1537, February 27, 2019 Oral Argument Transcript.

## CONCLUSION

Accordingly, it is respectfully recommended that plaintiffs' motion for sanctions should be granted and a default judgment should be entered against H&H Wholesale Services, Inc., Howard Goldman, and Lori Goldman.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  See also Fed. R. Civ. P. 6.  Such objections (and any responses to objections) shall be filed with the Clerk of the Court.  Any request for an extension of time to file objections must be made within the fourteen-day period.  Failure to file a timely objection to this Report generally waives any further judicial review.  Marcella v. Capital Dist. Physicians' Health Plan, Inc., 293 F.3d 42, 46 (2d Cir. 2002); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); see Thomas v. Arn, 474 U.S. 140 (1985).

SO ORDERED.

_____   /S/   _____
LOIS BLOOM
United States Magistrate Judge

Dated: May 2, 2019
       Brooklyn, New York