**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x
ABBOTT LABORATORIES, ABBOTT
DIABETES CARE INC., and ABBOTT
DIABETES CARE SALES CORPORATION,

                              Plaintiffs,

          -against-

ADELPHIA SUPPLY USA, et al.,

                         Defendants.

------------------------------------------------------------ x

:     15 Civ. 5826 (CBA) (LB)

:     **SUBJECT TO PROTECTIVE ORDER**

:     **REDACTED**


**PLAINTIFFS' BRIEF IN SUPPORT OF DEFAULT JUDGMENT DAMAGES**
**AGAINST THE H&H DEFENDANTS**

12251793

# **TABLE OF CONTENTS**

**Page**

BACKGROUND ................................................................................................................3

LEGAL STANDARD ......................................................................................................5

ARGUMENT ...................................................................................................................8

I.  EACH OF THE H&H DEFENDANTS IS LIABLE AS A MATTER OF LAW
    ON ALL PLEADED CLAIMS, INCLUDING WILLFUL INFRINGEMENT .................8

II.  ABBOTT'S ACTUAL DAMAGES ............................................................................10

    A.  The Method and Calculation of Damages Are Not in Dispute .............................10

    B.  Because the Authentic and Infringing Products Are Identical Except for
    the Printing on the Box, Abbott's Costs Are Fixed and Irrelevant to the
    Calculation of Damages ........................................................................................18

    C.  Each Diverted International Box Sold in the United States Displaced the
    Sale of a U.S. Retail FreeStyle Box .....................................................................20

        1.  The Court Must Accept as True Abbott's Allegations that Each
        Sales of an Infringing Box Caused the Lost Sale of an Authentic
        Box ............................................................................................................21

        2.  The Record Evidence Proves that Each Infringing Box Displaced
        an Authentic Box ......................................................................................22

            a.  It Remains Undisputed that Every Infringing Box Sold to
            Consumers Through Insurance Necessarily Displaced an
            Authentic Box on a One-for-One Basis ........................................22

            b.  The Evidence Shows that All of the Infringing Boxes
            Trafficked by the H&H Defendants Were Sold to Patients
            Through Insurance ........................................................................24

            c.  Any Sales of Infringing Strips for Cash Also Displaced the
            Sale of Authentic Strips ................................................................27

III.  THE COURT SHOULD AWARD TREBLE DAMAGES .............................................29

IV.  ABBOTT IS ENTITLED TO ATTORNEYS' FEES AND COSTS ...............................34

V.  PREJUDGMENT INTEREST IS APPROPRIATE HERE ...........................................37

    A.  The Applicable Rate and Compounding of Interest .............................................38

    B.  The Date of Interest Accrual ................................................................................41

CONCLUSION ................................................................................................................42

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*4 Pillar Dynasty LLC v. New York & Co.*,
   933 F.3d 202 (2d Cir. 2019).....................................................................38

*Abbott Laboratories et al. v. H&H Wholesale Services Inc. et al.*,
   No. 17-cv-3095 (E.D.N.Y.) ...................................................4, 5, 30, 36

*Arthur A. Kaplan Co. v. Panaria Int'l Inc.*,
   1999 U.S. Dist. LEXIS 6315 (S.D.N.Y. Apr. 26, 1999).........................37

*Aw Indus., Inc. v. Sleepingwell Mattresses, Inc.*,
   2011 U.S. Dist. Lexis 111889 (E.D.N.Y. Aug. 31, 2011) ...................6, 31

*Aw Indus., Inc. v. Sleepingwell Mattresses, Inc.*,
   2011 U.S. Dist. Lexis 106308 (E.D.N.Y. Sept. 21, 2011) .........................6

*Bambu Sales, Inc. v. Ozak Trading Inc.*,
   58 F.3d 849 (2d Cir. 1995).......................................................................35

*Beijing Daddy's Choice Sci. & Tech. Co. v. Pinduoduo Inc.*,
   2020 WL 729518 (S.D.N.Y. Feb. 13, 2020).......................................36-37

*Bricklayers Ins. & Welfare Fund v. Primo Brick, Inc.*,
   2013 WL 2120338 (E.D.N.Y. Apr. 3, 2013) ......................................38-39

*Bricklayers Ins. & Welfare Fund v. Primo Brick, Inc.*,
   2013 WL 2120318 (E.D.N.Y. May 15, 2013) .........................................39

*Bumble & Bumble, LLC v. Pro's Choice Beauty Care, Inc.*,
   2016 WL 658310 (S.D.N.Y. Feb. 17, 2016).................................38, 39, 41

*Bumble & Bumble, LLC v. Pro's Choice Beauty Care, Inc.*,
   2016 WL 1717215 (S.D.N.Y. Apr. 27, 2016) .........................................38

*Cartwright v. Lodge*,
   2017 U.S. Dist. LEXIS 48052 (S.D.N.Y. Mar. 30, 2017) ............7, 26, 28

*Close-Up Int'l, Inc. v. Berov*,
   2007 U.S. Dist. LEXIS 83972 (E.D.N.Y. Nov. 13, 2007)......................37

*Days Inn Worldwide, Inc. v. Adrian Motel Co.*,
   2009 U.S. Dist. LEXIS 90393 (E.D. Mich. 2009)..............................32, 33

ii

**TABLE OF AUTHORITIES**
**(CONTINUED)**

Page(s)

*Delchi Carrier SpA v. Rotorex Corp.*,
    71 F.3d 1024 (2d Cir. 1995)........................................................................................18, 19

*Etna Prods. Co. v. Q Mktg. Grp., Ltd.*,
    2004 U.S. Dist. Lexis 15323 (S.D.N.Y. Aug. 4, 2004) .........................................22

*Fair Wind Sailing, Inc. v. Dempster*,
    764 F.3d 303 (3d Cir. 2014)........................................................................................35

*Flanagan v. Odessy Constr. Corp.*,
    2018 WL 1179889 (E.D.N.Y. Feb. 9, 2018).............................................................39

*Flanagan v. Odessy Constr. Corp.*,
    2018 WL 1175164 (E.D.N.Y. Mar. 6, 2018) ....................................................... 39-40

*Fogerty v. Fantasy, Inc.*,
    510 U.S. 517, 534 (1994) ..........................................................................................35

*Fustok v. Conticommodity Servs., Inc.*,
    873 F.2d 38 (2d Cir. 1989)............................................................................................6

*General Electric Co. v. Speicher*,
    877 F.2d 531 (7th Cir. 1989) .....................................................................................10

*Getty Petroleum Corp. v. Bartco Petroleum Corp.*,
    858 F.2d 103 (2d Cir. 1988)........................................................................................30

*Go Med. Indus. Pty, Ltd. v. Inmed Corp.*,
    471 F.3d 1264 (Fed. Cir. 2006)..................................................................................10

*Gomez v. El. Rancho de Andres Carne de Tres Inc.*,
    2014 U.S. Dist. LEXIS 45580 (E.D.N.Y. Mar. 11, 2014)....................................5, 7

*Gomez v. El Rancho de Andres Carne de Tres Inc.*,
    2014 WL 1310299 (E.D.N.Y. Mar. 31, 2014) .......................................................41

*Gov't Emples. Ins. Co. v. Sannit-Thomas*,
    2015 U.S. Dist. LEXIS 135117 (E.D.N.Y. Sept. 4, 2015)....................................17

*Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*,
    973 F.2d 155 (2d Cir. 1992)........................................................................................21

*GTFM, Inc. v. Solid Clothing, Inc.*,
    2002 WL 31886349 (S.D.N.Y. Dec. 26, 2002) .............................................38, 39

iii

**TABLE OF AUTHORITIES**
**(CONTINUED)**

**Page(s)**

*Gutierrez v. Taxi Club Mgmt.*,
    2018 U.S. Dist. LEXIS 106808 (E.D.N.Y. June 25, 2018) .....................................................7

*Harris v. Fairweather*,
    2012 U.S. Dist. LEXIS 128409 (S.D.N.Y. Sept. 10, 2012)...................................................10

*Hughes Tool Co. v. Trans World Airlines, Inc.*,
    409 U.S. 363 (1973).................................................................................................................6

*HealthNow N.Y. Inc. v. Romano*,
    2018 U.S. Dist. Lexis 174493 (W.D.N.Y. Oct. 10, 2018) ....................................................35

*Hilton v. Int'l Perfume Palace, Inc.*, No. 12-CV-5074 (JFB),
    2013 WL 5676582 (E.D.N.Y. Oct. 17, 2013) ................................................................... 7-8

*Indu Craft, Inc. v. Bank of Baroda*,
    47 F.3d 490 (2d Cir. 1997)......................................................................................................9

*Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*,
    176 F. Supp. 3d 137, 162 (E.D.N.Y. 2016) .............................................................20, 22, 26

*Int'l Consulting Servs. v. Cheap Tickets, Inc.*,
    2007 U.S. Dist. LEXIS 71689 (E.D.N.Y Sep. 12, 2007)......................................................38

*Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A., Inc.*,
    80 F.3d 749 (2d Cir. 1996).....................................................................................................10

*Intel Corp. v. Terabyte Int'l*,
    6 F.3d 614 (9th Cir. 1993) .......................................................................................................8

*Kaleidoscope Media Grp., Inc. v. Entm't Sols., Inc.*,
    2001 U.S. Dist. LEXIS 10801 (S.D.N.Y. July 19, 2001) .....................................................35

*Koon Chun Hing Kee Soy & Sauce Factory*, *Ltd. v. Star Mark Mgmt., Inc.*,
    628 F. Supp. 2d 312 (E.D.N.Y. 2009) .....................................................................................9

*Kotuwage v. NSS Petroleum, Inc.*,
    2018 U.S. Dist. LEXIS 21917 (E.D.N.Y. Feb. 8, 2018).......................................................17

*Liu v. Jen Chu Fashion Corp.*,
    2004 U.S. Dist. LEXIS 33412 (S.D.N.Y. Jan. 7, 2004) .......................................................41

*Lodges 743 & 1746, Int'l Ass'n of Machinists v. United Aircraft Corp.*,
    534 F.2d 422 (2d Cir. 1975)...................................................................................................38

iv

### TABLE OF AUTHORITIES
### (CONTINUED)

**Page(s)**

*Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*,
    2018 U.S. Dist. LEXIS 3035 (S.D.N.Y. Jan. 8, 2018)............................................35

*Manzo v. Sovereign Motor Cars, Ltd.*,
    2010 WL 1930237 (E.D.N.Y. May 11, 2010) ......................................................40

*Melodrama Publ'g, LLC v. Santiago*,
    2015 WL 2380521 (S.D.N.Y. May 19, 2015) ................................................39, 41

*Melodrama Publ'g, LLC v. Santiago*,
    2015 WL 7288639 (S.D.N.Y. Nov. 16, 2015) ......................................................39

*Merck Eprova AG v. Brookstone Pharms., LLC*,
    920 F. Supp. 2d 404 (S.D.N.Y. 2013)......................................................31, 32, 34

*Merck Eprova AG v. Gnosis S.p.A.*,
    760 F.3d 247 (2d Cir. 2014)...........................................................9, 31, 32, 34

*Merck Eprova AG v. Gnosis S.p.A.*,
    901 F. Supp. 2d 436 (S.D.N.Y. 2012)...............................................31, 32, 34, 39

*Millennium TGA, Inc. v. Leon*,
    2013 U.S. Dist. LEXIS 150508 (E.D.N.Y. Sept. 24, 2013)..................................37

*Millennium TGA, Inc. v. Leon*,
    2013 U.S. Dist. LEXIS 150267 (E.D.N.Y. Oct. 18, 2013) ...................................37

*Mobius Mgmt. Sys., Inc. v. Fourth Dimension Software, Inc.*,
    880 F. Supp. 1005 (S.D.N.Y. 1995)................................................................16, 31

*N.Y. Racing Ass'n, Inc. v. Stroup News Agency Corp.*,
    920 F. Supp. 295 (N.D.N.Y.1996)..............................................................31, 33, 34

*Nat'l Ass'n for Specialty Food Trade, Inc. v. Construct Data Verlag AG*,
    2006 WL 5804603 (S.D.N.Y. Dec. 11, 2006) .........................................38, 40, 41

*Nat'l Ass'n for Specialty Food Trade, Inc. v. Construct Data Verlag AG*,
    2006 WL 656274 (S.D.N.Y. Feb. 23, 2007) .......................................................38

*Novell, Inc. v. Network Trade Ctr.*,
    25 F. Supp. 2d 1233 (D. Utah. 1998).................................................................31

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
    134 S. Ct. 1749 (2014)..............................................................................35, 36

v

**TABLE OF AUTHORITIES**
**(CONTINUED)**

**Page(s)**

*Ortho Sleep Prods., LLC v. Dreamy Mattress Corp.*,
  2012 U.S. Dist. LEXIS 183253 (E.D.N.Y. Aug. 29, 2012)...............................................30, 33

*Perez v. Progenics Pharms., Inc.*,
  204 F. Supp. 3d 528 (S.D.N.Y. 2016).................................................................39, 41

*Profi-Parkiet Sp. Zoo v. Seneca Hardwoods LLC*,
  2014 U.S. Dist. LEXIS 71289 (E.D.N.Y. May 23, 2014) ........................................................18

*Prot. One Alarm Monitoring, Inc. v. Exec. Prot. One Sec. Serv., LLC*,
  553 F. Supp. 2d 201 (E.D.N.Y. 2008) ...................................................................35

*Ramada Inns, Inc. v. Gadsden Motel Co.*,
  804 F.2d 1562 (11th Cir. 1986) ...........................................................................8

*Santillan v. Henao*,
  822 F. Supp. 2d 284 (E.D.N.Y. 2011) ...............................................................6, 21

*Sara Lee Corp. v. Bags of N.Y., Inc.*,
  36 F. Supp. 2d 161 (S.D.N.Y. 1999)...................................................................8, 35

*Saulpaugh v. Monroe Cmty. Hosp.*,
  4 F.3d 134 (2d Cir. 1993).................................................................................39, 40

*Schalaudek v. Chateau 20th St. LLC*,
  2017 U.S. Dist. LEXIS 26272 (S.D.N.Y. Feb. 24, 2017)...........................................5-6, 7, 25

*Schalaudek v. Chateau 20th St. LLC*,
  2017 U.S. Dist. LEXIS 53115 (S.D.N.Y. Apr. 6, 2017)................................................6

*Schonfeld v. Hilliard*,
  218 F.3d 164 (2d Cir. 2000).............................................................................8

*Skydive Ariz., Inc. v. Quattrochi*,
  673 F.3d 1105 (9th Cir. 2012) ...........................................................................7

*Sleepy's LLC v. Select Comfort Wholesale Corp.*,
  2016 U.S. Dist. LEXIS 3064 (E.D.N.Y. Jan. 11, 2016) ..........................................37

*State Farm Mut. Auto. Ins. Co. v. Grafman*,
  968 F. Supp. 2d 480 (E.D.N.Y. 2013) ...............................................................17

*Strippit, Inc. v. Coffee*,
  2009 U.S. Dist. LEXIS 99996 (W.D.N.Y. Oct. 27, 2009)................................30, 33

vi

**TABLE OF AUTHORITIES**
**(CONTINUED)**

**Page(s)**

*TeeVee Toons, Inc. v. Gerhard Schubert GmbH*,
    2006 U.S. Dist. LEXIS 59455 (S.D.N.Y. Aug. 22, 2006) ......................................................18

*TigerCandy Arts, Inc. v. Blairson Corp.*,
    2012 WL 760168 (S.D.N.Y. Feb. 23, 2012).................................................................................39

*TigerCandy Arts, Inc. v. Blairson Corp.*,
    2012 WL 1948816 (S.D.N.Y. May 30, 2012) .............................................................................39

*Trans World Airlines, Inc. v. Hughe*s,
    449 F.2d 51 (2d Cir. 1971).............................................................................................................6

*Wilson v. Great Am. Indus., Inc.*,
    763 F. Supp. 688 (N.D.N.Y. 1991)...............................................................................................39

*Winkler v. Allvend Indus., Inc.*,
    186 A.D.2d 732, 588 N.Y.S.2d 885 (2d Dep't 1992) ..................................................................35

*Zim Am. Integrated Shipping Servs., Inc. v. Caribbean-Am. Program for*
    *Empowerment (USA), Inc.*,
    2007 WL 2903853 (E.D.N.Y. Sept. 28, 2007) ...........................................................................39

**Statutes**

15 U.S.C § 1117....................................................................................................................... *passim*

21 U.S.C. § 331...................................................................................................................................23

21 U.S.C. § 333...................................................................................................................................23

21 U.S.C. § 352...................................................................................................................................23

26 U.S.C. § 6621...........................................................................................................................39, 40

26 U.S.C. § 6622.................................................................................................................................39

28 U.S.C. § 1920.................................................................................................................................37

N.Y. C.P.L.R. § 5001..........................................................................................................................41

N.Y. C.P.L.R. § 5004.....................................................................................................................38, 41

N.Y. G.B.L. § 349.................................................................................................................................9

N.Y. G.B.L. § 360-l..............................................................................................................................9

**TABLE OF AUTHORITIES**
**(CONTINUED)**

**Page(s)**

**Other Authorities**

Federal Rule of Civil Procedure 54 ........................................................................37, 42

Federal Rule of Civil Procedure 55 ...............................................................................5

Local Rule of the United States District Courts for the Southern and Eastern
    Districts of New York 54.1 ......................................................................................37

*McCarthy on Trademarks and Unfair Competition* (5th ed.) ......................................10

Plaintiffs Abbott Laboratories, Abbott Diabetes Care Inc., and Abbott Diabetes Care Sales Corp. (collectively, "Abbott") respectfully submit this brief in support of its claimed damages against H&H Wholesale Services, Inc. ("H&H"), Howard Goldman, and Lori Goldman (collectively, the "H&H Defendants").

## PRELIMINARY STATEMENT

This Court has already found the H&H Defendants to be willful infringers on the facts, and then thereafter stripped them of their right to defend this action as sanctions for their flagrant and widespread fraud perpetrated on this Court over the course of five years of litigation.  Abbott now should be awarded the damages to which it is entitled as a result of the H&H Defendants' willful violations of federal and state law.



.  Their infringement was willful and accomplished through fraud, and after they were caught, they engaged in vexatious litigation tactics and large-scale discovery fraud designed to cover up their misconduct

Abbott's damages award has four components.  First, Abbott seeks actual damages of ▆▆▆▆▆▆.  Second, given the willful nature of the H&H Defendants' violations, actual damages should be trebled for a total damages award of ▆▆▆▆▆▆.  Third, Abbott should be awarded its attorneys' fees and costs on the basis that this is an "exceptional case."  And fourth, Abbott seeks an award of prejudgment interest on its actual damages.

The Court is already familiar with Abbott's damages methodology and calculations, which the parties addressed extensively at summary judgment.  In its summary judgment opinion, this Court expressly approved of Abbott's methodology, as set forth in the opinion of its damages expert, Dr. Bell, and thereby rejected the defendants' challenges to Dr. Bell's opinion.

12251793

The Court also accepted—and no defendant seriously challenged—that all infringing boxes sold through insurance were in fact substituted for an authentic box on a one-for-one basis.  But the Court also found summary judgment on damages precluded by factual disputes concerning whether any infringing strips were sold to patients for cash, and whether any such infringing cash sales displaced authentic product.  In denying summary judgment, the Court held it was for the jury to weigh the evidence on those disputes and make the necessary inferences to reach a decision.  Through their own misconduct, the H&H Defendants have lost their right to try this case to a jury.

The law in the Second Circuit is clear: Abbott must now only prove, with all reasonable inferences drawn in its favor, that there is a "reasonable basis" to find a "reasonable probability," with "some degree of speculation" permissible, that the H&H Defendants' sales of infringing boxes caused Abbott to lose sales of its authentic boxes.  The evidence easily exceeds that low bar.

Abbott's obligation in this damages inquest is to introduce the record evidence supporting the amount of damages claim, and Abbott does so here.  But the evidence has not changed since summary judgment, and so the Court's analysis of Abbott's actual damages can be brief.  The Court has already held at summary judgment that a reasonable jury could find Abbott's claimed damages to be correct and fully supported by the record evidence.  It necessarily follows that, with all reasonable inferences drawn in its favor, Abbott has proven its claimed damages as to the H&H Defendants.

The Court's twin findings of willful infringement—once at summary judgment, and once as the automatic result of the H&H Defendants' default—are sufficient grounds to award treble damages and treat this case as "exceptional."  Abbott caught the H&H Defendants intentionally

2

violating this Court's injunction by selling international test strips in counterfeit U.S. packaging, executed a seizure order at H&H's warehouse, and stumbled onto a treasure trove of documents that the H&H Defendants had willfully withheld from discovery in this action.  The H&H Defendants are unrepentant, recidivist willful infringers for whom the risk of a being caught and embroiled in trademark litigation is just an expected cost of doing business.  Under the factors identified in the caselaw and as a matter of common sense, the H&H Defendants, and others like them, need to be punished and deterred from continuing to build a business based on intentional infringement and fraudulently concealing their misdeeds.  The Court should award the damages Abbott now seeks as discussed more fully below.

## BACKGROUND

The substance of Abbott's claims and history of this case has been recited numerous times.  *See, e.g.*, Mem. of Law in Support of Pls.' Mot. for Summ. J., D.E. # 1415 at 4-26, 76-102; Sept. 30, 2019 Mem. & Order, D.E. # 1563 at 6-8; Pls.' Resp. in Opp'n to the H&H Defs.' Objs. to the R&R, D.E. # 1555 at 2-4; Mar. 24, 2020 Mem. & Order, D.E. # 1613 at 2-6; Dec. 23, 2020 Mem. & Order, D.E. # 1633.  Abbott briefly recounts the background and procedural posture of this case as relevant to its request for damages against the H&H Defendants.



The H&H Defendants purchased, imported, and sold these strips knowing that they were infringing and

would be fraudulently dispensed to patients.  The H&H Defendants' sale of international

FreeStyle strips caused Abbott to suffer ████████ in actual damages.  *See* Ex. P552.[1]

Abbott initiated this trademark action against the H&H Defendants on October 9,

2015.  D.E. # 1.  Following extensive discovery, both Abbott and the H&H Defendants moved

for summary judgment.  D.E. # 1414; D.E. # 1400.  The Court granted Abbott's motion in part as

to liability, finding that H&H had willfully infringed Abbott's trademarks, and finding Howard

Goldman personally liable for the infringement as well.  D.E. # 1563 at 38-40, 54-57.[2]  The

Court denied both sides' motions for summary judgment as to damages.  In denying the H&H

Defendants' motion, the Court held that a reasonable jury could, based upon the record evidence,

award Abbott the damages calculated in the report of its expert economist, Dr. Bell.  D.E. # 1563

at 109-110, 112.

While preparing its motion for summary judgment, Abbott discovered the H&H

Defendants were violating this Court's injunction against selling international FreeStyle strips by

importing international FreeStyle strips repackaged into counterfeit U.S. packaging.  Thus, in

May 2017, Abbott commenced a related anti-counterfeiting action against the H&H Defendants.

*Abbott Laboratories et al. v. H&H Wholesale Services Inc. et al.*, No. 17-cv-3095 (E.D.N.Y.).

As part of that action, Abbott conducted a Court-ordered seizure of H&H's premises, including

its email server.  *See* D.E. # 1613 at 4.  The seized emails included thousands of emails that

H&H should have produced in this action, but did not.  *Id.* at 4-5.  That discovery led Abbott to

conduct an investigation lasting over a year, which uncovered that the H&H Defendants had

---

[1] Unless otherwise noted, all references to exhibits beginning with "Ex. P" are to exhibits that were submitted in connection with Abbott's motions for summary judgment, which were filed under seal and without a docket number.

[2] Abbott did not move for summary judgment as to Lori Goldman.  Ms. Goldman moved for summary judgment as to the Lanham Act claims against her, which the Court denied.  D.E. # 1400; D.E. # 1563 at 41.

engaged in a calculated pattern of discovery misconduct in this action that amounted to a fraud on the Court. *Id.* at 4-6.

Based on that misconduct, Abbott moved in this action for case-ending sanctions against the H&H Defendants.  D.E. # 1524.  The Court granted Abbott's motion and entered a default judgment against each of the three H&H Defendants: H&H, Lori Goldman, and Howard Goldman.  D.E. # 1613.  The Court found that each of "the H&H Defendants—including the Goldmans—had a duty to comply with the Court's orders, and each willfully and grossly failed to do so."  *Id.* at 15; *id.* at 16, 19 (finding the Goldmans "individually liable for the willful discovery fraud and cover-up they undertook personally or that was undertaken by their agents in their name"); *id.* at 25 (finding that "the H&H Defendants' withholding of … documents constituted willful discovery misconduct").

On December 23, 2020, the Court determined that the damages inquest against the now-defaulted H&H Defendants should proceed immediately pursuant to Federal Rule of Civil Procedure 55(b)(2), prior to trial against the remaining non-defaulting defendants.  D.E. # 1633.  The Court directed Abbott and the H&H Defendants to file briefing and relevant documentary evidence regarding the proper calculation and amount of damages to be entered against the H&H Defendants.  *Id.* at 13.

## **LEGAL STANDARD**

When a defendant is held in default, all well-pleaded allegations in the operative pleadings, and all reasonable inferences that can be drawn therefrom, are deemed admitted, other than allegations of the quantum of damages.  *See, e.g.*, *Gomez v. El Rancho de Andres Carne de Tres Inc.*, 2014 U.S. Dist. LEXIS 45580, at *4 (E.D.N.Y. Mar. 11, 2014) (Go, M.J.), *adopted*, 2014 U.S. Dist. LEXIS 43988 (E.D.N.Y. Mar. 31, 2014) (Amon, C.J.); *Schalaudek v. Chateau*

12251793

*20th St. LLC*, 2017 U.S. Dist. LEXIS 26272, at *6-7 (S.D.N.Y. Feb. 24, 2017), *adopted*, 2017

U.S. Dist. LEXIS 53115 (S.D.N.Y. Apr. 6, 2017).  Among the facts that are admitted is "that

damages were proximately caused by the defaulting party's conduct; that is, the acts pleaded in a

complaint violated the laws upon which a claim is based and caused injuries as alleged."

*Santillan v. Henao*, 822 F. Supp. 2d 284, 290 (E.D.N.Y. 2011) (citation omitted); *see also Trans

World Airlines, Inc. v. Hughe*s, 449 F.2d 51, 70 (2d Cir. 1971), ("[T]here was no burden on

[plaintiff] to show that any of [defendant's] acts pleaded in the complaint violated the antitrust

laws nor to show that those acts caused the well-pleaded injuries, except as we have indicated

that it had to for the purpose of establishing the extent of the injury caused [plaintiff], in dollars

and cents.") *rev'd on other grounds*, *Hughes Tool Co. v. Trans World Airlines, Inc.*, 409 U.S.

363 (1973).  In a Lanham Act case, defendants' acts of infringement are deemed to be willful as

a matter of law by virtue of their default.  *Aw Indus., Inc. v. Sleepingwell Mattresses, Inc.*, 2011

U.S. Dist. Lexis 111889, at *21-22 (E.D.N.Y. Aug. 31, 2011) (collecting cases holding

defendants deemed willful infringers by virtue of their default), *adopted*, 2011 U.S. Dist. Lexis

106308 (E.D.N.Y. Sept. 21, 2011).

　　　　To determine damages against defaulted defendants, the Court must conduct an inquest.

Fed. R. Civ. P. 55(b)(2).  At the Court's discretion, the inquest can take the form of an

evidentiary hearing or submissions based on affidavits and documents.  *See Fustok v.

Conticommodity Servs., Inc.*, 873 F.2d 38, 40 (2d Cir. 1989).  It is especially appropriate for the

damages inquest to be done on the paper record, without an evidentiary hearing, where the Court

is already familiar with the facts.  *Id.*

　　　　The burden of proof at the damages inquest is significantly lower than at a jury trial.  For

the inquest, Abbott's burden is to establish only a "**reasonable basis**" for its damages.  *See*

6

*Gomez*, 2014 U.S. Dist. LEXIS 45580, at *4 (emphasis added); *Cartwright v. Lodge*, 2017 U.S. Dist. LEXIS 48052, at *12 (S.D.N.Y. Mar. 30, 2017) (in case of default, plaintiff must provide "some reasonable basis to quantify" damages); *Gutierrez v. Taxi Club Mgmt.*, 2018 U.S. Dist. LEXIS 106808 (E.D.N.Y. June 25, 2018), at *7 ("In the damages phase, the court must ensure that there is a reasonable basis for the damages requested in a default judgment motion.").

Importantly, at the inquest, **all reasonable inferences from the facts concerning damages must be drawn in Abbott's favor**. *See Gomez* 2014 U.S. Dist. LEXIS 45580, at *4; *Schalaudek*, 2017 U.S. Dist. LEXIS 26272, at *6 ("[P]laintiffs are entitled to all reasonable inferences from the evidence presented in support of their damages claims" at a damages inquest); *Gutierrez*, 2018 U.S. Dist. LEXIS 106808 at *7 ("In the damages phase [of a default judgment] … [t]he moving party is entitled to all reasonable inferences from the evidence it offers.").

In a Lanham Act case, the plaintiff's low burden for proving damages at inquest is coupled with the Lanham Act's already plaintiff-friendly standards for proving the amount of damages. At an inquest, the fact (as opposed to the amount) of damages is established as a matter of law. *See, e.g.*, *Schalaudek*, 2017 U.S. Dist. LEXIS 26272, at *6-7. As this Court noted in its summary judgment opinion, under the Lanham Act, once the fact of damages has been established, then "a mark holder is held to a lower standard in proving the exact amount of actual damages.'" D.E. # 1563 at 102 (quoting *Skydive Ariz., Inc. v. Quattrochi*, 673 F.3d 1105, 1112 (9th Cir. 2012)). Under that lower standard, "'due to the inherent difficulty in isolating the causation behind diverted sales' ... courts may entertain 'some degree of speculation in computing the amount of damages, particularly where the inability to compute them is attributable to the defendant's wrongdoing.'" *Id.* (quoting *Hilton v. Int'l Perfume Palace, Inc.*,

No. 12-CV-5074 (JFB), 2013 WL 5676582, at *7 (E.D.N.Y. Oct. 17, 2013); *see also Schonfeld v. Hilliard*, 218 F.3d 164, 174-75 (2d Cir. 2000) ("[W]hen the existence of damage is certain, ... **the burden of uncertainty as to the amount of damage is upon the wrongdoer**.") (emphasis added; citation omitted); *Ramada Inns, Inc. v. Gadsden Motel Co.*, 804 F.2d 1562, 1565 (11th Cir. 1986) ("[A] plaintiff may recover upon a showing of the extent of damages as a matter of just and reasonable inference, although the result may be only an approximation."); *Intel Corp. v. Terabyte Int'l*, 6 F.3d 614, 621 (9th Cir. 1993) (holding actual damages may be proved using methods that are "somewhat crude," as long as they are "n[ot] ... fanciful."); *Sara Lee Corp. v. Bags of N.Y., Inc.*, 36 F. Supp. 2d 161, 169 (S.D.N.Y. 1999) ("[I]n determining infringement damages, courts are to resolve against the defendants any factual uncertainties … when the defendants left the uncertainty by not responding to the evidence of [infringing] sales with evidence of their own." (citation omitted)).

## ARGUMENT

## I.     EACH OF THE H&H DEFENDANTS IS LIABLE AS A MATTER OF LAW ON ALL PLEADED CLAIMS, INCLUDING WILLFUL INFRINGEMENT

The liability of each of the H&H Defendants for each of Abbott's surviving claims is no longer in dispute.  For liability purposes, the allegations of the Second Amended Complaint are deemed admitted.  The Court has already tested the sufficiency of those allegations and found them to support Abbott's stated claims.  *See* D.E. # 892 (denying the H&H Defendants' motion to dismiss).[3]

Abbott is therefore entitled to judgment as to liability, including willfulness, against each of the H&H Defendants as to all of Abbott's claims: for trademark infringement under Lanham

---

[3] The Court dismissed the eighth and ninth causes of action of the Second Amended Complaint, sounding under federal RICO, as to all defendants.  Abbott does not seek a finding of liability or any damages as to those dismissed claims.

12251793

Act Section 32; false advertising, trade dress infringement, and unfair competition under Lanham Act Section 43(a); trademark dilution under Lanham Act Section 43(c); importation of goods bearing infringing marks under Lanham Act Section 42; trademark dilution under N.Y. G.B.L. § 360-l; deceptive business practices under N.Y. G.B.L § 349; and Abbott's state-law claims for unfair competition, unjust enrichment, fraud, fraudulent inducement, and aiding-and-abetting fraud.

Moreover, as a result of their default, each of the H&H Defendants' infringement is deemed to be willful as a matter of law.  *See supra* p. 6.  Abbott notes that in addition to this automatic finding of willfulness, and before making willfulness findings in support of striking the H&H Defendants' pleadings, the Court had already ruled on summary judgment that H&H was willfully liable for trademark infringement.  Thus, the finding of willfulness is no mere legal fiction: the Court already found that the undisputed facts of the case establish H&H's willfulness as a matter of law.

As Abbott has previously explained to the Court, all of Abbott's claims give rise to overlapping actual damages.  Abbott is thus entitled to a finding of liability as to each of its claims against each of the H&H Defendants, but seeks only a single award of actual damages, which would be equally applicable to each claim.[4]  However, as set forth below, in addition to its actual damages, Abbott seeks under various causes of action additional monetary awards: namely, a trebling of its actual damages pursuant to 15 U.S.C § 1117(a); an award of its

---

[4] For example, Abbott is entitled to receive an identical damages award for its lost revenues under its Section 32 trademark infringement claims and under its Section 43(a) claims for false advertising, infringement of trade dress, and unfair competition.  *See Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 265 (2d Cir. 2014); *Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Star Mark Mgmt., Inc.*, 628 F. Supp. 2d 312, 316 (E.D.N.Y. 2009); *see also Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 497 (2d Cir. 1997) ("A plaintiff seeking compensation for the same injury under different legal theories is of course entitled to only one recovery.").

attorneys' fees and costs under the Lanham Act and state-law fraud claims; and an award of prejudgment interest under all claims.

## II.    ABBOTT'S ACTUAL DAMAGES

The Lanham Act entitles Abbott to its actual damages suffered as a result of the H&H Defendants' infringing conduct.  15 U.S.C. § 1117(a).  Actual damages under the Lanham Act are defined as "lost sales or revenue" (as well as other expenditures such as corrective advertising not at issue here).  *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A., Inc.*, 80 F.3d 749, 753 (2d Cir. 1996) (citation omitted); *see also Harris v. Fairweather*, 2012 U.S. Dist. LEXIS 128409, at *17-18 (S.D.N.Y. Sept. 10, 2012) (Peck, M.J., *adopted*, Castel, J.) (collecting cases).  Where a plaintiff elects to seek its actual damages (as opposed to defendant's profits or statutory damages), a full damages award is mandatory: the Lanham Act provides no discretion for a downward adjustment.  *Go Med. Indus. Pty, Ltd. v. Inmed Corp.*, 471 F.3d 1264, 1274 (Fed. Cir. 2006) (while "[a] district court ha[s] discretion under § 1117" to award less than the defendant's full profits, "§ 1117 does not allow for a downward adjustment of actual [i.e., lost revenue] damages"); *see also General Electric Co. v. Speicher*, 877 F.2d 531, 535-36 (7th Cir. 1989); *McCarthy on Trademarks and Unfair Competition* § 30:75 (5th ed.) ("There is no equitable basis to refuse the recovery of actual losses ...").  Here, Abbott has elected to seek its actual damages:  i.e., its lost revenues due to the infringement.[5]

### A.    The Method and Calculation of Damages Are Not in Dispute

As set forth in Dr. Gregory Bell's preliminary expert report dated May 5, 2017, and supplemental expert report dated January 15, 2018, Abbott's damages are straightforward and easily calculated.  To avoid burdening the Court with unnecessarily repetitive filings, Abbott

---

[5] As set forth below, Abbott's costs are identical regardless of whether an authentic (U.S. retail) or an infringing (international) box was sold.  Therefore, Abbott's lost revenues are identical to its lost profits.

incorporates by reference and respectfully refers the Court to its briefing and evidentiary submissions regarding this issue in connection with summary judgment. *See* D.E. #s 1414-1417, 1426, 1434, 1472, 1476, and exhibits cited therein. Abbott summarizes the relevant evidence and damages calculations below.

Abbott does not sell, and FDA regulations prohibit the sale, of international FreeStyle test strips in the United States. *See* D.E. #131 at 3-4; D.E. # 1415 at 7; Exs. P12 (Sterlin Decl.) ¶¶ 3, 5, 8-9; P20 (Sterlin Decl.); P13 (Williams Dep.) 28:7-28:14, 85:23-86:15, 101:10-101:15, 295:10-295:18; P14 (Nelson Dep.) 57:7-57:20; P5 (Martin Dep.) 17:8-17:21, 211:24-212:8; P21 (Nelson Test.) 230:4-230:11; P22 (Sterlin Test.) 116:14-116:20. Among other differences, the international strips include instructions for use that were specifically rejected by the FDA. Exs. P12 (Sterlin Decl.) ¶¶ 3, 8-9, 12-13, 15-16; P20 (Sterlin Decl.) ¶¶ 9-11; P22 (Sterlin Test.) 115:6-116:5, 116:14-116:20; P24; P25; P30-31; P40; P42; *see also* D.E. # 1563 at 7-8. Thus, only the U.S. retail FreeStyle test strips are approved for retail sale in the United States. *Id.* Abbott sells U.S. retail FreeStyle strips only to its authorized U.S. distributors, and sells international FreeStyle test strips only to authorized distributors in countries outside the United States. *Id.*; *see also* P14 (Nelson Dep.) 112:18-114:2, 141:19-142:24.

In any given country, including the United States, every authorized distributor pays the same set published wholesale price for a box of FreeStyle test strips. Exs. P4 (Kosinski Dep.) 166:22-167:22; P546; P14 (Nelson Dep.) 17:11-17:23; P2; P531-P536. That wholesale price differs from country to country for reasons specific to the country's insurance system and market structure. As a result, the wholesale price of FreeStyle strips in the United States is significantly higher than the prices abroad. *See* Ex. P13 (Williams Dep.) 268:16-268:20. Thus, for each infringing box that the H&H Defendants unlawfully trafficked in the United States, Abbott was

11

paid the lower international wholesale price.  But for that infringement, Abbott would have been paid the higher U.S. wholesale price.  The difference between the U.S. wholesale price and the international wholesale price thus represents Abbott's damages: its lost revenues as a result of the infringement.  *See* D.E. # 1415 at 242-246.



Thus, for every box of international FreeStyle strips that the H&H Defendants sold in lieu of a U.S. retail box, Abbott lost, on average, approximately ▮▮▮

Dr. Bell, a well-respected expert economist with decades of testifying experience,[6] has submitted an expert report setting forth the precise measure of Abbott's damages.  Dr. Bell's reports reflect the straightforward nature of Abbott's damages: "th[e] conservative measure of Abbott's alleged economic loss is equivalent to the difference in the wholesale price obtained by Abbott for U.S. sales (net of appropriate discounts) and the wholesale price obtained by Abbott

---

[6] Dr. Bell holds an M.B.A. and a Ph.D. in business economics, both from Harvard University, and is a Group Vice President at Charles River Associates, an economics and management consulting firm.  Ex. P544; *see also* D.E. # 1563 at 106 (noting that "Dr. Bell's expert opinions have been relied on by other courts in this Circuit").

12251793

in the country in which the diverted sale was actually made, multiplied by the number of diverted units." Ex. P543 (Supp. Bell Report) ¶ 7.

This Court has already held that Dr. Bell's methodology in calculating Abbott's actual damages is appropriate. D.E. # 1563 at 106-107. The H&H Defendants' damages expert, Dr. Jesse David, has not offered an opinion that casts any doubt on Dr. Bell's damages methodology, and has not offered any alternative methodology. D.E. # 1415 at 249-250; D.E. # 1472 at 88. The other defense damages expert in the case, Ms. Pauline Booth, expressly agreed with Dr. Bell's methodology of calculating damages. *See* Exs. P539 (Booth Report) at 7-8 n.40; P527 (Booth Dep.) 52:7-53:2, 60:16-61:13, 66:4-66:18.

Relying on the H&H Defendants' **own** documents, Dr. Bell calculated Abbott's actual damages for ███████████████████████ boxes of infringing international FreeStyle test strips trafficked by the H&H Defendants in the United States. *See* Exs. ██████ ████████████████████████████████████████████████ ████████████████████████). For each of these boxes, Dr. Bell identified the box size, the applicable international wholesale price, and the comparable U.S. wholesale price. *See* Exs. P542 (Initial Bell Report) ¶¶ 24(d), 27, 28 n.23; P543 (Supp. Bell Report) ¶¶ 21(a), 21(c), 25(f). He then applied (i.e., deducted) a ██████████ prompt-payment discount and an inventory management fee for each U.S. wholesale price. *See* Exs. P542 (Initial Bell Report) ¶¶ 20-21, 26; P543 (Supp. Bell Report) ¶¶ 18(c), 24, 25(g); P537-P538. Dr. Bell then calculated the difference between the downwardly adjusted U.S. wholesale price and the international wholesale price to determine the amount of actual damages per box. *See* Ex. P547. And he concluded that the H&H Defendants' unlawful sale of international FreeStyle strips caused Abbott to suffer at least ██████████ in actual damages. *See* Ex. P552.

13

12251793

Every element of Dr. Bell's calculations is based on the undisputed factual record. Any attempt by the H&H Defendants to attempt to manufacture a factual dispute would fail, because as defaulting parties those purported factual disputes would be resolved against them as a matter of law.

First, the number of infringing boxes that the H&H Defendants trafficked is undisputed. Dr. Bell's report includes a spreadsheet that sets forth the details of every order of infringing boxes that the H&H Defendants trafficked, for which Dr. Bell relied on the H&H Defendants' own documents, as well as business records produced by their suppliers and customers. *See* Ex. P547; *see also* Ex. P543 at 17.[7]  The full version of Dr. Bell's spreadsheet, which was submitted to the Court in connection with summary judgment, lists the transaction details for all defendants. *See* Ex. P547.  For the convenience of the Court, Abbott submits herewith a version of that spreadsheet – originally requested by, and produced to, the H&H Defendants in discovery – that is limited to the H&H Defendants' transactions.  Declaration of Geoffrey Potter ("Potter Decl.") Inquest Ex. P610.

Second, the facts concerning the relevant wholesale prices—i.e., the international wholesale price Abbott received for the infringing product and the U.S. wholesale price that Abbott would have received but for the infringement—are also undisputed.  Abbott's wholesale prices are published.  Abbott produced those prices in discovery, and they have never been challenged. Exs. P2-P3.  For each of the H&H Defendants' infringing transactions, Dr. Bell has identified and incorporated the applicable U.S. and international wholesale prices.

---

[7] The documents that Dr. Bell relies upon for these calculations are specified in his report, were submitted in connection with Abbott's summary judgment briefing, and are incorporated by reference here: Exs. ███████████████████████████████        █████████████████████████████ ).

12251793

Third, as this Court noted in its summary judgment opinion, Dr. Bell "employed conservative assumptions for many … variables" in calculating Abbott's damages.  D.E. # 1563 at 110.  The nature of the H&H Defendants' records was such that Dr. Bell often had incomplete information, in which case Dr. Bell made the most conservative assumptions possible.  As noted above, Abbott's per-box damages can be summarized as the U.S. price minus the international price.  All of Dr. Bell's assumptions have the effect of either lowering the U.S. price or raising the international price—in each case, erring in favor of the H&H Defendants and reducing the amount of Abbott's damages.  Because of these conservative assumptions, Dr. Bell's calculations significantly understate Abbott's damages.

For example, Abbott's per-box damages vary based on the country from which the international box was diverted.  However, many of the records concerning the H&H Defendants' purchases and sales do not indicate the infringing box's country of origin.  When that information was unavailable, Dr. Bell assumes that the diverted box came from the foreign country with the **highest** of the various international wholesale prices—which benefits the H&H Defendants as it generates the lowest possible per-box damages amount.  *See* Exs. P542 (Initial Bell Report) ¶ 27; P543 (Supp. Bell Report) ¶ 21(a).  This one assumption, which Dr. Bell applied widely because most of the H&H Defendants' records failed to identify the country of origin, has a significant impact on Abbott's damages.  If, for example, Dr. Bell had assumed that even the median international price applied to unidentified boxes, rather than the highest possible international price, his calculations of Abbott's actual damages would have increased over ███ ████.  Potter Decl. Inquest Ex. P611 ¶ 3 n.2.

Dr. Bell made a number of other conservative assumptions that also understate Abbott's damages.  *See* Exs. P542 ¶ 24(d) (where box size was not provided by a defendant,

15

conservatively assuming a 50-count box instead of a 100-count box); P542 ¶ 29 n.23 & P543 ¶¶ 21(c), 25(f) (where purchase date is missing, or if the U.S. wholesale price changed up to 30 days prior to defendant's transaction, conservatively applying the lower applicable U.S. wholesale price during the relevant period); Exs. P542 (Initial Bell Report) ¶¶ 20-21, 26; P543 (Supp. Bell Report) ¶¶ 18(c), 24, 25(g); P537-P538 (reducing all U.S. wholesale prices by conservatively assuming all such prices were reduced by a prompt-payment discount and inventory-management fee).

Fourth, to the extent that the H&H Defendants' expert identified any purported factual errors in Dr. Bell's preliminary calculations, Dr. Bell addressed and resolved those errors. After the conclusion of fact discovery and the submission of defendants' expert reports, Dr. Bell submitted a supplemental damages report, in which he redoubled his efforts to ensure the accuracy of his calculations as they related to each specific defendant. This included scouring the record to eliminate any potential instances of double-counting of transactions (or other errors made in transcribing or interpreting defendants' documents), and excluding boxes of international FreeStyle strips that defendants claimed to have exported, sequestered in inventory, or returned. Ex. P543 (Bell Supp. Report) ¶¶ 23(c), 25(b), (c). Dr. Bell identified and corrected potential errors proactively, and in response to critiques raised by Dr. David in his initial report. *See* Ex. P540 (David Initial Report) ¶¶ 7, 38, 43 & App'x 3.

To obviate any potential dispute, Dr. Bell's updated calculations conservatively resolved every issue that was even arguably supported by the evidence cited. Dr. Bell's corrections satisfied Dr. David, who raised no further critiques or other issues in his supplemental report, and who admitted at deposition that he was unable to identify a single defendant for whom Dr. Bell's

16

damages calculations were incorrect.  *See* Ex. P541 (David Supp. Report); Ex. P529 (David

Dep.) 157:2-161:10.

Fifth, because they have defaulted, the H&H Defendants have no right to seek a set-off

based on payments made by settling defendants—to the extent any such limited offsets actually

exist.  *Gov't Emples. Ins. Co. v. Sannit-Thomas*, 2015 U.S. Dist. LEXIS 135117, at *30

(E.D.N.Y. Sept. 4, 2015) (collecting cases and holding "a defendant in default may not invoke

the benefits of the set-off rule." (internal quotation marks omitted)).  That rule against applying

set-offs against defaulting defendants applies with special force when the default is the result of

sanctions for fraud on the Court:

> In this case, defendants Kagan and Mirka have engaged in well-documented
> conduct which was so disrespectful of the judicial process as to result in the entry
> of default judgment against them.... [F]rom willful refusal to comply with court
> orders to deliberate efforts to mislead the court and frustrate the discovery
> process, Kagan and Mirka have squandered their opportunities to convince the
> court that they should be held liable to plaintiff for anything less than the total
> amount of damages sought by plaintiff.  Far from satisfying their burden of
> establishing that the failure to apply a set-off will result in a double-recovery or be
> unjust, the arguments now advanced by these defendants amount to too little, too
> late.

*State Farm Mut. Auto. Ins. Co. v. Grafman*, 968 F. Supp. 2d 480, 484 (E.D.N.Y. 2013).  And

even if the Court were to consider applying set-offs against a damages award here—for the

reasons stated above, it should not—the burden of proof would rest squarely with the H&H

Defendants, not Abbott.  *Id.*; *see also Kotuwage v. NSS Petroleum, Inc.*, 2018 U.S. Dist. LEXIS

21917, at *30 (E.D.N.Y. Feb. 8, 2018) ("When a non-settling defendant seeks a set-off, the

burden rests squarely upon [defendant] to show the extent to which a recovery against it would

be duplicative of [a plaintiff's] recovery from settling defendants." (alterations in original)

(internal quotation marks omitted)).

**B.     Because the Authentic and Infringing Products Are Identical Except for the Printing on the Box, Abbott's Costs Are Fixed and Irrelevant to the Calculation of Damages**

As set forth in Abbott's summary judgment briefing, Abbott's costs are the same regardless of whether an authentic (U.S. retail) or infringing (international) box of FreeStyle strips is sold.  *See* D.E. # 1415 at 245-247.  Abbott's costs therefore are irrelevant to the calculation of its actual damages.

Abbott's costs are relevant to damages only to the degree that those costs would be different "but for" the infringement.  *Delchi Carrier SpA v. Rotorex Corp.*, 71 F.3d 1024, 1029-30 (2d Cir. 1995) ("[C]ourts generally do not include fixed costs in the calculation of lost profits.  This is, of course, because the fixed costs would have been encountered whether or not the breach occurred.... [T]he district court was correct to use the standard formula employed by most American courts and to deduct only variable costs from sales revenue to arrive at a figure for lost profits." (citation omitted)); *Profi-Parkiet Sp. Zoo v. Seneca Hardwoods LLC*, 2014 U.S. Dist. LEXIS 71289, at *30-31 (E.D.N.Y. May 23, 2014) (Bloom, M.J.) ("The standard formula to calculate lost profits is 'to deduct only variable costs from sales revenue ... because [] fixed costs would have been encountered whether or not the breach occurred.'") (quoting *TeeVee Toons, Inc. v. Gerhard Schubert GmbH*, 2006 U.S. Dist. LEXIS 59455, at *12 (S.D.N.Y. Aug. 22, 2006)).

Here, Abbott's costs are identical "whether or not the breach occurred," and so are irrelevant to damages.  *Id.*   Unlike a typical Lanham Act case, here Abbott is the manufacturer of both the authentic product (U.S. FreeStyle strips) and the infringing product (international FreeStyle strips).  Both U.S. and international FreeStyle strips are manufactured on the same assembly line in Ireland, and the physical strips themselves are identical.  *See* Exs. P14 (Nelson

18

Dep.) 37:23-38:10; P4 (Kosinski Dep.) 129:20-130:9.  The packaging differs only in terms of the words and images on the box and instructions.  *Id*.  While the different words and images associated with the international product are very important because they violate FDA regulations and cause consumer confusion, they do not affect Abbott's costs.  *Id*.

In short, Abbott's cost of producing and transporting a box of U.S. FreeStyle strips is identical to Abbott's cost of producing and transporting a box of international FreeStyle strips. *See id.*; Exs. P13 (Williams Dep.) 45:19-45:24, 389:25-390:17; P4 (Kosinski Dep.)154:5-156:13; *see also* Exs. P543 (Bell Supp. Report) ¶ 16(a); P540 (David Initial Report) ¶ 12 (defense expert accepting equivalence of manufacturing and distribution costs).  This Court held as much at summary judgment: "Because the product itself is identical and any differences in transportation and packaging costs are <u>de minimis</u>, Abbott's costs of producing the two versions are essentially identical."  D.E. # 1563 at 109.  Thus, Abbott's costs are irrelevant to the calculation of damages.

The H&H Defendants previously argued that Abbott's damages calculations should somehow account for the rebates that Abbott pays to Pharmacy Benefit Managers ("PBMs"). *See* Ex. P540 at 12.  That argument remains incorrect and continues to be a red herring. Whenever a box of FreeStyle test strips is sold through insurance in the United States, Abbott pays a rebate to that insurer's PBM.  *See, e.g.*, Ex. P13 (Williams Dep.) 94:4-95:4, 176:8-177:6; *see also* Ex. P543 (Bell Supp. Report) ¶ 16(b).  Because Abbott pays that same rebate on **every** box of FreeStyle that is sold through insurance, regardless of whether the pharmacy dispenses an authentic box of U.S. retail FreeStyle test strips or an infringing international box, it constitutes a fixed cost, not a deductible variable cost.  *Id.*; *see also Delchi Carrier*, 71 F.3d at 1029-30. Similarly, in the rare instances in which a box is sold for cash, not through insurance, Abbott **never** pays a rebate, regardless of whether the box is authentic or infringing.  *See* Ex. P543 at 11.

19

Thus, in all instances, the existence of a rebate and the amount of any such rebate are identical, regardless of whether an authentic or infringing product is sold.  And so, as with every other "cost" that remains the same whether or not the infringement occurred, the rebates are irrelevant to the calculation of damages.

> **C.     Each Diverted International Box Sold in the United States Displaced the Sale of a U.S. Retail FreeStyle Box**

At summary judgment, the Court found a material dispute of fact as to the degree to which the infringing sales in fact displaced authentic sales, causing Abbott to suffer lost revenues.  As the Court noted at summary judgment, "Defendants do not dispute the applicable standard Abbott must meet: a **reasonable probability** that, but for Defendants' infringing sale of international strips, Abbott would instead of sold a box of domestic strips."  D.E. # 1563 at 110 (emphasis added); *see Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*, 176 F. Supp. 3d 137, 162 (E.D.N.Y. 2016) ("[A] plaintiff need not present absolute proof that purchasers of the infringing product would have bought [plaintiff's] product instead.  Rather, plaintiff's burden of proof is one of reasonable probability." (citation omitted)).

At the inquest stage, that is no longer at issue: all questions concerning causation of damages and the fact of damages are resolved in Abbott's favor as a matter of law.  And even if the Court were to examine the evidentiary record on this issue, the Court has already held at summary judgment that a reasonable jury could find, based on that record, that Abbott has proven its claimed damages.  With all inferences drawn in Abbott's favor, Abbott has met its burden of proving "some reasonable basis" for finding a "reasonable probability" that the H&H Defendants' infringing sales displaced authentic sales.

12251793

1. **The Court Must Accept as True Abbott's Allegations that Each Sales of an Infringing Box Caused the Lost Sale of an Authentic Box**

In its Second Amended Complaint ("SAC"), Abbott has pleaded that the diverted international FreeStyle strips were dispensed through insurance and replaced a legitimate U.S. retail box.  SAC ¶¶ 382-383, 387.  Indeed, Abbott has pleaded that the whole reason the H&H Defendants' sale of international FreeStyle strips was profitable was because they were being sold to pharmacies for dispensation through insurance.  SAC ¶¶ 388, 391-392.

At the inquest stage, those allegations—and all reasonable inferences therefrom—are accepted as true.  Abbott must introduce evidence as to the *quantum* of damages it has suffered, but the *fact* of damages and the proximate *causation* of damages are established as a matter of law through the well-pled allegations of the Complaint.  *See supra* p. 6; *see, e.g., Santillan*, 822 F. Supp. 2d at 290 ("A default effectively constitutes an admission that damages were proximately caused by the defaulting party's conduct; that is, the acts pleaded in a complaint violated the laws upon which a claim is based and caused injuries as alleged.").  Of course, a default judgment does not provide "a blank check to recover from defendant[s] any losses it has ever suffered from any source."  *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 159 (2d Cir. 1992) (internal quotation marks and citation omitted).  But a default judgment does mean that there is "no burden on plaintiff to show that any of defendant[s'] acts" pleaded in the complaint violated the relevant law, or to show that those acts "caused the well-pleaded injuries, except as we have indicated that it had to for the purpose of establishing the extent of the injury caused [plaintiff], in dollars and cents."  *Id.* (internal quotation marks and citation omitted).

As set forth above, Abbott has introduced more than sufficient evidence of the "dollars and cents" quantum of its damages: e.g., the amount of infringing sales, the income it received

12251793

from the sale of the infringing products, and wholesale prices it would have received on the sale of authentic product.  The question of whether a customer would have bought Abbott's product "but for" the infringing sale is a causation issue, not a quantum issue.  *See Innovation Ventures*, 176 F. Supp. 3d at 162 ("'[T]he burden is on the plaintiff to demonstrate that it **would have made the sales but for the infringing activity**.'  However, 'a plaintiff need not present absolute proof that the purchasers of the infringing product would have bought [plaintiff's] product instead.  Rather plaintiff's burden of proof is one of reasonable probability.") (citations omitted); *Etna Prods. Co. v. Q Mktg. Grp., Ltd.*, 2004 U.S. Dist. Lexis 15323, at *35-38 (S.D.N.Y. Aug. 4, 2004) ("Etna claims that but for Q Marketing's sales of infringing mirrors to PCH, Etna could have sold at least the same number of [authentic] mirrors to PCH.  **Etna easily meets the 'but for' test** as far as these sales are concerned.  In all reasonable probability, Etna would have made the same sales to PCH that Q Marketing made.") (emphasis added).  At an inquest, Abbott satisfies that but-for causation element with the allegations of its pleadings.

> **2.     The Record Evidence Proves that Each Infringing Box Displaced an Authentic Box**

Even if the Court were to move beyond the pleadings on the issue of whether there is a "reasonable probability" that infringing boxes displaced authentic boxes—for the reasons stated above, it should not—the record evidence would more than satisfy Abbott's burden of proof.

> a.     <u>It Remains Undisputed that Every Infringing Box Sold to Consumers Through Insurance Necessarily Displaced an Authentic Box on a One-for-One Basis</u>

As Abbott alleged and demonstrated at summary judgment, the market for infringing international FreeStyle test strips in the United States depends on insurance fraud.  *See* D.E. # 307 ¶¶ 5-9, 374, 382-388, 391-392; D.E. # 1415 at 52-54, 247-248; D.E. # 1426 at 29-32; D.E. # 1472 at 90.  In the United States, insurers will only pay for drugs and medical devices that are on

22

the insurer's formulary, which are identified by that drug or device's unique National Drug Code, or NDC.  *See* D.E. # 307 ¶ 373; D.E. # 1415 at 32-33; Exs. P1 (Nelson Decl.) ¶¶ 8-15; P13 (Williams Dep.) 52:14-52:21, 157:13-157:15, 176:8-177:6, 243:10-243:16, 335:3-335:10; P14 (Nelson Dep.) 112:18-114:2, 141:19-142:24; Ex. P84 at 7.   The only FreeStyle test strips that are authorized to be sold in American retail pharmacies, and thus the only FreeStyle test strips whose NDC numbers are listed on formularies, are U.S. retail FreeStyle test strips.  *Id.* International FreeStyle strips are misbranded medical devices in the United States, and their sale in the United States is a strict-liability federal crime.  21 U.S.C. §§ 331, 333, 352; *see, e.g.*, Ex. P22 (Sterlin Test.) 116:14-116:20; D.E # 307 ¶ 13 & n.3.  International FreeStyle test strips are not FDA-approved, and include packaging and instructions for use that are contrary to and hence violate FDA requirements.  *See* Ex. P75 at 2-4, 11-13, 24; D.E. # 307 ¶¶ 11-13, 354-367; D.E. # 1415 at 31-41; D.E. # 1563 at 7-8.  Unsurprisingly, international FreeStyle strips do not have an NDC number on the box.  *Id.*

U.S. retail pharmacies cannot sell a box of FreeStyle test strips through insurance without providing the insurer with a valid NDC number.  *See* D.E. # 307 ¶¶ 355, 369-373, 388; D.E. # 1563 at 6-7; D.E. # 1415 at 3, 7-8, 20-21; Exs. P75 at 2-3; P12; P1 (Nelson Decl.) ¶¶ 8-15; P13 (Williams Dep.) 157:13-157:15, 176:8-177:6, 243:10-243:16, 335:3-335:10; P14 (Nelson Dep.) 57:7-57:23.  And since there is no NDC number for international strips (nor could there be, since they violate FDA regulations), the *only* way to sell international FreeStyle strips through insurance is to falsely misrepresent them to be U.S. retail FreeStyle strips and dispense them in place of a legitimate U.S. retail box of FreeStyle strips.  *See id.*; *see also* Exs. P58 (Nelson Decl.) ¶¶ 12, 20; P14 (Nelson Dep.) 112:18-114:2, 141:19-142:24.  This fraud is easily accomplished: all boxes of U.S. retail FreeStyle strips have the same NDC number, and so the pharmacy simply

23

enters the NDC number for the U.S. retail strips (or scans a U.S. retail box) while handing the customer an international box.  *See* Exs. P1 (Nelson Decl.) ¶ 12; P58 (Nelson Decl.) ¶ 20; P14 (Nelson Dep.) 112:18-114:2, 141:19-142:24; P99-P100; P178.

Thus, when a pharmacy sold a box of international FreeStyle test strips through insurance, it directly substituted an infringing international box in place of an equivalent U.S. retail box.  There is no question what the consumer would have purchased but for the infringement, because the *only* product the consumer could lawfully receive was the U.S. retail box.  Moreover, the patient received no benefit from being dispensed an international box.  Because the infringing transaction was fraudulently consummated as though authentic U.S. retail strips were being dispensed, the patient pays the same co-pay it would have paid as if a U.S. retail box was dispensed, and the patient receives a receipt falsely showing a U.S. retail box was dispensed.  In short, each infringing box was, quite literally, substituted for an authentic box of U.S. FreeStyle test strips at the point of sale, on a one-for-one basis.

Given these undisputed facts, there is only one reasonable inference a fact finder could draw: the infringing product displaced an equivalent authentic product.  Indeed, at summary judgment, neither the H&H Defendants nor any of the other defendants seriously contested—and certainly introduced no evidence to rebut—that every infringing box sold through insurance displaced the sale of an authentic box.

> b.   The Evidence Shows that All of the Infringing Boxes Trafficked by the H&H Defendants Were Sold to Patients Through Insurance

The evidence confirms that *all* of the infringing international FreeStyle strips sold by the H&H Defendants were dispensed to patients through insurance, and thus that *all* infringing boxes sold by the H&H Defendants in fact displaced authentic boxes on a one-for-one basis.  In its summary judgment decision, this Court denied Abbott's motion with regard to damages in part

24

because it found there to be "a genuine factual dispute over the percentage of international strips that were dispensed by insurance versus cash." D.E. # 1563 at 110. However, the Court explicitly held that in light of the evidence submitted by all parties, "the record allows a reasonable jury to find in favor of Abbott," and, specifically, that "a jury could conclude— relying on Abbott's statistics regarding FreeStyle in general and pharmacists' testimony that they intermingled their stock," that all or nearly all of the infringing international test strips at issue were sold through insurance and therefore were "literally substituted for domestic strips." *Id.* at 112.

Here, all reasonable inferences from the evidence must be drawn in Abbott's favor. *See Schalaudek*, 2017 U.S. Dist. LEXIS 26272, at *6 (At a damages inquest "plaintiffs are entitled to all reasonable inferences from the evidence presented in support of their damages claims."); *supra* pp. 5-8. The Court's ruling at summary judgment that, based on Abbott's evidence, a reasonable jury could find in Abbott's favor mandates such a finding in Abbott's favor at the inquest.

Abbott briefly recounts the evidence here. The uncontradicted evidence from Abbott's witnesses is that over 95% of all U.S. retail FreeStyle test strips are sold through insurance. D.E. # 1415 at 247-248; Exs. P1 (Nelson Decl.) ¶ 5; P4 (Kosinski Dep.) 50:19-53:8; P5 (Martin Dep.) 176:24-177:9; ███████████████████████████████████████████████████

███████████████████████████████████████. And Abbott introduced evidence from four retail pharmacies – consisting of every pharmacy deposed on the subject – that they (1) sold all or nearly all of their FreeStyle test strips through insurance and (2) indiscriminately intermingled their stock of international and domestic FreeStyle strips. *See id.*;

25

12251793

*see also* ███████████████████████████████████████████ D.E. # 1563 at 110-

111.

That evidence, which the Court found sufficient for a jury to award Abbott's full

damages against all defendants, applies with special force to the H&H Defendants. ██████



████████. And as the Court noted in connection with Abbott's claims of willfulness and

aiding and abetting fraud, there is substantial direct evidence in the record that the H&H

Defendants knew that its pharmacy customers were purchasing international FreeStyle test strips

in order to fraudulently sell them through insurance, and encouraged them to do so.  D.E. # 1563

at 55-56, 90-92; ████████████████████████████████████████

███████████████████████████████.

For their part, the H&H Defendants failed at summary judgment to introduce any

evidence that a single one of their retail pharmacy customers sold a single box of international

FreeStyle strips for cash, as opposed to through insurance.  Indeed, the H&H Defendants did not

take any discovery from any of their pharmacy customers on the subject.

In sum, Abbott has put forward more than sufficient evidence, reasonably interpreted in

the light most favorable to Abbott, to provide "some reasonable basis" to conclude there was a

26

"reasonable probability" that each infringing strip sold by the H&H Defendants was sold through insurance and therefore must have displaced an authentic strip. *Cartwright*, 2017 U.S. Dist. LEXIS 48052, at *12; *Innovation Ventures,* 176 F. Supp. 3d at 162.

      c.     <u>Any Sales of Infringing Strips for Cash Also Displaced the Sale of Authentic Strips</u>

At summary judgment, the Court found that in addition to there being a dispute of fact concerning whether international strips were sold to patients for cash, there was "a genuine factual dispute as to whether patients who did pay in cash would have purchased domestic strips, if international strips were not available." D.E. # 1563 at 112. For the reasons stated above, the Court need not reach the issue here—but if the Court were to do so, it would not affect the outcome of the inquest, because any and all infringing cash sales also displaced authentic boxes on a one-for-one basis.

The Court expressly found at summary judgment that "[o]n this record, a jury could credit … Abbott's theory (that absent international strips, [cash-paying] patients would have purchased Abbott's full price domestic strips for cash)." D.E. # 1563 at 113. Once again, while that finding may have precluded summary judgment as to other defendants, at this inquest involving the H&H Defendants, with all reasonable inferences made in Abbott's favor, the Court's finding that Abbott could prevail given the available evidence means that Abbott has demonstrated each infringing strip displaced an authentic strip, even if sold for cash. *See supra* pp. 25.

Briefly summarized, Dr. Bell's report sets forth his expert opinion that any patients who purchased international FreeStyle at a cash discount would have, but for the infringement, purchased authentic U.S. FreeStyle strips at full price as opposed to a competing product. *See* Exs. P542 at 7; P543 at 4-6. Abbott also introduced substantial and unrebutted evidence that

27

there are significant barriers to switching to different test strips, including the fact that the
FreeStyle meters work only with FreeStyle test strips.  *See, e.g.*, Exs. ███████████

███████████; P13 (Williams Dep.) 271:3-271:25 (explaining that the FreeStyle and FreeStyle

Precision Neo are "different technology" and therefore require different meters); *id.* 357:15-

358:7 (testifying that the institutional strips will not work with the consumer's meter); *see also*

Exs. P529 (David Dep.) 37:17-38:18; P527 (Booth Dep.) 96:9-96:25.  A buyer of FreeStyle

strips—whether the U.S. or international product—can only actually use those strips to monitor

their blood glucose level if they have a FreeStyle meter.  *Id.*; Ex. P5 (Martin Dep.) 221:10-

221:22; *see also* Ex. P528 (Bell Dep.) 93:21-96:12.  Abbott also introduced evidence that brand

loyalty is extraordinarily high among test-strip users.  *Id.*; *see also* Exs. ███████████

███████████████████████████████ P528 (Bell Dep.) 97:25-99:14; ███

███████████████████.  And Abbott introduced evidence that cash buyers who wanted

to save money would not have purchased the infringing product in the first place: even a heavily

discounted box of international FreeStyle strips is much more expensive than a vast array of

other FDA-approved test strips and meters (including other Abbott products).  *See* D.E. # 1426 at

33-37; D.E. # 1472 at 91; Exs. P540 (David Initial Report) at 7; P13 (Williams Dep.) 270:16-

271:21; P543 (Bell Supp. Report) ¶ 14; P528 (Bell Dep.) 60:21-63:12, 93:21-96:12, 97:25-99:14;

███████████████████████; P1 (Nelson Decl.) ¶ 3; ███████████████

██████████████████████████; P13 (Williams Dep. 271:3-271:25,

357:15-358:7); P529 (David Dep.) 37:17-38:18; P527 (Booth Dep.) 96:9-96:25; P5 (Martin

Dep.) 221:10-221:22.  A price-sensitive consumer would have chosen one of those options in the

first instance, rather than pay a large premium for the infringing FreeStyle strips.  *Id.*  In rebuttal,

the H&H Defendants (and the other defendants) offer only the opinion of Dr. David, who merely

28

points out that low-priced alternatives are available to patients who do not want to pay the full cash price of FreeStyle test strips. *See* Ex. P540 at 7.

While its evidence may not have been so conclusive as to warrant summary judgment with inferences drawn in the defendants' favor, the weight of the evidence is strongly in Abbott's favor, and Abbott would prevail on this issue at trial under a preponderance of the evidence standard. At inquest, it is certainly a more than reasonable inference that each infringing sale for cash did, in "reasonable probability," displace the sale of an equivalent authentic product and cause Abbott actual damages. Thus, regardless of whether an infringing box was sold to a patient through insurance or for cash, Abbott has met its burden proof with regard to calculating its actual damages, and the Court should award Abbott ███████ in actual damages as calculated by Dr. Bell.

## III.    THE COURT SHOULD AWARD TREBLE DAMAGES

All of the relevant factors that support trebling actual damages under the Lanham Act are present here. The H&H Defendants' infringement was willful. They engaged in fraud on this Court. They are recidivists with a clear willingness to risk trademark litigation as a cost of doing business. Abbott's damages calculations are conservative and understate Abbott's financial injury. And there is the need to send a strong, unequivocal message of deterrence to the H&H Defendants and other parties who place illegal profit ahead of patient safety and trademark rights.

The Lanham Act provides that the Court in its discretion "may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount." 15 U.S.C § 1117(a). "Courts have held that treble damages may be appropriate where, as here, the infringer has engaged in willful behavior."

29

*Ortho Sleep Prods., LLC v. Dreamy Mattress Corp.*, 2012 U.S. Dist. LEXIS 183253, at \*28-29 (E.D.N.Y. Aug. 29, 2012) (citations omitted).  Moreover, treble damages are routinely awarded after default judgment because the "default constitutes an admission of the allegation in the complaint that defendant acted at all relevant times willfully and intentionally, with knowledge of plaintiff's trademark rights."  *See Strippit, Inc. v. Coffee*, 2009 U.S. Dist. LEXIS 99996, at \*12-13 (W.D.N.Y. Oct. 27, 2009) (citation omitted).

Here, because the H&H Defendants' answer was stricken *after* the Court's entry of summary judgment, the Court is in the unusual circumstance of having found H&H to have willfully infringed as a matter of law based on the undisputed evidence, before an additional automatic finding of willfulness applied upon their default.  *See* D.E. # 1563 at 56.  Moreover, the Court has already found that the H&H Defendants willfully engaged in extensive litigation misconduct before this Court, which led to the application of the crime-fraud exception to the attorney-client privilege and, eventually, the entry of a default judgment as sanctions.  *See Abbott Labs. v. H&H Wholesale Servs.*, No. 17-cv-3095, D.E. # 102; D.E. # 1613 at 25.  Among other things, the Court has found that the H&H Defendants "had a duty to comply with the Court's orders, and each willfully and grossly failed to do so," and that they participated in a "willful discovery fraud and cover-up [that] they undertook personally or that was undertaken by their agents in their name."  D.E. # 1613 at 15, 19.  That conduct alone should be met with an award of treble damages to Abbott.

Treble damages are also appropriate where the plaintiff's damages calculation is conservative or fails to fully account for or quantify all of the harm caused.  *See Getty Petroleum Corp. v. Bartco Petroleum Corp.*, 858 F.2d 103, 110 (2d Cir. 1988) (holding the enhancement provision "enable[s] courts to redress fully plaintiffs whose actual damages [may be] difficult to

30

prove."); *AW Indus.*, 2011 U.S. Dist. LEXIS 111889, at \*21 (trebling actual damages "given the conservative nature of … [plaintiff's] actual damages calculation").  As set forth above, Abbott's actual damages calculation is conservative and significantly understates Abbott's lost profits. *See supra* pp. 12-15.  And Dr. Bell's calculations do not and cannot calculate the unquantifiable harm to Abbott's goodwill caused by the H&H Defendants' sale of infringing products that violate FDA regulations and contain language and symbols confusing to the U.S. consumer. Exs. P21 (Nelson Test.) 246:19-247:5, 247:17-248:6; P13 (Williams Dep.) 380:10-380:18; *see Novell, Inc. v. Network Trade Ctr.*, 25 F. Supp. 2d 1233, 1244 (D. Utah 1998) (departing upward due to unquantifiable harm to plaintiff's goodwill); *Mobius Mgmt. Sys., Inc. v. Fourth Dimension Software, Inc.*, 880 F. Supp. 1005, 1025 (S.D.N.Y. 1995) (enhancing monetary award to compensate plaintiff for the "difficult to quantify" loss of customer goodwill).

Moreover, "intangible benefits" accrued to the H&H Defendants as a result of their trademark infringement and false advertising.  *Merck Eprova AG v. Gnosis S.p.A.*, 901 F. Supp. 2d 436, 460 (S.D.N.Y. 2012), *aff'd*, 760 F.3d 247 (2d Cir. 2014).  ██████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████  Their sale of ████████ infringing FreeStyle strips in the United States has created an equivalent deprivation of Abbott's legitimate market share. *See, e.g.*, *Gnosis*, 901 F. Supp. 2d at 430, 460 (awarding treble damages because of the "intangible benefits that accrued to [the defendant] as a result of its false advertising, primarily [defendant's] usurpation of Merck's market share"); *Merck Eprova AG v. Brookstone Pharms., LLC*, 920 F. Supp. 2d 404, 430 (S.D.N.Y. 2013); *see also N.Y. Racing Ass'n, Inc. v. Stroup News Agency Corp.*, 920 F. Supp. 295, 301 (N.D.N.Y.1996) (trebling profits award because "[t]he

Court cannot compute the value of the intangible benefits [defendant] received as a result of its deliberate, flagrant, and mulish violation of [plaintiff's] mark").

Finally, enhanced damages are particularly appropriate where deterrence is needed. *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 263 (2d Cir. 2014); *see also Days Inn Worldwide, Inc. v. Adrian Motel Co.*, 2009 U.S. Dist. LEXIS 90393, at *46 (E.D. Mich. 2009) ("Courts frequently award treble damages where the infringer acted willfully or where the court wishes to deter future infringing activity." (citation omitted)); *Gnosis*, 901 F. Supp. 2d at 461 ("While an award under the Lanham Act must promote a compensatory and not punitive purpose, it is no small matter that [defendant] may be deterred from again engaging in such brazen behavior by being required to fully account for its actions."); *Brookstone*, 920 F. Supp. 2d at 430 (finding award of treble damages additionally "confirmed by the need to deter [the defendant] from engaging in such willful violations in the future").

The need for deterrence here is evident.  The H&H Defendants have been down this road before.  *See* D.E. # 1563 at 55.  They were previously sued by another major test-strip manufacturer for running precisely the same scheme: importing and selling the materially different international version of Johnson & Johnson's OneTouch test strips.  *Id.*; *see also* D.E. # 307 ¶¶ 552-556; D.E. # 1415 at 79-80, 88, 97.  And after the H&H Defendants entered into a multi-million-dollar settlement of that action (D.E. # 4-6), two of its major customers sought indemnity from H&H in connection with their purchase of international FreeStyle strips, knowing such purchases to be unlawful.  S*ee* Exs. P127; P156; P525.  None of this deterred the H&H Defendants, for whom trademark litigation is just an expected cost of doing business.

And as the Court is well aware, the H&H Defendants' malfeasance did not stop after Abbott filed suit.  To the contrary: it escalated.  ████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████   After a preliminary injunction was in place, the

H&H Defendants then engaged in criminal counterfeiting and flouted the injunction by

importing tens of thousands of boxes of international FreeStyle test strips that had been

repackaged into counterfeit domestic packaging.  *See* D.E. # 1415 at 97-98; ███████.  And the

H&H Defendants attempted to cover up their willful infringement and violation of this Court's

orders by engaging in a long-running series of frauds upon this Court, which eventually resulted

in entry of a default judgment as a sanction against them.  *See* D.E. # 1415 at 98; *see generally*

D.E. # 1521; D.E. # 1545; D.E. # 1613.  Failure to award treble damages would pose a moral

hazard and incentivize repeat offenders like the H&H Defendants to continue their willful

infringement and to fraudulently cover up their tracks if they get caught.

The egregiousness of the H&H Defendants' actions, both in the marketplace and before

this Court, far surpasses the misconduct that courts have found sufficient to impose a maximum

award of treble actual damages under the Lanham Act.  *See, e.g.*, *Ortho Sleep Prods.*, 2012 U.S.

Dist. LEXIS 183253, at *28-30 (awarding treble damages where defendants advertised plaintiff's

mattresses and then delivered inferior mattresses); *Strippit*, 2009 U.S. Dist. LEXIS 99996, at

*12-14 (awarding treble damages where defendant operated a website that infringed on the

trademark for plaintiff's sheet-metal machining products); *Days Inn Worldwide*, 2009 U.S. Dist.

LEXIS 90393, at *46-49 (awarding treble damages where defendants used plaintiff's mark on

their hotel); *N.Y. Racing Ass'n*, 920 F. Supp. at 301 (awarding treble damages where defendant

sold unlicensed t-shirts bearing the plaintiff's mark). The only set of cases that even approach the

H&H Defendants' conduct are those brought by Merck against defendants who falsely marketed

33

their supplements as containing Merck's high-quality ingredients. *Gnosis*, 901 F. Supp. 2d at 461; *Brookstone*, 920 F. Supp. 2d at 431. One of those defendants, Gnosis, also engaged in similarly "outrageous" discovery conduct (901 F. Supp. 2d at 443), and offered perjured testimony at trial (*id.* at 458-59), just as the H&H Defendants did at deposition. *See* D.E. # 1524 at 13-17, 19-22; D.E. # 1613 at 6, 15, 17-18. Those facts certainly justified an award of treble damages. But even in the *Merck* litigations, the defendants did not have the H&H Defendants' history of engaging in—let alone being successfully sued for—the same infringing scheme years before the instant suit was brought. The H&H Defendants stand out as truly bad actors in a field of willful infringers, and only an award of treble damages will make Abbott whole and sufficiently deter the H&H Defendants from further unlawful diversion and litigation misconduct.

Finally, Abbott notes that in addition to up-to-treble damages under the Lanham Act, the Court has discretion to impose punitive damages under Abbott's state-law claims for the H&H Defendants' willful and fraudulent acts. *See* D.E. # 1563 at 116; *N.Y. Racing Ass'n v. Stroup News Agency Corp.*, 920 F. Supp. 295, 304 (N.D.N.Y. 1996) (awarding double damages that had already been trebled under the Lanham Act). However, given that the enhanced-damages analysis under the Lanham Act already incorporates considerations of deterrence for willful malfeasance, Abbott does not propose an additional punitive damages award against the H&H Defendants. Instead, Abbott respectfully urges the Court to issue a full award of treble damages against the H&H Defendants pursuant to 15 U.S.C § 1117(a).

## IV. ABBOTT IS ENTITLED TO ATTORNEYS' FEES AND COSTS

Section 35(a) of the Lanham Act provides that plaintiffs are entitled to their attorneys' fees and costs "in exceptional cases." This is unquestionably an exceptional case.

It is well established in this Circuit and others that willful infringement satisfies the "exceptional case" standard and merits an award of fees and costs. *See Bambu Sales, Inc. v. Ozak Trading Inc.*, 58 F.3d 849, 854 (2d Cir. 1995); *Sara Lee*, 36 F. Supp. 2d at 170. Here, the Court has expressly found the H&H Defendants willful as a matter of law on two separate occasions. *See* D.E. # 1563, 1613. And even without those findings, the fact of the H&H Defendants' default constitutes both willfulness and sufficient exceptional circumstances to award fees. *HealthNow N.Y. Inc. v. Romano*, 2018 U.S. Dist. Lexis 174493, at *16 (W.D.N.Y. Oct. 10, 2018) ("When the plaintiff pleads the necessary facts for willful infringement and the defendants default, the defendant's violations are deemed willful and thus constitute exceptional circumstances." (internal quotation marks and citation omitted)); *Prot. One Alarm Monitoring, Inc. v. Exec. Prot. One Sec. Serv., LLC*, 553 F. Supp. 2d 201, 208-209 (E.D.N.Y. 2008) (same).[8]

The factors that the Supreme Court identified as tending to demonstrate a case is exceptional are present here: the "'frivolousness, motivation, [and] objective unreasonableness'" of the H&H Defendants' position, and "'the need in particular circumstances to advance considerations of compensation and deterrence.'" *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 n.6 (2014) (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 (1994)); *see also Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 315 (3d Cir. 2014) (applying *Octane Fitness* standard); *Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*, 2018 U.S. Dist. LEXIS 3035, at *3-4 (S.D.N.Y. Jan. 8, 2018) ("[T]he Supreme Court's [*Octane Fitness*] decision applies to fee applications under the Lanham Act as well.") (collecting cases).

---

[8] In addition to being entitled to its attorneys' fees under Section 35(a) of the Lanham Act, Abbott is also entitled to its fees under state law for the H&H Defendants' fraudulent conduct. *See, e.g., Kaleidoscope Media Grp., Inc. v. Entm't Sols., Inc.*, 2001 U.S. Dist. LEXIS 10801, at *11 (S.D.N.Y. July 19, 2001) (citing *Winkler v. Allvend Indus., Inc.*, 186 A.D.2d 732, 588 N.Y.S.2d 885 (2d Dep't 1992) ("[A]ttorney's fees may be recovered for fraud as out of pocket damages.")).

35

12251793

Given that this case involves the willful sale of misbranded, FDA-regulated medical devices, the facts here are precisely the sort of "circumstances" where "considerations of ... deterrence" are at their apex. *Octane Fitness*, 134 S. Ct. at 1756 n.6.

This case also "is simply one that stands out from others with respect to the substantive strength of [Abbott's] litigating position (considering both the governing law and the facts of the case)" and because of "the unreasonable manner in which the case was litigated" by the H&H Defendants. *Id.* at 1754, 1756. As of this writing, there are nearly 2,200 numbered docket entries, which does not include the entries in the related counterfeiting action against the H&H Defendants. A disturbingly large percentage of those entries were necessitated by the H&H Defendants' bad-faith, scorched-earth approach to their defense of this action. That includes bringing counterclaims that were easily dismissed (D.E. # 1167); producing documents in an indistinguishable mass of scanned-together, unnumbered hard copies (*see* D.E. # 1075); refusing to make electronic productions absent Court order (*see id.*; D.E. # 1080); resorting to gamesmanship and "unnecessary hard ball" tactics, which the Court found "offensive" (Ex. BR (Tr. of Nov. 30, 2015 Conf.) at 87:21-88:6); engaging in a calculated pattern of discovery misconduct, which in addition to extending the length of discovery, demanded extensive investigation and motion practice; using counsel as an instrumentality of their discovery fraud, requiring the briefing and argument of Abbott's successful motion for the application of the crime-fraud exception to the attorney-client privilege (*Abbott Labs. v. H&H Wholesale Servs.*, No. 17-cv-3095, D.E. # 102); pursuing baseless appeals (D.E. # 1029); and employing a revolving door of attorneys. All this has not come cheaply. "[C]onsiderations of compensation" therefore militate in favor of a fee award. *Octane Fitness*, 134 S. Ct. at 1756 n.6; *see also Beijing Daddy's Choice Sci. & Tech. Co. v. Pinduoduo Inc.*, 2020 WL 729518, at *4 (S.D.N.Y.

36

Feb. 13, 2020) (finding case to be exceptional because, in part, of plaintiff's unreasonable litigation conduct in concealing relevant information).

Finally, the H&H Defendants' willfulness subjects them to liability for Abbott's costs necessary to "investigat[e] and prosecut[e] the[] infringement." *See, e.g.*, *Close-Up Int'l, Inc. v. Berov*, 2007 U.S. Dist. LEXIS 83972, at *20-29 (E.D.N.Y. Nov. 13, 2007), *aff'd*, 382, F. App'x 113 (2d Cir. 2010); *Millennium TGA, Inc. v. Leon*, 2013 U.S. Dist. LEXIS 150508, at *42-44 (E.D.N.Y. Sept. 24, 2013), *adopted*, 2013 U.S. Dist. LEXIS 150267 (E.D.N.Y. Oct. 18, 2013); *Arthur A. Kaplan Co. v. Panaria Int'l Inc.*, 1999 U.S. Dist. LEXIS 6315, at *8-9 (S.D.N.Y. Apr. 26, 1999), *aff'd*, 205 F.3d 1321 (2d Cir. 2000); *see also* 28 U.S.C. § 1920; E.D.N.Y. L.R. 54.1.

Abbott therefore respectfully requests that the Court adjudge this an "exceptional case," enter judgment on Abbott's entitlement to attorneys' fees and costs including investigative fees and costs. Because Abbott's attorneys' fees are still accruing, and in order not to derail this damages inquest, the Court should further set a briefing schedule for the determination of Abbott's reasonable attorneys' fees and costs, or refer the issue to proceedings before Magistrate Judge Bloom pursuant to Rule 54(d)(2)(D). *See Sleepy's LLC v. Select Comfort Wholesale Corp.*, 2016 U.S. Dist. LEXIS 3064, at *17-18 (E.D.N.Y. Jan. 11, 2016) (granting motion for attorneys' fees under the Lanham Act and ordering the "parties to confer and submit a proposed briefing schedule" on the amount of fees to be awarded).

## V.   PREJUDGMENT INTEREST IS APPROPRIATE HERE

An award of prejudgment interest is governed by the same test as attorneys' fees: whether the case is "exceptional." The Second Circuit "draws no distinctions between the showing required to support such an award [of prejudgment interest] and that required to justify an award of attorney's fees." *4 Pillar Dynasty LLC v. New York & Co.*, 933 F.3d 202, 216 (2d

Cir. 2019).  Thus, the same reasons that warrant an award of attorneys' fees warrant an award of prejudgment interest.

### A.      The Applicable Rate and Compounding of Interest

The appropriate rate of prejudgment interest to be applied lies in the sound discretion of the Court.  *See GTFM, Inc. v. Solid Clothing, Inc.*, 2002 WL 31886349, at *4 (S.D.N.Y. Dec. 26, 2002).  Prejudgment interest should be awarded "to: (i) ensure that an infringer not profit in any way from its misconduct; and (ii) provide a specific and general deterrent to those who might exploit another's trademark rights without authorization."  *Nat'l Ass'n for Specialty Food Trade, Inc. v. Construct Data Verlag AG*, 2006 WL 5804603, at *7 (S.D.N.Y. Dec. 11, 2006), *adopted*, 2007 WL 656274 (S.D.N.Y. Feb. 23, 2007).  Courts have found these objectives particularly salient where the defendant has engaged in willful infringement or been found to have defaulted. *See Bumble & Bumble, LLC v. Pro's Choice Beauty Care, Inc.*, 2016 WL 658310, at *12 (S.D.N.Y. Feb. 17, 2016), *adopted*, 2016 WL 1717215 (S.D.N.Y. Apr. 27, 2016).

Courts in the Second Circuit have generally adopted one of two interest rates.  Many have utilized the 9% rate called for in N.Y. C.P.L.R. § 5004.  *See, e.g.*, *GTFM*, 2002 WL 31886349, at *4; *Bumble & Bumble*, 2016 WL 658310, at *12; *Int'l Consulting Servs. v. Cheap Tickets, Inc.*, 2007 U.S. Dist. LEXIS 71689, at *27 (E.D.N.Y Sep. 12, 2007); *Nat'l Ass'n for Specialty Food Trade*, 2006 WL 5804603, at *7.  The Second Circuit, in analogous contexts, has confirmed that it is proper "to look to state law in order to determine the appropriate rate."  *Lodges 743 & 1746, Int'l Ass'n of Machinists v. United Aircraft Corp.*, 534 F.2d 422, 446 (2d Cir. 1975).  Magistrate Judges Go and Bloom have followed suit.  *See, e.g.*, *Bricklayers Ins. & Welfare Fund v. Primo Brick, Inc.*, 2013 WL 2120338, at *5 (E.D.N.Y. Apr. 3, 2013) (Bloom, M.J.) (applying 9% rate for Labor Management Relations Act claim), *adopted*, 2013 WL 2120318 (E.D.N.Y. May 15,

38

2013); *Zim Am. Integrated Shipping Servs., Inc. v. Caribbean-Am. Program for Empowerment (USA), Inc.*, 2007 WL 2903853, at *3 (E.D.N.Y. Sept. 28, 2007) (Go, M.J.) (applying 9% rate in admiralty case).

Other courts, by comparison, have borrowed from Section 1117(b) of Title 15, which governs unlawful uses of counterfeit marks and utilizes the interest rate established under 26 U.S.C. § 6621(a)(2): the federal short-term rate plus three points, which currently would calculate to 3%. *See, e.g.*, *Melodrama Publ'g, LLC v. Santiago*, 2015 WL 2380521, at *7 (S.D.N.Y. May 19, 2015), *adopted*, 2015 WL 7288639 (S.D.N.Y. Nov. 16, 2015); *Gnosis*, 901 F. Supp. 2d at 461; *TigerCandy Arts, Inc. v. Blairson Corp.*, 2012 WL 760168, at *1 (S.D.N.Y. Feb. 23, 2012), *adopted*, 2012 WL 1948816 (S.D.N.Y. May 30, 2012).

Where the purpose of the damages award is to make the plaintiff whole, the Second Circuit has stated that goal "can only be achieved if interest is compounded." *Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 145 (2d Cir. 1993) (in Title VII action, finding failure to apply a compound rate of interest an abuse of discretion). Courts applying a 9% interest rate have typically compounded on an annual basis. *See Wilson v. Great Am. Indus., Inc.*, 763 F. Supp. 688, 691 (N.D.N.Y. 1991), *aff'd in part, rev'd in part*, 979 F.2d 924 (2d Cir. 1992); *Bumble & Bumble*, 2016 WL 658310, at *12; *GTFM*, 2002 WL 31886349, at *4; *cf. Perez v. Progenics Pharms., Inc.*, 204 F. Supp. 3d 528, 549 (S.D.N.Y. 2016) (applying 9% interest rate with annual compounding for Sarbanes-Oxley cause of action, finding monthly compounding "unnecessary"). Section 1117(b), on the other hand, calls for prejudgment interest to be compounded on a ***daily*** basis. *See* 26 U.S.C. § 6622; *see, e.g.*, *Flanagan v. Odessy Constr. Corp.*, 2018 WL 1179889, at *8 (E.D.N.Y. Feb. 9, 2018), *adopted*, 2018 WL 1175164 (E.D.N.Y. Mar. 6, 2018) (compounding daily in ERISA case); *but see Manzo v. Sovereign Motor Cars,*

39

*Ltd.*, 2010 WL 1930237, at \*12 (E.D.N.Y. May 11, 2010) (applying interest rate embodied in Section 6621(a)(2), but compounding annually).

Here, the Court should apply the New York statutory 9% rate, compounded annually, when calculating pre-judgment interest.  That rate is both legally appropriate and necessary to make Abbott whole.  *See Saulpaugh*, 4 F.3d at 145.  Abbott is seeking its actual losses, not statutory or hypothetical damages.  For over 10 years, Abbott did not have access to and was therefore unable to spend or invest those funds in research and development.

For the same 10-plus years, the H&H Defendants had full access to and use of their ill-gotten gains, essentially receiving an interest-free loan for that entire period.  And the H&H Defendants cannot be heard to complain about the length of time over which prejudgment interest accrues, as they are the architects of the delay in the resolution of this action.  At every step of this litigation, the H&H Defendants engaged in gamesmanship, discovery misconduct, and out-and-out discovery fraud, all of which caused huge and unnecessary delays in the resolution of this action.  *See supra* pp. 30, 36.  For example, the litigation over the H&H Defendants' fraud on this Court consumed over a year's worth of the Court's and Abbott's resources.   Applying the New York 9% rate, compounded annually, will ensure that the H&H Defendants do not profit from their misconduct.  *See Nat'l Ass'n for Specialty Food Trade*, 2006 WL 5804603, at \*7.

And perhaps most importantly, awarding the proposed 9% rate with annual compounding will serve as a clear deterrent to the H&H Defendants and any other would-be recidivists who view willful infringement and exploitation of trademarks as part of a lucrative business plan.  *See id.*; *Bumble & Bumble*, 2016 WL 658310, at \*12.  The Court should enter a comprehensive prejudgment interest award.

40

## B.     The Date of Interest Accrual

Finally, in addition to setting the rate and compounding of prejudgment interest, the

Court in its discretion must set the date(s) on which prejudgment interest begins to accrue.

Courts have generally found that prejudgment interest should begin to accrue at or in proximity

to the time the unlawful act occurred.  This Court, in a Fair Labor Standards Act case, laid out

"two acceptable methods of calculating prejudgment interest." *Gomez v. El Rancho de Andres*

*Carne de Tres Inc.*, 2014 WL 1310296, at *10 (E.D.N.Y. Mar. 11, 2014) (Go, M.J.), *adopted*,

2014 WL 1310299 (E.D.N.Y. Mar. 31, 2014) (Amon, J.).  Relying on N.Y. C.P.L.R. § 5001, the

companion to § 5004, Judge Go explained: "First, interest may be calculated from the earliest

ascertainable date the cause of action existed."  2014 WL 1310296, at *10 (internal quotation

marks omitted); *see, e.g.*, *Perez*, 204 F. Supp. 3d at 548 (awarding prejudgment interest from

date of plaintiff's unlawful termination).  Second, however, where "'damages were incurred at

various times, interest shall be computed upon each item from the date it was incurred or upon

all of the damages from a single reasonable intermediate date.'"  *Gomez*, 2014 WL 1310296, at

*10 (quoting N.Y. C.P.L.R. § 5001(b)).  Exercising its "wide discretion in determining a

reasonable date from which to award pre-judgment interest," this Court measured prejudgment

interest from "the midway point" of the accrual of damages.  *Id.* (citing, inter alia, *Liu v. Jen Chu*

*Fashion Corp.*, 2004 U.S. Dist. LEXIS 33412, at *5 (S.D.N.Y. Jan. 7, 2004)); *see, e.g.*,

*Melodrama Publ'g*, 2015 WL 2380521, at *7 (awarding prejudgment interest accruing from the

"approximate midpoint" from which the infringing conduct occurred).

Here, the H&H Defendants' infringement occurred over the course of six years.  Given

the breadth of their infringement, the Court should apply pre-judgment interest once per each of

the six years, and apply that year's interest at the midpoint of the year (June 30).  For the

41

convenience of the Court, Dr. Bell has calculated pre-judgment interest using the mid-point of

each year under various scenarios.  His report, which sets forth his methodology and calculations

of prejudgment interest, is attached as Inquest Exhibit P611.  Dr. Bell will, of course, provide

updated calculations at the Court's request once an order has been issued.

## CONCLUSION

For the reasons stated above, this Court should enter a damages award against the

H&H Defendants and in Abbott's favor of ███████ in actual damages, which, after

trebling, results in an overall combined damages total of ███████.  The Court should also

find this an "exceptional case" and rule that Abbott is entitled to attorneys' fees and costs under

15 U.S.C. § 1117(a) and, at an appropriate time pursuant to Federal Rule of Civil Procedure

54(d)(2)(D), refer the matter to Magistrate Judge Bloom to set a briefing schedule for an inquest

or other means for determining attorneys' fees and costs.  The Court should also issue an award

of prejudgment interest at a rate of 9%, compounded annually, measured at the midpoint of

the year in which the infringement occurred, and should set a briefing schedule for Abbott

to submit a final calculation of such prejudgment interest.

12251793

Dated: New York, New York
       January 29, 2021

Respectfully submitted,

PATTERSON BELKNAP WEBB & TYLER LLP

By:  */s/ Geoffrey Potter*
     Geoffrey Potter
     gpotter@pbwt.com
     William F. Cavanaugh, Jr.
     wfcavanaugh@pbwt.com
     Timothy A. Waters
     twaters@pbwt.com
     R. James Madigan III
     jmadigan@pbwt.com

1133 Avenue of the Americas
New York, NY  10036-6710
Tel: (212) 336-2000
Fax: (212) 336-2222

*Attorneys for Plaintiffs Abbott Laboratories,*
*Abbott Diabetes Care Inc., and Abbott*
*Diabetes Care Sales Corporation*

43