UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ABBOTT LABORATORIES, ABBOTT DIABETES CARE INC., and ABBOTT DIABETES CARE SALES CORPORATION,<br><br>                                 Plaintiffs,<br><br>    v.<br><br>ADELPHI SUPPLY USA, *et al.*,<br><br>                                Defendants. | 1:15-cv-05826-CBA-LB |

**BRIEF IN SUPPORT OF OPPOSITION TO PLAINTIFFS' CALCULATION OF DEFAULT JUDGMENT DAMAGES BY DEFENDANTS H&H WHOLESALE SERVICES, INC., HOWARD GOLDMAN AND LORI GOLDMAN**

THE JANEY LAW FIRM LLP
111 Broadway, Suite 701
New York, New York 10006
(212) 566-7766 (phone)
(212) 374-1506 (fax)

Bachner & Weiner, PC
39 Broadway-Suite 1610
New York, NY 10006
O: 212-344-7778
C: 917-225-9276

*Counsel for H&H Wholesale Services, Inc., Howard Goldman, and Lori Goldman*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES……………………………………………………..……iii

PRELIMINARY STATEMENT ………………………………………………………..1

FACTUAL BACKGROUND…………………………………………………………....11

ARGUMENT ……..…………………………………………………………..………16

I.      DISPUTED THRESHOLD AND PRELIMINARY ISSUES……………………16

    A.  Abbott's Request To Award Damages Against H&H For Causes Of Action This Court Dismissed Is Frivolous…………………………………………..17

    B.  The Defaulting Defendants Should Be Afforded A Set-Off Based On Payments Made By Certain Settling Defendants……………………...18

    C.  Abbott's Request to Award Treble Damages Against H&H Should Be Denied……………………………………………………………………22
       1.  Willfullness……………………………………………………..……22
       2.  Abbott's Damage Fully Accounts For the Damages It Alleges It Sustained……………………………………………………………23
       3.  Plaintiffs' Claim that Defendant Received Intangible Benefits Do Not Support The Imposition of Treble Damages……………………………24
       4.  Treble Damages Are Not Required To Deter Defendants………………27

II.     SUMMARY REGARDING DISPUTED THRESHOLD AND PRELIMINARY ISSUES……………………………………………………………………...29

III.    ABBOTT'S   THEORY   OF   ONE-TO-ONE   DISPLACEMENT   IS FUNDAMENTALLY FLAWED AND DOES NOT SUPPORT A REASONABLE BASIS FOR DAMAGES…………………………………………………...30

    A.  The Reality Of Competitive Bidding And Its Impact On The Insurance Market Contradict Dr. Bell's One-to-One Displacement Theory………..…37

IV.    AN UNDERSTANDING OF THE INDIVIDUALS IS RELEVANT AND MATERIAL TO A DECISION AS TO WHAT LEVEL OF REMEDIAL MEASURES ARE APPROPRIATE IN THIS CASE……………………...…41

    A.  Howard Goldman Is A Long-Term Diabetic With A Deep Understanding of the Diabetic Patient Market-Place…………………………………………42
    B.  Lori Goldman……………………………………………………………...43

**CONCLUSION**……………………………………………………………………………44

## **TABLE OF AUTHORITIES**

**Page**

__Cases__

*AW Indus. v. Sleepingwell Mattress, Inc.,*
  2011 U.S. Dist. LEXIS 111889 (E.D.N.Y August 31, 2011) ................................... 22

*Braun Inc. v. Optiva Corp.,*
  2000 U.S. Dist. LEXIS 12592 (S.D.N.Y. August 31, 2000)............................... 23, 27

*Church & Dwight Co. v. SPD Swiss Precision Diagnostics GmbH,*
  2018 U.S. Dist. LEXIS 151961 (S.D.N.Y. Aug. 22, 2018) ............................... 26, 28

*City of New York v. Mickalis Pawn Shop, LLC,*
  645 F. 3d 114 (2d Cir. 2011).............................................................. 17

*Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.,*
  778 F.3d 1059 (9th Cir. 2015)............................................................ 24

*George Basch Co. v. Blue Coral, Inc.,*
  968 F.2d 1532 (2d Cir. 1992)............................................................. 28

*Getty Petroleum Corp. v. Bartco Petroleum Corp.,*
  858 F.2d 103, 109 (2d Cir. 1988) *cert. denied,* 490 U.S. 1006, 104 L. Ed. 2d 158, 109 S. Ct.
  1642 (1989) ........................................................................ 22, 27, 42

*Gov't Emples. Ins. Co. v. Azu Ajudua,*
  2018 U.S. Dist. LEXIS 213930 (E.D.N.Y. Dec. 18, 2018)................................... 20

*Gov't Exmples. Ins. Co v. Simakovsky,*
  2015 U.S. Dist. LEXIS 135488, 2015 WL 5821407 (E.D.N.Y. Oct. 5, 2015) ....................... 19

*Gravelle v. Kaba llco Corp.,*
  684 Fed. Appx. 974 (Fed. Cir. 2017) ..................................................... 26

*Gutman v. Klein,*
  2010 WL 4975593 (E.D.N.Y. Aug. 19 2010) ............................................... 18

*J&J Sprts Prods., Inc. v. Abdelraouf,*
  2019 WL 457719, 2019 U.S. Dist. LEXIS 18677 (E.D.N.Y. Feb. 5, 2019)........................ 18

*Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Kun Fung USA Trading Co.,*
  07-CV-2568 (JG), 2012 U.S. Dist. LEXIS 68117 (E.D.N.Y. January 20, 2012) .............. 19, 20

*Kotuwage v. NSS Petroleum Inc.*,
15 Civ. 4374 (FB)(ST), 2018 U.S. Dist. LEXIS 21917, 2018 WL 1189332 (E.D.N.Y. Feb. 8, 2018) ................................................................................................................................................ 19

*Lama Holding Co. v. Smith Barney*,
88 N.Y.2d 413 (1996) ................................................................................................................ 5

*Lelchook v. Islamic Republic of Iran*,
2020 U.S. Dist. LEXIS 221606 (E.D.N.Y. November 23, 2020) ............................................ 20

*McDermott v. AmClyde*,
511 U.S. 202 (1994) ................................................................................................................ 19

*Mee Indus. V. Dow Chem*. Co.,
608 F.3d 1202 (11th Cir. 2010) .............................................................................................. 26

*Merck Eprova AG v. BrookStone Pharms., LLC*,
920 F.Supp.2d 404 (S.D.N.Y. Jan. 31, 2013) .................................................................. 26, 27

*Merck Eprova AG v. Gnosis S.p.A.*,
760 F.3d 247 (2d Cir. 2014) .............................................................................................. 25, 28

*Merck Eprova AG v. Gnosis S.p.A.*,
901 F. Supp.2d 436 (S.D.N.Y. 2012) ................................................................................ 25, 28

*Mobius Management Sys. v. Fourth Dimension Software*,
880 F. Supp. 1005 (S.D.N.Y. 1994) ........................................................................................ 27

*Mobius Mgmt. Sys., Inc v. Forth Dimensions Software, Inc.*,
880 F. Supp 1005 (S.D.N.Y.1995) .......................................................................................... 23

*New York Racing Ass'n v. Stroup News Agency Corp.*,
920 F. Supp. 295 (N.D.N.Y. 1996) .................................................................................... 23, 27

*Novell, Inc. v. Network Trade Ctr., Inc.*,
25 F. Supp. 2d 1233 (D. Utah 1998) ...................................................................................... 24

*Ortho Sleep Prods*.,
2012 U.S. Dist. LEXIS 183253 (E.D.N.Y. Aug. 29, 2012) ............................................... 22, 27

*Pedinol Pharmacal, Inc. v. Rising Pharm. Inc.*,
570 F. Supp. 2d 498 (E.D.N.Y. 2008) .................................................................................... 28

*SEC v. Razmilovic*,
738 F.3d 14 (2d Cir. 2013), *as amended,* (Nov. 26, 2013) ...................................................... 17

v

*Shiqui Chen v. Besat Miyako Sushi Corp.,*
    2021 U.S. Dist. LEXIS 21747 (S.D.N.Y. Feb. 1, 2021) ..................................................... 17, 18

*Singer v. Olympia Brewing Co.,*
    878 F.2d 596 (2d Cir. 1989) ............................................................................................. 18

*United States ex rel. National Dev. & Construction Corp. v. United States Envtl. Universal
    Services,* 2014 U.S. Dist. 97351,  2014 WL 4652712 (S.D.N.Y. Sept. 2, 2014) ..................... 17

*Vivint, Inc. v. Northstar Alarm Servs., LLC,*
    2019 U.S. Dist. LEXIS 37921 (UT Dist. Ct. March 8, 2019) ................................................. 26

**Other Authorities**

Brian O'Donnell, Eric Rollins James Mathews, *Competitive Bidding Reduced Medicare
Spending On Diabetes Testing Supplies Without Negatively Affecting Beneficiary Outcomes*,
healthaffairs.org (April 8, 2020),
https://www.healthaffairs.org/do/10.1377/hblog20200326.122054/full/ ...........................38, 39, 40

*Centers for Medicare and Medicaid Services*, usa.gov, https://www.usa.gov/federal-
agencies/centers-for-medicare-and-medicaid-services ...............................................................37

*DMEPOS Competitive Bidding – Home*, cms.gov (November 20, 2020),
hjttps://guides.libraries.uc.edu/c.php?g=222561&p=1472886 ……………………………….…37

Mark D. Hughes, "The Business of Self-Monitoring of Blood Glucose:  A Market Profile,"
*Journal of Diabetes Science and Technology*, v. 3, n. 5, September 2009, pp. 1219-1223……..41

Maureen I. Harris, "Frequency of Blood Glucose Monitoring in Relation to Glycemic Control in
Patients with Type 2 Diabetes," *Diabetes Care*, v. 24, n. 6, June 2001, pp. 979-982…………...41

*Medicare's National Mail-Order Program for Diabetic Testing Supplies*, cms.gov (April 2013),
https://www.cms.gov/Outreach-and
Education/Outreach/Partnerships/Downloads/DMEPOSBeneFactSheetNatMailOrderProgApril2
01311634.pdf………………………………………………………………………….…39

Zhi-De Hu, Kai-Ping Zhang, Ying Huang, and Shu Zhu, "Compliance to Self-monitoring of
Blood Glucose among Patients with Type 2 Diabetes Mellitus and Its Influential Factors:  A
Real-world Cross-sectional Study Based on the Tencent TDF-I Blood Glucose Monitoring
Platform," *mHealth*, v. 3, n. 25, June 2017……………………………………………………....41

**Statutes**

15 U.S.C. § 1117(a)…………………………………………………………………………22, 27

18 U.S.C. § 1117(a)……………………………………………………………………….…...19

Abbott Laboratories, Abbott Diabetes Care Inc., and Abbott Diabetes Care Sales Corp. (collectively, "Abbott" or "Plaintiffs") submitted application to this Court for a damages award that has four components: (a) actual damages in the amount of ███████ (b) actual damages that should be trebled, thus resulting in a total damages award in the amount of ███████; (c) attorneys' fees and costs; and (d) prejudgment interest on its actual damages.

Defendants H&H Wholesale Services, Inc. ("H&H"), Howard Goldman, and Lori Goldman (collectively, the "H&H Defendants") respectfully submit this brief in support of their position that Plaintiffs have failed to meet their burden in support of that application.  More particularly, the H&H Defendants submit this brief in support of its position that Plaintiffs have failed to show its alleged Lanham Act damages of ███████ has a reasonable basis and, related, that its theory of damages is supported by a reasonable basis; in support of its request that the Court deny Abbott's application for treble damages on the basis of "willfulness"; in support of its request that the Court deny Abbott's request for attorneys' fees and costs (which are not described); and in support of its request that an award of prejudgment interest on actual damages be denied. Further, for the reasons described below, the H&H Defendants request an evidentiary hearing as part of this inquest proceeding.

**PRELIMINARY STATEMENT**

Your Honor, it is unfortunate that the parties are in this place, an inquest on damages. Undersigned counsel was retained to represent the H&H Defendants after Abbott filed its motion for default and following briefing on the discovery abuse allegation.  We wish only to have been counsel to the H&H Defendants prior to all of those events.

The seriousness of an inquest on damages on a defaulting defendant, especially where the default lies for reasons other than lack of participation, and where the alleged quantum of damages is ██████████████ cannot be overstated.  Here, even at this hour, the H&H Defendants, as in January 2019, stand ready and willing, to have meaningful settlement discussions in lieu of further litigation.  That said, given that an inquest on damages has been ordered by this Court, and in light of Plaintiffs' brief, it is critical to first correct several of Abbott's misstatements of the record in this case, including pertaining to some of Your Honor's decisions and orders, and, in specific respects, misrepresentations about the law as applied to this proceeding.  Accordingly, some level of "fact-setting" must first occur before the H&H Defendants can properly address the alleged quantum of damages proximately caused by the H&H Defendants; otherwise, material and consequential parts of Abbott's damages presentation that are misleading will be left uncorrected.

As more fully elaborated herein, at the outset, in summary, that "fact-setting" is as follows:

- Even at an inquest, the law provides that **only** well-pleaded claims are relevant and not dismissed claims.  The Abbott submission does not respect that principle of law because it seeks to hold Lori Goldman jointly and severally liable for fraud claims dismissed by this Court.  In fact, nowhere does Abbott acknowledge that Your Honor dismissed the fraud claims against Lori Goldman in Your Honor's decision and order on summary judgment dated September 30, 2019.  *See* ECF NO. 1563, 94 ("Only the aiding and abetting fraud claims remains against H&H.  There is no evidence in the record suggesting that Lori Goldman participated in, or had knowledge of, any role H&H may have played

in aiding and abetting its pharmacy customers' fraud.  Accordingly, Lori Goldman's motion for summary judgment dismissing Abbott's fraud claims is granted.")  Even if Lori Goldman is jointly and severally liable as an initial matter on Plaintiffs' Lanham Act claim, she cannot be liable on Plaintiffs' fraud claims or anything that might flow from those claims given this Court's decision on Summary Judgment, which predates the decision on the default motion by more than a year.

- Abbott, here, and consistently, refers to H&H as an importer of the test strips at issue.  But, this is merely an effort to further paint a poor picture of the H&H Defendants, without foundation in fact.  There is no evidence that H&H imported any boxes in this litigation.  Moreover, Abbott has previously conceded that it does not seek additional relief on its unlawful importation claim under 15 U.S.C. §1124, and has acknowledged that the claim is inconsequential to its damages calculation.  *See* ECF NO. 1563, 23 ("In light of (1) the conclusion that all defendants are strictly liable for direct infringement under 15 U.S.C. § 1114(1), (2) Abbott's concession that it does not seek any additional relief from its unlawful importation claim under 15 U.S.C. § 1124, and (3) the uncertainty in this Circuit regarding the applicability of 15 U.S.C. § 1124 to gray goods, the Court need not address the parties' arguments regarding Abbott's unlawful importation claim and declines to do so.")  Nevertheless, Abbott persists in arguing that it is entitled to damages on importation of goods bearing infringing marks under Lanham Act Section 42 (*see* Pls.' Br., 9) as it does in this proceeding.  Abbott's importation claim is not part of this inquest.

- Related, while Abbott acknowledges that it is not entitled to liability on the frivolous dismissed RICO claim, (*id.*), Abbott avers that it is entitled to liability on fraud and fraudulent inducement; however, this is an untenable position because the fraud and fraudulent inducement claims were dismissed as to the wholesaler defendants, including H&H, as a matter of law on the record in this case. A damages inquest does not revive those dismissed claims and cannot now be reargued for reconsideration here. More specifically, neither the fraud nor the fraudulent inducement claims should influence **any** of the four components of Abbott's damages calculation.

- Seemingly, in an effort to strengthen the connection between H&H and the dismissed fraud claims, and to show that there can be no doubt H&H intended to sell the infringing boxes to patients through insurance (which, in turn, is an argument to support Plaintiffs' expert's, Dr. Gregory K. Bell, one-to-one displacement argument), **Abbott states that H&H sold only to pharmacies**. *See* Pls.' Br. 26, citing ███████. **But, that is a false statement.** In fact, the very exhibit Abbott offers as evidence for this proposition demonstrates the falsity of the statement. H&H also sold to wholesale distributors. Rather, as Abbott well knows, as supported by the evidence, and as elaborated herein, H&H also sold to wholesale distributors, including wholesale distributors that only sold online with a "no insurance accepted" policy and to pharmacies where patients were clearly cash-buyers. But, Abbott is misleading on this point because it wants this Court to accept that there are no "serious" challenges to

4

Dr. Bell's theory of one-to-one displacement which rests upon an unsupported premise that diabetic patients are price insensitive.

- There is no need for a separate damages analysis in connection with Abbott's aiding and abetting fraud claim against H&H as it is subsumed by Abbott's Lanham Act's damages theory.  Abbott brings its aiding and abetting fraud claim against H&H under New York common law.  *See* ECF NO. 892, 1.  In New York, damages for fraud are calculated according to the "out-of-pocket" rule and must reflect "the actual pecuniary loss sustained as the direct result of the wrong".  *Lama Holding Co. v. Smith Barney*, 88 N.Y.2d 413, 421 (1996).  Damages may only properly compensate plaintiffs for "what they lost because of the fraud, not ... for what they might have gained," and "there can be no recovery of profits which would have been realized in the absence of fraud".  *Id.* In support of its aiding and abetting fraud claim, Abbott points to H&H's knowledge that its pharmacy customers were purchasing international FreeStyle test strips in order to fraudulently sell them through insurance, and encouraged them to do so.  Pls.' Br., 26.  In other words, any damages under Abbott's aiding and abetting fraud claim wholly overlays with Abbott's direct infringement claim—H&H's sales of international FreeStyle test strips within the United States.  *Id.*, 3.  Accordingly, any damages under the aiding and abetting fraud are duplicative of Abbott's damages under its Lanham Act claim.

- The Abbott claims against the H&H Defendants are serious.  However, as if those claims were not enough, in this damages inquest, **Abbott consistently accuses H&H of trafficking in counterfeiting**.  *See* Pls.' Br. 11, 13, 14, and

5

24.  However, this, too, is an effort to further convince the Court to deal with the H&H Defendants harshly and punish them.  *See* Pls.' Br. 3 ("Under the factors identified in the case law and as a matter of common sense, the H&H Defendants…need to be punished.")  However, this is a civil case, a case about money; punishment does not find a home in any dimension of the applicable case law here.   Moreover, neither Abbott nor its counsel is a government prosecutor.  Further, **Abbott's counterfeiting claim (*Abbott II*) is not relevant or material to this damages inquest which is about Plaintiffs' Lanham Act claims (*Abbott I*)**.  As this Court has consistently pointed out, including in response to objections by the H&H Defendants to the adoption of Judge Magistrate Bloom's Report and Recommendation, the allegation that H&H knowingly engaged in a counterfeiting scheme is a disputed issue that is the subject of a separate action pending before the Court, and is not part of this action; thus, that allegation cannot be taken into account for **any** of the assessment of damages in this inquest proceeding.  *See* ECF NO. 1613, 25 ("[T]he R&R makes clear that this [the alleged counterfeiting scheme] is a disputed issue that is the subject of a separate action pending before the Court. (See R&R at 13 n.8 ("The H&H Defendants deny that they knew they were buying counterfeits.  That is the central issue in Abbott II.").[1]

---

[1] As demonstrated during the deposition of Holland Trading Group ("HTG") employee, Jeroen Erents, on April 16, 2019 in the Netherlands in connection with *Abbott II*, Erents testified that H&H had no knowledge that HTG was shipping H&H counterfeit product.  *See* ECF NO. 1557.  Attached hereto as **Exhibit A** is a copy of ECF NO. 1557. Moreover, "Mr. Erents, even though he knew or had reason to know that the goods were counterfeit, never informed H&H of his suspicions at any time before the first shipment or any time thereafter."  *Id*.  Abbott is aware of this testimony, despite continuing to refer to H&H as counterfeiters.

- Abbott's premise for the number of H&H Freestyle boxes at issue for this damages inquest is also misleading.  Dr. Bell's analysis relies on the number of boxes **purchased** by H&H as the predicate for the damages calculation.[2]  However, this approach does not comport with a damages analysis under the Lanham Act.  More specifically, the Lanham Act addresses damages for **sales** of infringing product injected into the stream of commerce.  In fact, by reviewing Abbott's evidence submitted for this proceeding, namely ██████, ███████████, the evidence shows that H&H **sold** ██████ (██████████████████████)[3].  This figure is obviously lower than the ████████ Abbott states H&H purchased during the damages period.  This is important because the number of boxes purchased does not support a reasonable basis for a damages calculation under the Lanham Act.

- Related, in the first instance, it is unclear whether Dr. Bell's report actually supports a damages analysis under the Lanham Act at all.  His report states that his assignment was to calculate losses related to unlawful diversion.  Whatever tort that might be, it is not the same as economic losses related to sales of infringing product.

---

[2] ████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[3] ████████████████████████████████████████████████████████████████████████████████████

- As more fully explained, Abbott is misleading on the law pertaining to "off-sets" in an effort to reap a windfall from H&H.  First, as a threshold matter, Abbott can only recover the sum total of boxes unlawfully sold in the United States.  And, in that context, it cannot recover that sum total from any one defendant but must recover from those wholesale distributors, for example, who are in the same distribution chain (on the premise that they are jointly and severally liable with each other).[4]  But, where defendants that are in the same distribution chain with H&H have already settled with Abbott, H&H should be able to off-set to the actual damages Abbott alleges against H&H for its Lanham Act claims.  This is important so to avoid a windfall for Abbott, beyond the boxes in which H&H dealt, and, further, to prevent H&H from being accountable for infringing boxes related to defendants with whom it is not within the same distribution chain, and, more broadly, to ensure Abbott remains consistent with the premise it has stated to Your Honor, repeatedly, that H&H is not liable for the entirety of the damages sought or, simply, more than the diverted boxes H&H trafficked.  Here, even holding aside for the moment our argument against one-to-one displacement, on the basis of current settlements with defendants who purchased diverted boxes from H&H, Abbott has already

---

[4] As this Court noted in its Memorandum and Order on the issue of sequencing this damages inquest ahead of the jury trial for non-defaulting defendants, Abbott cannot recover the sum total of the infringing boxes it claims from H&H. *See* ECF No. 1633, 6-7 ("[W]ith regard to the Lanham Act claims for trademark infringement against both the defaulting and the non-defaulting defendants, Abbott has alleged a theory of joint and several liability…Abbott does not argue that any one defendant is automatically liable for the entirety of the damages sought by Abbott regardless of which boxes the defendant actually trafficked. Rather, each defendant is liable for the unlawfully diverted boxes that it trafficked, and Abbott is seeking varying damages amounts against different defendants based on that varying number of boxes.") (internal citations omitted)

received approximately ▮▮▮▮▮.  That alone reduces Abbott's alleged actual

damages here to approximately ▮▮▮▮▮

Again, even before considering the flawed and unreasonable assumptions by Abbott's expert on

one-for-one displacement theory, the important points described above are emphasized to "fact-

set" the Abbott damages presentation.  Otherwise, any calculation for any quantum of damages

against H&H would be without a reasonable basis, as required by law.

In other words, for the affirmative case on behalf of the H&H Defendants, as an initial

matter, there are **four foundational points**: (1) with respect to the claims to which Abbott is

entitled to liability, only the Lanham Act claim is relevant to the inquest; (2) fraud claims in their

entirety have already been dismissed with respect to Lori Goldman and that is the law of the

case, and Lori Goldman is only jointly and severally liable on the Lanham Act claim[5]; (3)

purchase data does not support a reasonable basis for a damages calculation and, if anything,

sales data should be the basis for a discussion about damages; and (4) H&H should be permitted

to offset settlements that have already taken place for the purposes of any damages calculation at

this proceeding, even holding aside for the moment our critique of Abbott's damages theory.

As to Abbott's theory of one-to-one displacement, as Your Honor has pointed out, Abbott

puts all of its eggs in this one theory.  *See* Tr. of June 18, 2019 Conf., 80.  Abbott has never

deviated from this theory, including for this inquest proceeding.  However, the problem for

Abbott is that it has failed to provide a reasonable basis for the essential underlying assumptions

---

[5] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

of this theory's underlying damages calculation.  More particularly, Dr. Bell's report fails to provide any evidence whatsoever that if the diverted box was unavailable, the patient would have purchased the higher priced U.S. retail box.  Rather, Dr. Bell states ███████████████ ████████████████████████████████████████  On the other hand, defendants' expert, Jesse David Ph.D. ("Dr. David"), as the evidence shows, clearly demonstrates that Dr. Bell's assumptions about price insensitivity lack a reasonable basis.  Moreover, as Dr. David points out, and as this Court has questioned before (*see* Tr. of June 18, 2019 Conf., 89), Abbott offers no evidence for its argument that in the instance of either H&H diverted boxes specifically or diverted boxes in this litigation generally that "almost everything was sold through insurance."

Moreover, Abbott's theory of damages entirely ignores the reality of what was occurring in the insurance market during the damages period (2010-2015) relevant to this litigation. Namely, as more fully explained herein, competitive bidding in the insurance market mandated by Medicare fundamentally and dramatically changed reimbursements for diabetic products, especially test strips, the most expensive aspect of annual maintenance for diabetic patients. Government data, as well as studies published in the *Journal of Diabetic Sciences*, clearly show that diabetic patients became incredibly price sensitive once competitive bidding took effect in 2011; their co-pays increased by 50-70%; Medicare's payment rate for blood glucose test strips declined by about 75 percent between 2010 and 2017; and in cases of patients with Type 2 diabetes that were not on insulin, some insurance companies refused to reimburse their test strip purchases at all.  Dr. Bell's "analysis" omits consideration of any these material factors that substantially impacted diabetic patients fundamentally during the damages period.  As more fully explained herein, these important facts make it practically impossible to calculate any quantum of damages from the papers, even with a "permitted degree of speculation."  Accordingly, the

H&H Defendants submit that an evidentiary hearing is necessary wherein the H&H Defendants should be permitted to cross-examine Dr. Bell with respect to (a) why such facts were not considered; (b) whether they would potentially change either his report or his deposition testimony; (c) for the record to reflect where Dr. Bell is consistent (or inconsistent) as between his testimony in the evidentiary hearing as compared to his prior deposition testimony; and (d) as well as to cross-examine Dr. Bell based on other evidence.  The H&H Defendants should also be permitted to offer its own expert on direct examination, Dr. David, wherein the court can hear directly from our expert and compare the two expert testimonies.  Otherwise, the court is left with what is otherwise attorney argument about a complicated and unclear damages theory. Where the stakes are this high, lawyer argument should not suffice.

## FACTUAL BACKGROUND

The substance of this litigation has been recited numerous times over the past five years. *See, e.g.*, ECF NOS. 1563, 6-8; 1613, 2-6; and 1633.  The H&H Defendants briefly recount the relevant background and procedural posture of the case as necessary for the damages inquest proceeding.

On January 4, 2017, in response to motions to dismiss by wholesaler defendants, including H&H, the Court issued a Decision and Order dismissing Abbott's seventh and eighth claims, a claim under federal Racketeering Influenced and Corrupt Organizations Act (the "RICO Claim") and a claim for unjust enrichment (the "Unjust Enrichment Claim"), respectively, from this action.  ECF NO. 892.  Regarding the dismissed RICO Claim, the Court stressed that Abbott did not allege facts demonstrating that an enterprise existed or that any defendant engaged in the conduct of such an enterprise.  *Id.*, 4.  In fact, the Court determined that

Abbott failed "to allege facts showing how these are the actions of members function[ing] as a unit.  Rather, no alleged facts support an inference that the entities were acting in any way but in their own independent interests.  Glaringly absent are allegations of interpersonal relationships or common interest."  *Id*., 7-8 (internal quotation and citation omitted.).  The Court added that Abbott's allegations failed to either "show any continuing units with common purposes that would constitute associations in fact under RICO" (*id*., 10.) or include "facts from which the Court could reasonably infer that either the distributors or the pharmacies operated or managed the alleged enterprise."  *Id*., 15.  In dismissing the RICO Claim, the Court underscored, in addition to the aforementioned deficiencies, Abbott's lack of factual support for the conspiracy claim and its reliance on only conclusory allegations that defendants knew, agreed, or conspired to commit the predicate acts of fraud.  *Id*., 21.

On July 10, 2018, Abbott moved for summary judgment against the then remaining defendants ("Abbott's Summary Judgment Motion").  ECF NO. 1414.  **Against all defendants**, Abbott moved for summary judgment on its claims for trademark infringement under the Lanham Act, 15 U.S.C. § 1114(1) and state law unfair competition, and sought permanent injunctive relief, actual damages, and a finding of willful infringement, treble damages, punitive damages, and attorneys' fees and costs.  *Id*.  Against a subset of defendants, including the H&H Defendants, Abbott moved for summary judgment on its claims for unlawful importation under the Lanham Act, 15 U.S.C. § 1124[6], and for fraud, fraudulent inducement, and aiding and abetting fraud[7].  *Id*.

---

[6] Abbott moved against the following defendants on its unlawful importation claim: GlobalMed, Absolute Freight, H&H, Able, Novex, Adelphia, Misar, Nwholesaledeals, and TAS.  *See* ECF NO. 1563, 5, fn. 2.
[7] Abbott moved against the following defendants on its fraud claims: H&H, E-Pharm, Goodlife, and Priority Care. *Id*., 5, fn. 3.

Subsequently, certain defendants, including the H&H Defendants (*see* ECF NO. 1400), also moved for summary judgment against Abbott on some or all of these claims and additional claims from Abbott's second amended complaint.  More particularly, the H&H Defendants moved for the dismissal of Abbott's fraud claims.  *See* ECF NO. 1400.

On September 30, 2019, the Court granted in part and denied in part Abbott's Summary Judgment Motion (the "Summary Judgment Decision and Order").  ECF NO. 1563.  Pertaining to Abbott's claim that all defendants are strictly liable for trademark infringement under the Lanham Act, the Court granted Abbott's motion.  *Id*., 123.  In relation to the H&H Defendants, specifically, the Court held that the H&H Defendants were also liable for willful trademark infringement and unfair competition.  *Id*.  Further, the Court held that Howard Goldman was personally liable for H&H's infringement as he was a moving, active, conscious force behind this conduct.  *Id*., 40.

However, **the Court granted the H&H Defendants' motion seeking dismissal as to direct fraud and fraudulent inducement as the claims were not "well-pleaded"**.  *Id*., 89, 123. In dismissing these claims, the Court noted that "[h]aving reviewed the allegations in the Second Amended Complaint and the history of this litigation, the Court agrees with defendants that Abbott failed to provide them with fair notice of this theory of direct liability for fraud."  *Id*., 88. The Court added that "[n]owhere does Abbott mention misrepresentations the wholesalers made to their customers" and "Abbott does not now identify any statements that the wholesalers made directly to insurers or to Abbott, as pleaded in the Second Amended Complaint."  *Id*., 88-89. The Court concluded that "[b]ased on the foregoing, the wholesaler defendants were not on notice that Abbott sought to press a direct fraud theory based on misrepresentations from wholesalers to customers. The Court therefore declines in its discretion to consider this

unpleaded theory of liability". *Id.*, 89.  **The Court also dismissed all fraud claims against Lori Goldman holding "[o]nly the aiding and abetting fraud claims remains against H&H. There is no evidence in the record suggesting that Lori Goldman participated in, or had knowledge of, any role H&H may have played in aiding and abetting its pharmacy customers' fraud.  Accordingly, Lori Goldman's motion for summary judgment dismissing Abbott's fraud claims is granted."** *Id.*, 94; Tr. of Sept. 30, 2019 Conf., 94.  Relatedly, in connection with H&H, the Court opted not to make a finding on summary judgment as to aiding and abetting fraud.  *Id.*, 94.

Additionally, **the Court found that Abbott's importation claim was, in effect, duplicative of the Lanham Act claim.**  *Id.*, 23 ("In light of (1) the conclusion that all defendants are strictly liable for direct infringement under 15 U.S.C. § 1114(1), (2) Abbott's concession that it does not seek any additional relief from its unlawful importation claim under 15 U.S.C. § 1124, and (3) the uncertainty in this Circuit regarding the applicability of 15 U.S.C. § 1124 to gray goods, the Court need not address the parties' arguments regarding Abbott's unlawful importation claim and declines to do so.")

Finally, and importantly, the Court did not grant Abbott summary judgment on its damages claim given clear and obvious disputes of material fact surrounding Abbott's damages theory.  *Id.*, 110.  The Court noted the following controversial aspects of Abbott's damages claim: 1) "…the percentage of international strips that were dispensed through insurance versus by cash" (*id.*, 110); 2) "…whether patients who did pay in cash would have purchased domestic strips, if international strips were not available… [t]here is no direct evidence of consumer behavior" (*id.*, 112); 3) "…whether Abbott has proven with 'reasonable probability' that defendants' sales of international strips caused damages to Abbott by displacing sales of

14

domestic strips" (*id.*, 113) (emphasis added); 4) whether the wholesaler defendants' conduct proximately caused Abbott's injury (*id.*, 114) (emphasis added); and 5) whether "Abbott offers no method for ascertaining the total, aggregate amount of actual damages it is entitled to collect and that Dr. Bell's methodology results in double counting". *Id*. The Court concluded that a jury must decide whether Abbott suffered actual damages, treble damages, and attorneys' fees and costs and any decision on these issues were premature at summary judgment. *Id.*, 115-116. With regard to punitive damages as for H&H, the Court declined to hold, as a matter of law, that Abbott was entitled to punitive damages and left the determination of both the amount and decision to the jury's discretion. *Id.*, 116.

As the Court will recall from the Summary Judgment proceedings, the wholesaler defendants, including H&H, put forward its own expert, Dr. Jesse David, to critique the Abbott damages analysis presented by Dr. Bell and his one-to-one displacement theory. In response to Dr. Bell, Dr. David provided analysis in the form of a main expert report dated November 15, 2017 ("Dr. David's Expert Report") and a supplemental report dated January 29, 2018 ("Dr. David's Supplemental Expert Report"). Attached hereto as **Exhibit C** and **Exhibit D** are Dr. David's Expert Report and Dr. David's Supplemental Expert Report, respectively.

Independent of these issues surrounding Abbott's Summary Judgment Motion and its damages claims, on December 21, 2018, Abbott moved for case-ending sanctions alleging discovery fraud against the H&H Defendants, including Lori Goldman (the "Sanctions Motion"). ECF NO. 1521. Abbott requested the Court issue an order: "(1) striking their [H&H's] pleadings and entering a default judgment against each of them [the H&H Defendants]; (2) ordering them, on a joint and several liability basis, to pay Abbott's fees and costs, including attorneys' fees, in investigating and litigating the issue of their discovery fraud…and (3) ordering such additional

and further relief the Court deems appropriate." *Id.*, 37-38.  The Court referred Abbott's

Sanctions Motion to the Honorable Magistrate Judge Lois Bloom for a report and

recommendation pursuant to 28 U.S.C. § 636(b)(1), and the Court held oral argument on

February 27, 2019.

On May 2, 2019, Magistrate Judge Bloom issued a report and recommendation

recommending that the Court grant the Sanctions Motion and enter a default judgment against

the H&H Defendants, including as against Lori Goldman (the "R&R").  ECF NO. 1545.

On May 28, 2019, the H&H Defendants filed objections under seal to the R&R.  *See* ECF

NO. 1548.  ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

Subsequently, on March 24, 2020, the Court adopted Magistrate Judge Lois Bloom's

recommendation that the Court grant Abbott's Sanctions Motion and enter a default judgment

against the H&H Defendants, including finding Lori Goldman liable with the other H&H

Defendants.  ECF NO. 1613.

## ARGUMENT

### I.    DISPUTED THRESHOLD AND PRELIMINARY ISSUES

As described above, there are some threshold issues that, although already settled by

this Court, namely the dismissed claims, appear to require argument here because they have been

put at issue by Abbott.  Additionally, Abbott has raised other threshold issues, such as the H&H's

opportunity to set-off monies already paid to Abbott by settling defendants to whom it sold diverted boxes, as part of the damages calculation here.   Herein below the H&H Defendants address those points.

### A. Abbott's Request To Award Damages Against H&H For Causes Of Action This Court Dismissed Is Frivolous.

Remarkably, Abbott argues that damages should be awarded against the H&H Defendants for fraud and fraud in the inducement (*See* Pls.' Br., 9), despite the fact that this Court granted summary judgment in defendants' favor on those very causes of action. (ECF NO. 1563, 89) ("Accordingly, moving defendants' motions for summary judgment dismissing Abbott's claims of fraud and fraudulent inducement against them on the basis of misrepresentations to their customers are granted. Abbott's motion for summary judgment against H&H and E-Pbarm on the same claims is denied.") Abbott's argument is non-sensical and without any basis in the law.

It is well-settled law that after a default, all well-pleaded factual allegations in the complaint as to liability are "deemed admitted." *SEC v. Razmilovic,* 738 F.3d 14, 19 (2d Cir. 2013), *as amended,* (Nov. 26, 2013); *City of New York v. Mickalis Pawn Shop, LLC,* 645 F. 3d 114, 137 (2d Cir. 2011) ("It is an 'ancient common law axiom' that a defendant who defaults thereby admits all 'well-pleaded' factual allegations contained in the complaint." (internal citation omitted).   But, here, the direct fraud claim and fraud in the inducement were dismissed and that is the law of the case.   Even if post-default inquest submissions try to provide additional information in an effort to try to revive the dismissed claims, those efforts cannot be permitted.   *See Shiqui Chen v. Besat Miyako Sushi Corp.,* 2021 U.S. Dist. LEXIS 21747, at *20 (S.D.N.Y. Feb. 1, 2021) (emphasis in original), *report and recommendation adopted*, 2021 U.S. Dist. LEXIS 31246 (S.D.N.Y. Feb. 19, 2021); *accord*, *United States ex rel. National Dev. & Construction Corp. v. United States Envtl. Universal Services,*   2014 U.S. Dist. 97351,   2014 WL 4652712, at *4

(S.D.N.Y. Sept. 2, 2014), quoting *Gutman v. Klein,* 2010 WL 4975593, at *10 (E.D.N.Y. Aug. 19 2010) ("[i]t is the . . . [c]omplaint, not the inquest submissions, that establishes defendants' liability") (alterations in the original); *J&J Sprts Prods., Inc. v. Abdelraouf*, 2019 WL 457719, at *2, 2019 U.S. Dist. LEXIS 18677 (E.D.N.Y. Feb. 5, 2019) ("It is the moving party's burden to demonstrate that it is entitled to recovery based on the factual allegations pleaded in the complaint.").

Here, this Court granted H&H's request for summary judgment on the fraud and fraud in the inducement claims based on Plaintiffs' failure to plead the facts necessary to substantiate the claims ("Based on the foregoing, the wholesaler defendants were not on notice that Abbott sought to press a direct fraud theory based on misrepresentations from wholesalers to customers. The Court therefore declines in its discretion to consider this unpleaded theory of liability…" [citation omitted] Indeed, Abbott did not press this theory at oral argument. *See* Tr. of June 18, 2019 Conf., 60:9-69:5. In any event, even if it were to consider this theory, Abbott cannot state a fraud claim by establishing that the customers relied on the misrepresentations.") ECF NO. 1563, 89. Thus, no damages can be awarded on these claims. *See Shiqui Chen v. Besat Miyako Sushi Corp*., *supra.* at *20. (emphasis in original).

### B. The Defaulting Defendants Should Be Afforded A Set-Off Based On Payments Made By Certain Settling Defendants.

Abbott argues that because the H&H Defendants defaulted, then the H&H Defendants have no right to seek an offset of the payments made by the other settling defendants. Abbott is wrong.

Under federal common law, in an action alleging violations of federal law "when a plaintiff receives a settlement from one defendant, a non-settling defendant is entitled to a credit of the settlement amount against any judgment obtained by the plaintiff against the non-settling defendant as long as both the settlement and judgment represent common damages." *Singer v.*

*Olympia Brewing Co.*, 878 F.2d 596, 600 (2d Cir. 1989); *accord Kotuwage v. NSS Petroleum Inc.*, 15 Civ. 4374 (FB)(ST), 2018 U.S. Dist. LEXIS 21917, 2018 WL 1189332 at *12 (E.D.N.Y. Feb. 8, 2018) *report and recommendation adopted*, 2018 U.S. Dist. LEXIS 37364, 2018 WL 1187397 (E.D.N.Y. Mar. 7, 2018).   In *McDermott v. AmClyde,* 511 U.S. 202  (1994), an admiralty case, the Supreme Court held that where a jointly liable co-defendant has settled, the non-settling defendant's liability should ordinarily be reduced based on his proportionate share of liability.[8] *McDermott v. AmClyde,* 511 U.S. 202, 221 (1994).   The Court also noted that its holding does not prohibit a plaintiff from recovering more than his actual losses.   *Id*. at 219. ("The law contains no rigid rule against overcompensation. Several doctrines…recognize that making tortfeasors pay for the damage they cause can be more important than preventing overcompensation"); *Gov't Exmples. Ins. Co v. Simakovsky,* 2015 U.S. Dist. LEXIS 135488, 2015 WL 5821407, at *13 (E.D.N.Y. Oct. 5, 2015) (same).   In the instant matter, however, the statutory provisions of the Lanham Act provide important guidance to the Court.   Where the recovery amount would be "excessive" the court has discretion to adjust that award, and to "enter judgment for such sum as the court shall find to be just, according to the circumstances of the case."  18 U.S.C. § 1117(a). This statutory provision applies equally to a defaulting defendant.  *See Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Kun Fung USA Trading Co.*, 07-CV-2568 (JG) 2012 U.S. Dist. LEXIS

---

[8] Although an admiralty case, the holding in *McDermott* has been applied to actions arising out of federal law generally, including violations of the Lanham Act. *See Johnson & Johnson v. Azam International Trading,* 2013 U.S. Dist. LEXIS 112755, *41 (E.D.N.Y. July 18, 2013).   Proportionate liability means that the trier of fact apportions liability among the settling and non-settling defendants, and then reduces the non-settling defendant's liability to a level commensurate with their proportionate degree of fault. *McDermott v. AmClyde, supra*, 511 U.S. at 221.   In cases where the defendant has defaulted, thus obviating a trial as to liability, some cases instead apply a "pro tanto" approach (although rejected in *McDermott*) where the defaulting defendant's liability is reduced  by the amount received by the Plaintiff from settling defendants. *See Lukaszuk v. Sudeen,* No. 02-5143, 2007 U.S. Dist.  LEXIS 95919, 2007 WL 4699018, *8 (E.D.N.Y. Nov. 27, 2007) ("Application of the [pro tanto approach] is particularly appropriate here since Freeman has willfully defaulted and impeded determination of liability and comparative culpability."); *Oak-Jin Oh v. Soo Bok Choi*, 2016 U.S. Dist. LEXIS 25553 (E.D.N.Y. February 29, 2016).

68117 *25 (E.D.N.Y. January 20, 2012) ("I recommend that the defaulting defendants not be held liable for the amount that plaintiff has already recovered from other defendants…I recommend that the set-off be applied in amounts that are proportionate to the liability of each defendant…").

Moreover, courts within the Eastern District of New York have found the set-off to be appropriately applied to a defaulting defendant, *see Lelchook v. Islamic Republic of Iran,* 2020 U.S. Dist. LEXIS 221606 (E.D.N.Y. November 23, 2020) (collecting cases), particularly where the award would otherwise be excessive, *see, e.g., Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Kun Fung USA Trading Co., Inc.,* 2012 U.S. Dist. LEXIS 68117, 2012 WL 1414872, *9 (E.D.N.Y. Jan. 20, 2012), *report and recommendation adopted,* No. 07-cv- 2568, 2012 U.S. Dist. LEXIS 189346 (E.D.N.Y. March 30, 2012) (Lanham Act violation), or to avoid a windfall to the plaintiff.  *See Gov't Emples. Ins. Co. v. Azu Ajudua,* 2018 U.S. Dist. LEXIS 213930, *23-24 (E.D.N.Y. Dec. 18, 2018) (collecting cases) ("Having considered the competing lines of cases involving defaulting defendants, this Court follows the lead of those opinions that, in order to avoid overcompensating plaintiffs on their federal claims, have set off the amounts of prior settlements with co-defendants with whom the defaulting defendant is jointly and severally liable.").

Here, as discussed below, a set-off is appropriate because 1) an award against the H&H Defendants would otherwise be excessive and duplicative, and 2) despite their default, the H&H Defendants have actively participated in the damages aspect of the case.



██████████████████████   These defendants settled with Abbott and entered into consent judgments as reflected on the court docket. ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████   On that basis, the H&H Defendants calculate that those settlements represent approximately ███████ paid to Abbott already.

████████████████████████████████████████████



---

[10] It is important to note that in a meet and confer with Abbott for the purposes of the damages inquest, the H&H Defendants requested information about settling defendants, including the amounts of those settlements.  Abbott declined to provide that information.

█ ██████████████████████████████████████████████████████████

These settlements should be offset from Abbott's Lanham Act damages claim of approximately

████████ because they are otherwise duplicative and would constitute a windfall and an

excessive award.  Indeed, this approach is consistent with Abbott's stated approach to only recover

the sum total of the ████████ boxes sold into the United States by defendants in this case.

### C.  Abbott's Request to Award Treble Damages Against H&H Should Be Denied.

#### 1.  <u>Willfulness</u>

The imposition of treble damages is not, as insinuated by Abbott, mandatory.[12]  Indeed,

pursuant to 15 U.S.C. § 1117(a) this Court has <u>broad discretion</u> to determine an appropriate award,

including the right to adjust its finding of damages if the amount is excessive or inadequate, or

also to increase <u>up to </u>three times the amount it determines as plaintiff's damages.  **The purpose of**

**the damage award must be remedial—to compensate the plaintiff for his damages—it may**

**not be used punitively to penalize the wrongdoer**.  *Id.*; *see Getty Petroleum Corp. v. Bartco*

*Petroleum Corp.*, 858 F.2d 103, 109, 113 (2d Cir. 1988) *cert. denied*, 490 U.S. 1006, 104 L. Ed.

2d 158, 109 S. Ct. 1642 (1989); *AW Indus. v. Sleepingwell Mattress, Inc.,* 2011 U.S. Dist. LEXIS

111889, at *21 (E.D.N.Y August 31, 2011)[13].  Enhanced damages awarded solely for purposes of

deterrence, for example, are an impermissible penalty. *See Getty, supra,* 858 F.2d at 113.  Thus, a

court may not award enhanced damages as a deterrent unless the damages serve a compensatory

---

[12] Abbott's reliance on *Strippit, Inc. v. Coffee*, 2009 U.S. Dist. LEXIS 99996, *12-13, 2009 WL 3644247 and *Ortho Sleep Prods., LLC v. Dreamy Mattress Corp.*, 2012 U.S. Dist. LEXIS 183253 (E.D.N.Y. August 29, 2012) is misleading.  In both cases, the defendant defaulted in an action claiming, inter alia,  a violation of the Lanham Act based on the use of a counterfeit marks or goods.  *Strippit* at *1; *Ortho Sleeps*, at *23.   In both cases, the court specifically noted in that in assessing damages for a violation involving counterfeiting, the statute <u>required</u>, absent extenuating circumstances, the imposition of treble damages.  Here, H&H's liability under Section 1114 as alleged in the Complaint, is based on a diversion theory – not on counterfeiting.  (ECF NO. 307, 143-144).  Accordingly, the amount of additional remedial damage to be imposed by this Court, over the actual damages sustained by Abbott, is purely discretionary.

[13] Although punitive damages are inappropriate under the Lanham Act, in cases of willful violation of the Act, this enhancement may be used to deter further willful violations. *See Getty Petroleum Corp. v. Bartco Petroleum Corp., supra*, at 113 (2d Cir. 1988).

purpose. *Braun Inc. v. Optiva Corp.,* 2000 U.S. Dist. LEXIS 12592 at *8 (S.D.N.Y. August 31, 2000); *New York Racing Ass'n v. Stroup News Agency Corp.*, 920 F. Supp. 295, 303 (N.D.N.Y. 1996) (the Second Circuit interprets section 35 of the Lanham Act as permitting courts to increase damages award only for remedial purposes).

Here, **Abbott's request to triple the award imposed to <u>over ████</u> is blatantly punitive and cannot even pretend to be remedial.** In fact, the award of treble damages would likely shut down H&H's business, thus destroying innocent people, as the evidence would show.

### 2.     Abbott's Damage Fully Accounts For the Damages It Alleges It Sustained

If Your Honor awards Abbott damages under the Lanham Act against the H&H Defendants, which we argue should not occur based on Dr. Bell's flawed theory, we submit that such an award would be sufficient for both adequate compensation and deterrence. Abbott, on the other hand, claims that an award of treble damages is warranted since its damage calculation is conservative or fails to fully account for or quantify all of the harm caused including loss of goodwill, which Plaintiffs state is not quantifiable. *See* Pls.' Br., 30-31. In support of its argument, Plaintiffs rely on two cases, both readily distinguishable from the case at bar.

In *Mobius Mgmt. Sys., Inc v. Forth Dimensions Software, Inc.*, 880 F. Supp 1005 (S.D.N.Y.1995), the court authorized the trebling of the monetary award to compensate the plaintiff for the loss of customer goodwill, which was hard to quantify. Significantly, however, in explaining its decision, the court emphasized the statutory requirement not to impose a punitive award. Given the "modest amount of actual damages calculated," ($21,008.80), tripling the award would serve to discourage violations of the Act "without being so large as to constitute a penalty." *Id.*, 1026. Here, Abbott has requested actual damages of over ████ Abbott's enhancement demand in excess of ███ is the exact opposite of "modest" and would constitute a penalty.

Indeed, at least one court cautioned that the "district court ought to tread lightly when deciding whether to award increased profits, because granting an increase could easily transfigure an otherwise-acceptable compensatory award into an impermissible punitive measure. Generally, actual, proven profits will adequately compensate the plaintiff." *Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.,* 778 F.3d 1059, 1077 (9th Cir. 2015) (internal citation omitted).

The case of *Novell, Inc. v. Network Trade Ctr., Inc.*, 25 F. Supp. 2d 1233 (D. Utah 1998), also relied on by Abbott, **actually supports H&H's contention that an enhanced award, if imposed, must be sufficiently low to avoid becoming punitive**. In *Novell,* the Special Master determined the monetary award could have been increased up to treble damages, since the harm to the plaintiff's goodwill and reputation was not quantifiable and proof of profits or damages was otherwise imprecise. Nevertheless, the Special Master increased the award by $500,000 – which represented an increase of less than 5% of the total award. *Novell, Inc. v. Network Trade Ctr., Inc.*, 25 F. Supp. 2d 1233, 1233 (D. Utah 1998). The Special Master's findings were upheld by the District Court.

### 3. Plaintiffs' Claim that Defendant Received Intangible Benefits Do Not Support The Imposition of Treble Damages

Plaintiffs' expert has computed its actual damages (defined as lost sales or revenue under the Lanham Act) to be ███████. Despite this, Plaintiffs also urge the Court to simultaneously consider defendants' profits from the same sales by also imposing treble damages, since unidentified "intangible benefits" accrued to them as a result of their misconduct. Pls.' Br., 31. In support, Plaintiffs rely heavily upon *Merck Eprova AG v. Gnosis S.p.A.,* 901 F. Supp.2d 436 (S.D.N.Y. 2012) ("*Merck I*"), *aff'd, Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247 (2d Cir. 2014) ("*Merck II*").

24

In *Merck I*, the court first ordered disgorgement, and then, finding that amount inadequate, ordered trebling.  The district court awarded lost profits "in the interests of deterrence," and treble damages "not as a punishment or penalty" but to "reflect the intangible benefits that accrued to [defendant] as a result of its false advertising," and in particular, "Gnosis's usurpation of Merck's market share." *Id.*, 460. The court further explained:

> [t]hough an award of three times profit is an imprecise measure of compensation, the impossibility of gauging Merck's losses along with the undeniable existence of those losses makes it a proper, if crude, measure.

*Id.*, 461. (Emphasis added).  Affirming, the Second Circuit emphasized that it was proper to apply a presumption of intangible benefit to the defendant on the limited facts presented in that case. Because plaintiff was indisputably the only other manufacturer of the product before the defendant's entry into the market, the defendant had reaped "intangible benefits" from its false ads, and other materials published by the defendant, and because the full scope of plaintiff's improved market condition, gained solely as a result of its false advertising, was "impossible" to quantify. *Merck II*, 254, 262-63.

The case at bar is distinguishable in several important respects.  Unlike the plaintiff in *Merck I*, Abbott—relying on H&H documents and business records produced by other defendant suppliers and customers (Pls.' Br., 13)—at least theoretically has been able to precisely calculate its actual damages. Indeed, Abbott even argues that due to procedural defaults and judicially imposed sanctions, their expert's calculation cannot be challenged by Defendants. *See* Pls.' Br., 14.  It is clear that the Second Circuit did not intend to create a generalized exception which would permit courts to engage in rank speculation by awarding treble damages for defendant's purported "intangible gains", as Abbott invites this Court to do in this case.  *See Gravelle v. Kaba llco Corp.*, 684 Fed. Appx. 974 (Fed. Cir. 2017) (Merck explicitly limits its holding to a two-player-market

scenario, which the present case does not involve.  Rather, here, the market had a couple hundred participants.).

In addition, **amorphous concepts such as intangible benefits a defendant may have received as a result of his misconduct; goodwill; and reputational damage are complex topics which require expert testimony**.  *Mee Indus. V. Dow Chem*. Co., 608 F.3d 1202, 1222 (11th Cir. 2010); *see, e.g.*, *Vivint, Inc. v. Northstar Alarm Servs*., *LLC*, 2019 U.S. Dist. LEXIS 37921 at *31-32 (UT Dist. Ct. March 8, 2019) (plaintiff's claim for "loss of goodwill" and "reputation damage" involve complex financial calculations that require expert testimony and must be dismissed where no expert discovery on the issue was provided).  At no time in this litigation has Abbott offered expert testimony on the topic of "good will."  Certainly Dr. Bell's information cannot be said to provide expert testimony on "loss of goodwill" or "reputation damage."

The other cases Abbott relies upon all found that an award of plaintiff's lost profits or defendant's gains were woefully inadequate.  For example, in *Merck Eprova AG v. BrookStone Pharms., LLC,* 920 F.Supp.2d 404 (S.D.N.Y. Jan. 31, 2013), the court first considered awarding licensing fees that defendants avoided by their improper conduct.  However, since plaintiff had specifically declined to license the infringed product, it determined that awarding that amount would amount to a forced licensing deal, and not adequately compensate plaintiff or deter defendants.  The court therefore found it reasonable to treble the damages.

In *Church & Dwight Co. v. SPD Swiss Precision Diagnostics GmbH*, 2018 U.S. Dist. LEXIS 151961 (S.D.N.Y. Aug. 22, 2018), the court denied plaintiff's request to treble damages based upon "intangible" harm, concluding that its award of nearly $10 million was adequate compensation for all harm done.

**4.** **Treble Damages Are Not Required To Deter Defendants**

Under the Lanham Act, enhanced damages "shall constitute compensation and not a penalty." 15 U.S.C. 1117(a).  As described above, enhanced damages solely for purposes of deterrence are an impermissible penalty.  *Braun, Inc. v. Optiva Corp.*, 2000 U.S. Dist. LEXIS 12592 at *3 (S.D.N.Y. Aug. 31, 2000).  **Enhanced damages may only be awarded for remedial purposes**.  *Getty Petroleum Corp. v. Bartco Petroleum Corp.,* 858 F.2d 103, 115 (2d Cir. 1988). A court may not award enhanced damages as a deterrent unless the damages serve a compensatory purpose.

Nevertheless, in support of its position, Abbott cites *New York Racing Ass'n v. Stroup News Agency Corp*., 920 F.Supp. 295 (N.D.N.Y. 1996); that case is unavailing.  There, the court found that to simply award lost profits of less than $12,000 would do little to compensate plaintiff or deter defendant. Such an award would allow defendant to merely pay the royalty it avoided by not entering into a licensing agreement with plaintiff and would likely have no deterrent effect on an economically rational trademark infringer.  As in *BrookStone, supra*, the court therefore trebled damages, resulting in a total award of less than $35,000.  *Id*., 304.

Similarly, in other cases cited by Abbott, the court determined that given the exceedingly modest amount of actual damages, trebling was necessary to properly deter defendant from committing further acts of willful bad faith violations without being so large as to constitute penalties.  *See Mobius Management Sys. v. Fourth Dimension Software*, 880 F. Supp. 1005, 1026 (S.D.N.Y. 1994) (awarding a total of approximately $63,000; *Ortho Sleep Prods*., 2012 U.S. Dist. LEXIS 183253 (E.D.N.Y. Aug. 29, 2012) (trebling damages of approximately $31,000). Conversely, courts have recognized that a substantial award of lost profits can be adequate deterrence.  In *Church & Dwight Co. v. SPD Swiss Precision Diagnostics GmbH*, 2018 U.S. Dist. LEXIS 151961 (S.D.N.Y. Aug. 22, 2018), Judge Nathan explained that "[w]hile damages directly

27

measure the plaintiff's loss, defendant's profits measure the defendant's gain. Thus, an accounting may overcompensate for a plaintiff's actual injury and create a windfall judgment at the defendant's expense." *Id*., *55. The court concluded that its award of nearly $10 million was "not simply nominal, but rather significant", and was sufficient for both adequate compensation and additional deterrence, and declined plaintiff's request to treble damages. *Id*, ** 55-57.

As discussed in greater detail above, in *Merck II* the Second Circuit observed that "[o]ur precedent permits a district court to award a defendant's full profits based solely on deterrence." 760 F.3d at 262. In that case, defendants had profits of approximately $175,000, which was trebled. In the case at bar, for comparison, Abbott seeks a total of approximately ████ as trebled damages alone. In *Merck I*, Judge Sullivan did not merely order trebling of defendant's profits, as the quote suggests, nor was the award based only on deterrence. Instead, the Court first found all three rationales identified by the Second Circuit for disgorgement under the Lanham Act: (1) to deter a willful wrongdoer from doing so again; (2) to prevent the defendant's unjust enrichment; and (3) to compensate the plaintiff for harms caused by the infringement. *Merck I*, 457, *Pedinol Pharmacal, Inc. v. Rising Pharm. Inc*., 570 F. Supp. 2d 498, 504 (E.D.N.Y. 2008), (citing *George Basch Co. v. Blue Coral, Inc*., 968 F.2d 1532, 1537 (2d Cir. 1992)). The court also considered other factors, including the availability and adequacy of other remedies to achieve the permissible purposes. *Id*. Disgorgement based on deterrence "is not compensatory in nature, but rather seeks to protect the public at large." *George Basch*, 968 F.2d, 1539. Judge Sullivan concluded that a full accounting of profits was needed to prevent defendant from running false advertisements in the future. *Id.*, 458. The Second Circuit affirmed the remedy, including the trebling of the amount, in part because the losses sustained in that particular case were "impossib[le] [to] gaug[e]". *Id.*, 461. In that case, the total award was less than $1 million. The

remedy sought by plaintiffs—an award of approximately ███████—would be nothing more than a gratuitous windfall having no relationship to any of the Second Circuit's stated purposes for disgorgement—and should therefore be summarily rejected.

## II.     SUMMARY REGARDING DISPUTED THRESHOLD AND PRELIMINARY ISSUES

**In sum**, before turning to Dr. Bell's one-to-one displacement theory, as it relates to threshold matters, **the H&H Defendants submit the following**:

- Abbott is not entitled to liability or damages against the H&H Defendants on its dismissed direct fraud claim and its fraudulent inducement claim; nor is Abbott entitled to liability on the duplicative aiding and abetting claim (duplicative of the requested Lanham Act damages).

- Abbott is not entitled to liability or damages against Lori Goldman on any of its fraud claims.

- Abbott is not entitled to liability or damages on its unjust enrichment claim against the H&H Defendants.

- The H&H Defendants should be permitted to use the monies paid to Abbott by settling defendants within the H&H distribution chain to off-set against any damages award granted to Abbott.

- The imposition of treble damages is **not** mandatory.  Moreover, Abbott's request to treble the award imposed to over ███████ is, admittedly by Abbott, meant to be punitive.  Accordingly, Abbott's application for treble damages should be denied.

- Abbott's claim that the H&H Defendants received intangible benefits does not support the imposition of treble damages.  Additionally, intangible benefits a defendant might

have received, and the related loss to the plaintiff, in the form of either goodwill or reputational damage, requires expert testimony.  Abbott has never put forth expert testimony on this topic.

- Enhanced damages solely for purposes of deterrence are an impermissible penalty and should not be permitted here; there is no exception under the law to this rule.  Enhanced damages may only be awarded for remedial purposes.

- An evidentiary hearing should be held in which the H&H Defendants are permitted to cross-examine Dr. Bell and to present defendants' expert witness, Dr. David.

III.   **ABBOTT'S THEORY OF ONE-TO-ONE DISPLACEMENT IS FUNDAMENTALLY FLAWED AND DOES NOT SUPPORT A REASONABLE BASIS FOR DAMAGES**

Dr. Bell's position is that defendant wholesale distributors in this case, including H&H, have committed the tort of "unlawful diversion," whatever that might mean, and his assignment is oriented toward supporting analysis that would return Abbott to the position it would have occupied had the diversion not taken place.  The measure of damages is the difference between the wholesale price Abbott would have received in the U.S. for the sale of the diverted unit and the price Abbott actually received.  Pls.' Br., 12-13.  Putting aside for the moment whether Dr. Bell's assignment actually comports with an assessment of Lanham Act damages, his theory is flawed and devoid of reality.

In the instance of H&H, as described by Plaintiffs for this proceeding, Dr. Bell's theory would mean ███████ **box multiplied by the number of diverted boxes**.  Pls.' Br., 12.  However, the calculation itself rests entirely on Dr. Bell's proposition that each diverted international box displaced a U.S. retail box of Freestyle test strips on a one-for-one basis.  Pls.' Ex. P543, 4; Pls.' Br., 2.  Dr. Bell fails to provide any actual data in support of this proposition.  For example, Dr.

Bell does not present any figures showing that sales of diverted test strips had an impact on sales of U.S. retail boxes such that the proportional impact would be one-to-one. Similarly, as Dr. David explains, the Bell submission "provides no analysis of consumer preferences regarding blood glucose test strips; no analysis of available competing products and their prices." *See* H&H Ds.' Ex. C, 15. Instead, Abbott's expert relies on several key assumptions:

- **Purchase data** for defendants, such as H&H, is the basis for determining the total number of boxes defendants displaced in the marketplace[14];

- The availability of alternative products offered at lower prices is irrelevant for diabetic patients. In other words, Abbott diabetic patients consuming Abbott diabetic product, such as test strips, are both price-insensitive as a general matter and refrain from substituting Abbott product for other product where a difference in price exists. Dr. Bell argues that this is necessarily the case **for each and every sale that occurred through insurance**. *See* Pls.' Ex. P543, 6.

- Dr. Bell also assumes that there is a minority of patients (5% or fewer) who are not insurance buyers, in other words, cash buyers; however, Dr. Bells posits that these cash buyers do not purchase the diverted, international Abbott Freestyle test strips for reasons based on price. Instead, Dr. Bell holds that these cash buyers are just as price insensitive as the insurance buyer. *See* Pls.' Ex. P543, 7, ¶ 14.

> to opt for one of the numerous lower-priced alternatives, such as these store brand strips, in preference to diverted international FreeStyle test strips, negating any rationale for purchasing the latter solely on the basis of lower price.")

Dr. Bell's analysis rises and falls on his ability to establish that consumers who purchased the diverted FreeStyle product would not have bought any product other than Abbott's retail U.S. FreeStyle product. If he is wrong about one-to-one displacement, Abbott's damages theory for Lanham Act damages against H&H totally collapses.

Nevertheless, Plaintiffs argue that no wholesale defendant seriously questions Dr. Bell's theory of one-to-one displacement. That is simply false. Wholesaler defendants presented Dr. David to critique Dr. Bell's analysis and laid bare the lack of data and the broad assumptions that ultimately can only lead to the conclusion that Abbott's damages theory lacks a reasonable basis.

As a threshold matter, Dr. Bell states that his assumption is reasonable because 95 percent of the FreeStyle strips are sold to patients covered by insurance. As such, there is no mechanism, according to Dr. Bell, for the insured patient to pay less for a box of diverted international FreeStyle test strips than for a U.S. retail box. Pls.' Ex. P543, 5-6, ¶¶12-13. Notably, Dr. Bell dismisses or ignores the possibility that insured patients might purchase the lower price diverted box through cash rather than using their insurance. Either the deductible or copayment might cause them to make that decision because of the price difference between the diverted box, on the one hand, and the U.S. retail box, on the other.

As Dr. David points out, Dr. Bell's assumption that every consumer who purchased an international box of FreeStyle test strips would have bought a box of retail U.S. strips at the full retail prices must be based on two conditions. H&H Ds.' Ex. C, 15-16. First, it assumes (1) pharmacies were selling the international product at the same prices as regular retail U.S. product

and therefore consumers would be indifferent between international and retail U.S. product; or (2) pharmacies could have been selling the international boxes at lower prices than the full retail price for U.S. boxes, but consumers are completely insensitive to prices (presumably because they have insurance) and would continue to buy the same amount of Abbott's retail product at a higher price if the lower price-option was not available.  *Id.*

With respect to the first notion, it rests on the idea that the diverted box sold for the same price as the U.S. retail box and that consumers are sufficiently price insensitive and loyal to Abbott's brand that they would not search for a lower-priced option.  However, Abbott itself, in the record of this case, presents evidence that counters those presumptions.  As Dr. David points out, as part of its investigation regarding domestic sales of the diverted product, Abbott personnel purchased international product from various defendants in the case in brick-and-mortar stores as well as through online outlets.  Those personnel filed declarations and attached receipts and invoices showing the pricing of diverted product.  In general, the prices were far below the prices for retail U.S. boxes.  For example, the documented pricing for international FreeStyle products purchased from online outlets generally fell in the range of $35-$40 per 50-count box (and approximately twice that range for 100-count boxes).  The prices for product purchased by mail order from various defendants fell generally in the range of $35-$40 per 50-count box.  In-store purchases were priced generally in the range of $40-$60 per 50-count box, with a few purchases at higher prices.  By comparison, Abbott's wholesale price for 50-count product to be sold at retail is currently $72.58 per box and retail prices are substantially higher than that.  *Id.*, citing the Declarations of Brian Cairl and Thomas J. Kneir.[15]  Dr. Bell, however, discounts this evidence by stating that these were not purchases made by "end users," in other

---

[15] Attached hereto as **Exhibits F and G** are the Declaration of Brain Cairl and Thomas J. Kneir.

words, actual diabetic patients.  Pls.' Ex. P 543, 6, fn. 15.  That response is absurd; the question is whether the situation exists where the price unity between the diverted and the U.S. retail box actually exists, as Dr. Bell claims.  Abbott's own investigation raises a serious question about that assumption and Dr. Bell, for his part, only otherwise states ███████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

This is important because insofar as there is not a price unity between the diverted box and the U.S. retail box a serious question emerges.  If the pharmacies offer the diverted box at a less expensive price, they are likely doing so because there are a group of consumers who are looking for less expensive strips and the diverted box is an option.  At minimum, this means one-to-one displacement does not occur because the patient would not have bought the higher priced Abbott strips.  Even assuming *arguendo* that the insurance paying patient is totally unaffected by the cost of co-pays and the like, and thus, is price insensitive as Dr. Bell envisions, and, therefore, is not likely to ever become a cash-payer of lower priced product—a model we dispute as lacking reality—not all consumers have insurance.  ███████████████████████████ █

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

There is already evidence in this case showing that (a) pharmacy defendants sold diverted test strips alongside the U.S. retail box and (b) that the pharmacies sold the diverted box at markedly lower prices.  This is evidence from Abbott's own investigation.  So, it is fair to

believe that the option was available to the consumer.  Additionally, the record evidence in this case shows that pharmacy defendants actually sold diverted boxes.  So, it is also fair to believe that the consumer exercised that option for lower priced diverted boxes over the higher priced Abbott box.  Some of those consumers could have been folks without insurance.  Moreover, some of the consumers seeking lower prices could have been those covered by insurance.

As Dr. David points out, some consumers with insurance may still pay out of pocket because, for example, they wish to purchase strips in excess of the quantity covered by their insurance policies or to purchase products not on their policies' preferred formulary tiers.  And, as mentioned earlier here, other consumers may have insurance but still be price sensitive due to the presence of large deductibles and/or copays.  Such consumers are likely to be disproportionately purchasing discounted product, such as international, compared to all consumers of Abbott's FreeStyle products.  In fact, on the record in this case, Abbott witnesses testified, in sum and substance, that a market has long existed for discounted strips.[16]  Notably, the lower priced Abbott product currently on the market, the NEO, offered to persons without insurance, did not exist during the damages period for this case, 2010-2015.

Further, even though Abbott acknowledges that as many as 5 percent of its sales of retail product are on a cash basis or to a consumer without a prescription, it does not follow that only 5 percent purchased the diverted box.  The percentage of consumers purchasing international product in the U.S. without insurance could be much higher.  During the damages period, the uninsured rate in the U.S. ranged between 9 percent and 13 percent.  In certain instances,

---

[16]  Abbott witnesses themselves give credence to the view that diabetic patients have long sought lower priced alternatives, directly in contradiction to Dr. Bell's analysis.  *See* H&H Ds.' Ex. C, 17, fn. 41, citing to the Deposition of Thomas J. Kneir, 111-112 ("Abbott witnesses have testified that purchasers of international FreeStyle boxes in the U.S. may have previously been purchasing diverted NFRS boxes.").  Attached hereto as **Exhibit H** is an excerpt of the Deposition of Thomas J. Kneir.

distributor defendants in this case sold product online direct to consumers through outlets such as eBay and Amazon.  In yet other situations, wholesalers sold to other wholesalers who only sold online. ███████████████████████████████████████

███████████████████████████████████████████. Insurance is not permitted.

█████████████████████████████████████████████

| ████████████████████ ███████ | ████████ | ███████████████ ████ | ███████████████ █████ |
|---|---|---|---|
| ████████████████ | ███ | █ | ████ |
| ████████████████ | ███ | ███ | █████ |
| ███ ██████████ | ███ | ███ | █████ |
| █████████████ | ███ | ███ | ██████ |
| ███ ██████████ | ███ | █ | ████ |
| ██████████████ | ███ | ███ | █████ |
| ██████████████████ | ███ | ███ | █████ |
| ████ █████████ | ███ | ███ | █████ |
| ████████████ | ███ | ████ | █████ |
| ████ | | ███ | █████ |

████████████████████
█ ████████████████████████████████████████████████
       █

### A. The Reality Of Competitive Bidding And Its Impact On The Insurance Market Contradict Dr. Bell's One-to-One Displacement Theory

Dr. Bell argues that insurance-covered purchasers of diabetes test strips are price insensitive and unlikely to look for lower price alternatives.  These assumptions are contrary to the realities of how the insurance market for diabetes test strips has evolved over the past decade.  More particularly, Dr. Bell's Report and Abbott's damages submission fail to consider the effects and impact of the Centers for Medicare and Medicaid Services' (CMS)[18] implementation of a competitive bidding program and national mail order program, which has lowered Medicare's payment contribution for diabetes test strips and decreased the amount of beneficiary claims for test strips.  Given changes in the insurance market for diabetes test strips, as well as the financial restraints for many diabetes patients and steadily rising co-pays, Abbott's one-for-one theory does not hold water.  It is far more likely that purchasers of diabetes test strips are acutely price-sensitive and, but for the infringement, would not have purchased authentic U.S. FreeStyle Strips at full price.  Instead, they would have sought out cheaper alternatives.

In 2003, Congress mandated a competitive bidding program for Durable Medical Equipment, Prosthetics, Orthotics and Supplies (DMEPOS) through the Medicare Prescription Drug, Improvement, and Modernization Act.  *DMEPOS Competitive Bidding – Home*, cms.gov (November 20, 2020), h¡ttps://guides.libraries.uc.edu/c.php?g=222561&p=1472886.  The statute required Medicare to replace fee schedule payment methodology for selected DMEPOS items with a competitive bid process.  *Id*.  The intent behind this legislation was to improve the effectiveness of the Medicare methodology for setting DMEPOS payment amounts, which would

---

[18] CMS is a federal agency that is part of the United States Department of Health and Human Services provides health coverage to more than 100 million people through Medicare, Medicaid, the Children's Health Insurance Program, and the Health Insurance Marketplace. *Centers for Medicare and Medicaid Services*, usa.gov, https://www.usa.gov/federal-agencies/centers-for-medicare-and-medicaid-services.

lower beneficiary out-of-pocket costs and generate savings for the Medicare program while

providing beneficiary access to quality items and services. *Id.* The Competitive Bidding

Program works as follows:

> Under the program, a competition among suppliers who operate in a particular
> competitive bidding area is conducted. Suppliers are required to submit a bid for
> selected products. Not all products or items are subject to competitive bidding.
> Bids are submitted electronically through a web-based application process. Bids
> are evaluated based on the supplier's eligibility, its financial stability and the bid
> price. Contracts are awarded to the Medicare suppliers who offer the best price
> and meet applicable quality and financial standards. Contract suppliers must agree
> to accept assignment on all claims for bid items and will be paid the single
> payment amount.

*Id.* Since CMS began using competitive bidding in 2011, Medicare spending on DMEPOS

products has fallen dramatically. Between 2010 and 2017, Medicare spending for products

subject to competitive bidding fell by 62 percent, from $7.5 billion to $2.8 billion. *See* Brian

O'Donnell, Eric Rollins James Mathews, *Competitive Bidding Reduced Medicare Spending On*

*Diabetes Testing Supplies Without Negatively Affecting Beneficiary Outcomes*, healthaffairs.org

(April 8, 2020), https://www.healthaffairs.org/do/10.1377/hblog20200326.122054/full/. As

reflected in **Figure 3** below, spending on diabetes testing supplies declined even more severely

falling by 88 percent:

**Figure 3:  Medicare Spending For Test Strips**

| | Expenditures in 2010 ($) | Expenditures in 2017 ($) | Percent change (%) |
|---|---|---|---|
| **Products Subject To Competitive Bidding (Total)** | 7.5 | 2.8 | -62 |
| ***Products Other Than Diabetes Testing Supplies*** | 5.9 | 2.6 | -56 |
| ***Diabetes Testing Supplies*** | 1.6 | 0.2 | -88 |
| **Products Not Subject To Competitive Bidding** | 3.3 | 4.7 | 44 |

*Id.*  **Importantly, Medicare's payment rate for diabetes test strips, the highest-expenditure product in the diabetes testing supply category, declined by about 75 percent, plummeting from about $33 to $8 for a box of 50 test strips.**  *Id.*

The insurance market for diabetes test strips has also been substantially affected by the implementation of a national mail order program in July 2013.  This program was introduced as part of the competitive bidding program in an effort to ensure that Medicare's allowed payment amount would be the same for diabetic testing supplies bought at the store or delivered to the home.  *See Medicare's National Mail-Order Program for Diabetic Testing Supplies*, cms.gov (April 2013), https://www.cms.gov/Outreach-and-Education/Outreach/Partnerships/Downloads/DMEPOSBeneFactSheetNatMailOrderProgApril201311634.pdf.  Regardless, there was an approximate 20% decline in the number of claims for diabetes test strips between July 2013 and January 2015 as demonstrated in the **Figure 4** on the following page:

**Figure 4 - The Number Of Beneficiaries Per Month With A Claim For Test Strips Decreased Substantially After The Start Of Competitive Bidding**



Brian O'Donnell, Eric Rollins James Mathews, *Competitive Bidding Reduced Medicare Spending On Diabetes Testing Supplies Without Negatively Affecting Beneficiary Outcomes*, healthaffairs.org (April 8, 2020), https://www.healthaffairs.org/do/10.1377/hblog20200326.122054/full/.  In other words, there were less insurance claims processed through Medicare during a time-frame of rising insurance costs to diabetic patients.

In light of competitive bidding and the dramatic decrease of Medicare's payment rate for diabetes test strips, the fact that there was a substantial decline in the number of claims for diabetes test strips demonstrates that purchasers of diabetes test strips are quite price sensitive; they were seeking lower price alternatives, contrary to what Dr. Bell refuses to accept, or at minimum, is not reflected in his model.

Moreover, research has shown that patient compliance with blood glucose monitoring undertaken at the recommendation of a physician can be affected by a variety of factors, including the cost of the strips.  As stated in a paper published in the *Journal of Diabetes Science and Technology*, there is a "[g]eneral unwillingness of diabetes patients (many of whom are low income or on fixed incomes) to pay more 'out-of-pocket' expense" and further that "[w]ith copays generally rising, some patients are seeking lower-cost alternatives or testing less frequently."[19]

This data and research directly undercut Abbott's and Dr. Bell's damages theories.  It is simply not plausible that insurance-covered purchasers of diabetes test strips are price-

---

[19] Mark D. Hughes, "The Business of Self-Monitoring of Blood Glucose:  A Market Profile," *Journal of Diabetes Science and Technology*, v. 3, n. 5, September 2009, pp. 1219-1223.  *See also*, Maureen I. Harris, "Frequency of Blood Glucose Monitoring in Relation to Glycemic Control in Patients with Type 2 Diabetes," *Diabetes Care*, v. 24, n. 6, June 2001, pp. 979-982; and Zhi-De Hu, Kai-Ping Zhang, Ying Huang, and Shu Zhu, "Compliance to Self-monitoring of Blood Glucose among Patients with Type 2 Diabetes Mellitus and Its Influential Factors:  A Real-world Cross-sectional Study Based on the Tencent TDF-I Blood Glucose Monitoring Platform," *mHealth*, v. 3, n. 25, June 2017.

indifferent.  Over the past decade, the insurance market for DMEPOS, including diabetes test strips, has dramatically changed.  Notably, due to the implementation of the Competitive Bidding Program, Medicare's payment rate for blood glucose test strips declined by about 75 percent between 2010 and 2017.  This development, along with the rise of co-pay, undoubtedly affected the buying decisions of test strips purchasers as the vast bulk of them are low income or on fixed incomes and on Medicare.  Given their limited financial resources and the deterioration of Medicare's contribution rate, it is only sensible that any patients who purchased international FreeStyle at a cash discount, but for the infringement, would have looked for lower price alternatives, including reverting to cash.

Accordingly, it is not a reasonable inference that each infringing sale for cash did, in "reasonable probability," displace the sale of an equivalent authentic product on a one-for-one and cause Abbott actual damages.  Instead, it is far more likely that these patients would have sought out other cheaper options and rarely, if ever, would have paid for U.S. FreeStyle retail strips at full price.

## IV.    AN UNDERSTANDING OF THE INDIVIDUALS IS RELEVANT AND MATERIAL TO A DECISION AS TO WHAT LEVEL OF REMEDIAL MEASURES ARE APPROPRIATE IN THIS CASE

For the reasons explained herein above, the H&H Defendants submit that Abbott's theory of one-to-one displacement fails to provide a reasonable basis for its Lanham Act damages calculation.  Accordingly, on the law, Abbott should not be awarded any damages whatsoever for the claimed infringement.  However, if Plaintiffs are awarded some quantum of damages, and where the Court considers Abbott's claim for enhanced damages, we submit that it is relevant

and material to consider the characteristics of the individual defendants when determining a remedial-based penalty.

Again, the purpose of the damage award here is remedial, *i.e.*, to compensate Abbott for its damages, and may not be punitive in nature. *Getty Petroleum*, *infra*. Here, analogizing to federal statutes in a different context, the "history and characteristics" of the individual defendants counsel in favor of a balanced remedial award, if such an award is deemed necessary at all by Your Honor.

**A.** ███████████████████████████████████

███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

███████████████████████████

███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████

███████████████████████████████████████

███████████████████████████████████

███████████████████████████████

███████████████████████████████████████

███

███████████████████████████████████

███████████████████████████████████████





## <u>CONCLUSION</u>

For the reasons stated above, this Court should deny Abbott's request to adjudicate this

damages inquest on the papers; rather, it should convene an evidentiary hearing where the H&H

Defendants are permitted to cross-examine Dr. Bell and present its expert, Dr. David.

---

[22] Mrs. Goldman's interview can be found here: https://www.cnn.com/videos/tv/2020/10/21/lori-goldman-leah-greenberg-grassroots-election-2020-democrats-aman.cnn.

If Your Honor declines to hold an evidentiary hearing, for the reasons described herein above, this Court should deny Abbott's application for actual damages in the amount of ███████ because that calculation, and the underlying theory on which it is based, lacks a reasonable basis.  Dr. Bell's theory of one-to-one displacement is implausible.  As Abbott has invested its entire damages analysis on that single theory, given its flaws, Abbott should not be awarded any damages.  If, nevertheless, Your Honor does award Abbott some quantum of damages, and also believes enhanced damages are appropriate, we submit that the Court should award the least amount of enhanced damages and only those sufficient to meet remedial objectives.

Dated: New York, New York

March 8, 2021

Respectfully submitted,

THE JANEY LAW FIRM LLP

By:     */s/ Derrelle M. Janey*
         Derrelle M. Janey (DJ 6897)

THE JANEY LAW FIRM LLP
111 Broadway, Suite 701
New York, New York 10006
(212) 566-7766 (phone)
(212) 374-1506 (fax)

Michael Bachner
Bachner & Weiner, PC
39 Broadway-Suite 1610
New York, NY 10006
O: 212-344-7778
C: 917-225-9276

*Counsel for H&H Wholesale Services, Inc., Howard Goldman, and Lori Goldman*