Filed Date: 12/28/2022

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
ABBOTT LABORATORIES, ABBOTT
DIABETES CARE INC., and ABBOTT
DIABETES CARE SALES CORP.,

                     Plaintiffs,

      -against-

H&H WHOLESALE SERVICES, INC.,
HOWARD GOLDMAN, and LORI GOLDMAN,

                    Defendants.
------------------------------------------------------------x

**MEMORANDUM & ORDER ON
INQUEST FOR DAMAGES**
15-cv-5826 (CBA) (LB)

**AMON, United States District Judge:**

      Following entry of a default judgment, Plaintiffs Abbott Laboratories, Abbott Diabetes Care Inc., and Abbott Diabetes Care Sales Corp. (collectively, "Abbott") seek actual damages against H&H Wholesale Services, Inc. ("H&H"), Howard Goldman, and Lori Goldman (collectively, the "H&H defendants") in the amount of $13,245,690 trebled for a total of $39,737,070, attorneys' fees and costs, and prejudgment interest at a rate of 9%. For the reasons set forth herein, Abbott's request is granted in part and denied in part.

## BACKGROUND

      Abbott initiated this action in October 2015, asserting claims against multiple defendants, including the H&H defendants, in connection with the unlawful sale of Abbott's international FreeStyle test strips in the United States. (See ECF Docket Entry ("D.E.") # 1.) Following extensive discovery, Abbott moved for summary judgment against the defendants, seeking, inter alia, summary judgment on its claims against the H&H defendants under the Lanham Act for willful trademark infringement. (See D.E. # 1415.) I granted in part Abbott's motion for summary judgment as to liability, finding that H&H had willfully infringed Abbott's trademarks and that Howard Goldman was personally liable for the infringement. Abbott Lab'ys v. Adelphia Supply

USA, No. 15-cv-5826 (CBA) (LB), 2019 WL 5696148, at *9, *17, *24 (E.D.N.Y. Sept. 30, 2019). I denied Lori Goldman's motion for summary judgment in which she had sought to relieve herself of individual liability for H&H's infringement, finding that "Abbott has adduced sufficient evidence to allow a reasonable jury to conclude that she was a moving, active, conscious force behind H&H's infringing activities." Id. at *18.

While Abbott was preparing its motion for summary judgment, it commenced a related action against the H&H defendants for their sale of international FreeStyle strips repackaged in counterfeit U.S. packaging.  See Abbott Lab'ys v. H&H Wholesale Servs. Inc., No. 17-cv-3095 (CBA) (LB) (E.D.N.Y. May 23, 2017).  In that action, Abbott conducted a Court-authorized search of H&H's premises, which resulted in the seizure of their email server.  (See D.E. # 1613 at 4.) Review of the contents of that server revealed that the H&H defendants had engaged in a calculated pattern of discovery misconduct in this action that amounted to a fraud upon the Court.  (Id. at 4-6.)

Abbott moved for case-ending sanctions against the H&H defendants in the instant action, and the motion was referred to Magistrate Judge Lois Bloom for report and recommendation ("R&R").  (See Order dated Jan. 14, 2019.)  On May 2, 2019, Magistrate Judge Bloom issued an R&R recommending that I grant Abbott's motion and enter a default judgment against the H&H defendants.  (D.E. # 1545.)  After receiving objections to the R&R and Abbott's reply to those objections, I adopted Magistrate Judge Bloom's R&R in its entirety and entered a default judgment against the H&H defendants.  (D.E. # 1613.)  Among my findings were that "the H&H defendants—including the Goldmans—had a duty to comply with the Court's orders, and each willfully and grossly failed to do so."  (Id. at 15; see also id. at 16-19 (finding the Goldmans

"individually liable for the willful discovery fraud and cover-up they undertook personally or that was undertaken by their agents in their name").)

On December 23, 2020, I determined that the damages inquest against the now-defaulted H&H defendants should proceed immediately pursuant to Federal Rule of Civil Procedure 55(b)(2), prior to the damages trial against the remaining non-defaulting defendants. (D.E. # 1633.) I directed Abbott and the H&H defendants to file briefing and relevant documentary evidence regarding the proper calculation and amount of damages to be entered against the H&H defendants. (Id.) Abbott filed an opening brief in support of damages, with accompanying documentary evidence, (D.E. # 1637 ("Abbott Mem.")); the H&H defendants filed a brief in opposition, (D.E. # 1647 ("H&H Opp'n")); and Abbott filed a reply, (D.E. # 1659 ("Abbott Reply")).[1] Because I have sufficient information to resolve the question of damages based upon the parties voluminous submissions both on this motion and on summary judgment, see Fed. R. Civ. P. 55(b)(2); Action S.A. v. Marc Rich & Co., Inc., 951 F.2d 504, 508 (2d Cir. 1991), I deny the request of the H&H defendants to conduct an evidentiary hearing.

## DISCUSSION

### I.     Standard of Review

A default constitutes an admission of all the well-pleaded factual allegations in the complaint, except for those relating to damages. See City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 137 (2d Cir. 2011); Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992). Still, looking to the facts alleged, a court should "satisfy itself that the plaintiff has established a sound legal basis upon which liability may be imposed." Santillan v. Henao, 822 F. Supp. 2d 284, 290 (E.D.N.Y. 2011); see also Finkel v. Romanowicz,

---

[1] The H&H defendants' request to file a sur-reply to Abbott's reply, (see D.E. # 1662), is denied.

577 F.3d 79, 84 (2d Cir. 2009). "A default also effectively constitutes an admission that damages were proximately caused by the defaulting party's conduct; that is, the acts pleaded in a complaint violated the laws upon which a claim is based and caused injuries as alleged." Santillan, 822 F. Supp. 2d at 290 (citing Greyhound, 973 F.2d at 159). As to damages, a court need only determine "that there is a reasonable basis for the damages requested in a default judgment motion." Gutierrez v. Taxi Club Mgmt., No. 17-cv-532 (AMD) (VMS), 2018 U.S. Dist. LEXIS 106808, at *7 (E.D.N.Y. June 25, 2018); Gomez v. El Rancho De Andres Carne De Tres Inc., No. 12-cv-1264 (CBA) (MDG), 2014 U.S. Dist. LEXIS 45580, at *4 (E.D.N.Y. Mar. 11, 2014) (same). Additionally, the moving party, here Abbott, is entitled to all reasonable inferences from the evidence it offers. Finkel, 577 F.3d at 84; Gutierrez, 2018 U.S. Dist. LEXIS 106808, at *7.

## II.   **Liability**

Liability has been undisputedly established. In my decision on summary judgment, I granted Abbott's motion for summary judgment as to liability for willful infringement under 15 U.S.C. § 1114(1) against H&H and Howard Goldman. Abbott Lab'ys, 2019 WL 5696148, at *9, *17, *24. Summary judgment was not granted as to Lori Goldman because I found disputed issues of fact, id. at *18, but it is well settled that a default constitutes an admission of all the well-pleaded allegations in the complaint, see Mickalis Pawn Shop, LLC, 645 F.3d at 137, and I have previously found the allegations in the Second Amended Complaint to have plausibly supported claims for willful infringement against all the H&H defendants, including Lori Goldman, (see D.E. # 892 at 29-31 (denying motion to dismiss and crediting allegations that Lori Goldman is "'the marketing manager of H&H' who 'exercises control over H&H and is a moving, conscious, active force behind H&H's unlawful conduct.'") (quoting D.E. # 307 ("Second Am. Compl.") ¶ 35); see

<u>also</u> Second Am. Compl. ¶ 568 (alleging that "Defendants' acts [of infringement] have been committed deliberately and willfully . . .")).[2]

### III.   <u>Actual Damages</u>

#### A.   <u>Standard of Law</u>

Abbott seeks recovery for its actual damages in the amount of $13,245,690.  (Abbott Mem. at 1.)  The Lanham Act authorizes prevailing plaintiffs, "subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action."  15 U.S.C. § 1117(a).  Actual damages "may include compensation for (1) lost sales or revenue; (2) sales at lower prices; (3) harm to market reputation; or (4) expenditures to prevent, correct, or mitigate consumer confusion."  <u>Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A., Inc.</u>, 80 F.3d 749, 753 (2d Cir. 1996) (citing Restatement (Third) of Unfair Competition § 36(2) (Am. L. Inst. 1995)).

As stated in my prior summary judgment opinion, a plaintiff must prove with "'reasonable probability,' not absolute certainty, that it suffered damages due to the trademark infringement."  <u>Abbott Lab'ys</u>, 2019 WL 5696148, at *45 (quoting <u>Innovation Ventures, LLC v. Ultimate One Distrib. Corp.</u>, 176 F. Supp. 3d 137, 162 (E.D.N.Y. 2016)).  Moreover, courts "distinguish between proof of the fact of damages and the amount of damages because a mark holder is held to a lower standard in proving the exact amount of actual damages."  <u>Id.</u> at *46 (citations and internal quotation marks omitted) (emphasis removed).

---

[2] I need not address the interplay between my decision on the motion to dismiss that the fraud claims were well-pleaded, and my decision that those claims could not be sustained on summary judgment.  Abbott has expressly stated that it does not seek damages at this inquest under any fraud claim.  (<u>See</u> Abbott Reply at 17-18.)

B. Abbott's Damages Application at Inquest

Abbott has satisfied its burden at inquest to prove $13,245,690 in actual damages. It is first important to note that the H&H defendants were placed in default after extensive summary judgment briefing and entry of a decision on cross motions from the parties as to both liability and damages. My conclusions of law in that decision foreshadowed the conclusion reached here. As to the issue of damages, which involved arguments and evidence largely identical to that presented at this inquest, I denied both parties' motions because:

> the record allows a reasonable jury to find in favor of Abbott or to find in favor of Defendants. Specifically, a jury could conclude—relying on Abbott's statistics regarding FreeStyle in general and pharmacists' testimony that they intermingled their stock—that 95 percent of international strips were dispensed through insurance and literally substituted for domestic strips. But a reasonable jury could also conclude, based on defendants' evidence of cash sales, that Abbott has failed to prove this fact.

Id. at *50. As to any infringing strips that may have been sold for cash, I further concluded that "[o]n this record, a jury could credit either Abbott's theory (that absent international strips, patients would have purchased Abbott's full price domestic strips by cash) or Defendants' theory (that absent international strips, patients would have turned to different, cheaper alternatives)." Id. In sum, I concluded—upon considering the same evidence presented now—that a reasonable jury could find for Abbott under the same damages theory it presses upon default. The legal standards at the summary judgment and inquest stage, of course, differ in a manner that redounds to Abbott's benefit: all reasonable inferences must now be drawn in Abbott's favor in assessing whether there is a reasonable basis for the award sought. Finkel, 577 F.3d at 84; Gutierrez, 2018 U.S. Dist. LEXIS 106808 at, *7.

Succinctly, Abbott's basic theory of lost revenue is as follows: for each box of international strips unlawfully sold in the United States, Abbott lost a sale of a box of domestic strips, on a one-

6

to-one basis.  (Abbott Mem. at 20-29.)  Abbott's costs of producing the two versions are essentially identical.  (Id. at 10 n.5, 18-20.)  Thus, according to Abbott, its actual damages are the difference between the U.S. wholesale price and the international wholesale price for each box sold.  (Id. at 12.)

Abbott has satisfied its burden to establish that its costs in producing the international and domestic boxes are equal or vary to a de minimis degree.  (See id. at 18-19; P14[3] at 37:23-38:10; P4 at 129:20-130:9; P542 ("Bell Rpt.") ¶ 20(b).)   Abbott has also adequately established the relevant wholesale prices of the different boxes.  (See, e.g., P4 at 166:22-167:22; P13 at 268:16-268:20; Bell Rpt. ¶¶ 20(a), 27.)  These varying prices are published, (see P2; P3), and the H&H defendants do not contest the pricing data.  Nor do they contest the affirmation of Dr. Gregory K. Bell—Abbott's retained expert—that in producing his damages calculation, he employed conservative assumptions for many pricing variables for which he did not have data, such as prompt-payment discounts, uncertainties in the box size (i.e., 50-count or 100-count), and uncertainties in the country of origin.  (See generally Bell Rpt.)  These conservative assumptions had the effect of decreasing his damages calculations.

The H&H defendants' arguments consist of two principal contentions: (1) that Abbott's damages theory overstates the number of international test strip boxes the H&H defendants sold; and (2) more significantly, that Abbott's theory that it lost a sale of a domestic box for each sale of an international box is flawed.

---

[3] Citations beginning with "P" are to exhibits submitted by Abbott at summary judgment and at this damages inquest (with the exception of P610 and P611, which were submitted by Abbott only at the inquest stage).  (See D.E. # 1637-1 ("Decl. of Geoffrey Potter").)

   1.  *Number of Boxes*

Abbott seeks damages against the H&H defendants for trafficking 333,887 infringing boxes (representing 320,682 50-count boxes and 13,205 100-count boxes).  (See Abbott Mem. at 3.)  The H&H defendants raise two objections to this figure.  First, they argue that the evidence Abbott cites for this figure reflects the number of boxes purchased by the H&H defendants, whereas the relevant figure for Lanham Act liability is the number of boxes sold.  (H&H Opp'n at 7.)  Second, they argue that certain evidence indicates that the total number of boxes sold was no greater than 297,765.  (Id.)  Neither of these objections is meritorious.

First, at summary judgment, Abbott's statement of undisputed material facts stated that the H&H defendants "purchased, and then sold within the United States, at least 320,682 50-count boxes and at least 13,205 100-count boxes of international FreeStyle test strips."  (D.E. # 1457-1 ¶ 216.)  In response, the H&H defendants disputed only the attribution of those sales to Howard and Lori Goldman—they did not dispute the quantities of boxes that H&H sold.  (Id.)  This constitutes an admission concerning the total number of infringing boxes sold.  See Fed. R. Civ. P. 56(g); Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003).

Moreover, even were the H&H defendants somehow able to escape this concession, Abbott's expert evidence independently establishes a reasonable basis for imposing damages on the H&H defendants for the specified quantity.  (See P93 at 59:14-60:6, 95:15-96:2 (confirming purchases and sales of international strips); P112; P113; P552; P610.)  Without citation to any authority, the H&H defendants argue that the "number of boxes purchased does not support a reasonable basis for a damages calculation under the Lanham Act."  (H&H Opp'n at 7.)  But in assessing damages in cases of trademark infringement, courts may entertain "some degree of speculation in computing the amount of damages, particularly when the inability to compute them

is attributable to the defendant's wrongdoing."   Abbott Lab'ys, 2019 WL 5696148, at *46 (citations omitted).  Relying on the purchase data here as a proxy for sales is particularly reasonable and does not constitute impermissible speculation.  First, to the extent that sales data is not available, it is because the H&H defendants have not provided it.  As Dr. Bell opined, "with respect to the contention that purchase data is insufficiently precise and that retail sales data would be more suitable, I note that the Defendants have not produced sufficient information to trace shipments through the supply chain to the end customer, and therefore reliance on retail sales is not an option."  (P543 ("Bell Suppl. Rpt.") ¶ 24(a).)  Second, Plaintiffs have made genuine efforts to address flaws identified by the H&H defendants.  In advance of summary judgment, the H&H defendants had their testifying expert, Dr. Jesse David, identify flaws in Dr. Bell's expert report, such as instances of double-counting, as well as purchased boxes that were sequestered, returned, or otherwise not sold.  Dr. Bell considered and incorporated these criticisms in his supplemental report where he felt appropriate, and he accordingly revised the damages calculation against the H&H defendants.  (See id. ¶¶ 23(c), 25(b)-(c), 31.)  Dr. David was unable during his deposition to specifically identify any unresolved issues in Dr. Bell's supplemental report concerning the revised quantity-of-boxes calculation; although he believed that "there were two or three or maybe a few more [issues in Dr. Bell's revised report]," (P529 at 158:21-25), when asked to identify those issues he could not recall what they were, (id. at 158:21-24, 159:12-16, 160:5-9).

In the wake of this evidence, the H&H defendants make a cursory reference to the "native format" document of one of Abbott's inquest exhibits—P113—and claim that their analysis of it reflects sales of only 297,765 boxes.  (H&H Opp'n at 7.)  However, they fail to cite to any exhibit that provides their analysis of the "native format" of P113, nor explain how that would allay the aforementioned concerns of Dr. Bell regarding the unreliability of retail sales data in this case.

2. *Substitution Theory*

The H&H defendants' principal objection here—as at summary judgment—is to Abbott's contention that sales of international boxes displaced sales of domestic boxes on a one-for-one basis (hereinafter "the substitution theory"). As an initial matter, Abbott argues that its substitution theory is automatically deemed admitted since it is a question of proximate cause—which is deemed admitted on default—rather than a question about the quantum of damages. See Santillan, 822 F. Supp. 2d at 290 (citing Greyhound, 973 F.2d at 158). The H&H defendants did not directly contest that point in their opposition brief and sought leave to file a sur-reply opposing the notion that the substitution theory is automatically admitted. The dispute is largely academic, however, because even assuming the substitution theory is not automatically admitted, Abbott has—as it argued in the alternative—nevertheless established a reasonable basis for this theory and the amount of damages flowing from it.

Abbott's substitution theory stems from the following propositions, all of which are reasonably supported by the evidence cited by Abbott in its briefing. First, over 95% of U.S. retail FreeStyle test strips are sold through insurance. (See Abbott Mem. at 25.) Second, international strips cannot be lawfully billed through insurance without a valid code, which domestic but not infringing boxes contain. (Id. at 22-23.) Accordingly, every international box sold through insurance was fraudulently scanned as a domestic box and fraudulently represented to the customer as a domestic box, who paid any associated insurance expenses applicable to the sale of a domestic box. (Id. at 23-24.) Thus, when a pharmacy sold a box of international FreeStyle test strips through insurance, it directly substituted an infringing international box in place of an equivalent U.S. retail box. According to Abbott and Dr. Bell, there is no question that the U.S. FreeStyle test strips are what the consumer would have purchased but for the infringement, because the only product the

10

consumer could lawfully receive was the U.S. retail box. (Id. at 24.) Dr. Bell's expert opinion is that customers who purchase through insurance are price insensitive and would have no incentive to purchase anything other than the domestic box they believed they were receiving if the infringing box were not sold to them. (See Bell Suppl. Rpt. at 4-6.) In addition to price insensitivity, Abbott introduced evidence that there are barriers dissuading customers—including any potential small number of cash-paying customers—from purchasing strips other than the FreeStyle strips; namely, that patients would have to change their test strip meter to accommodate other test strips, that FreeStyle customers have significant brand loyalty, and that any price-sensitive customers would not have chosen Abbott's more expensive products in the first instance. (See Abbott Mem. at 27-28.)

Importantly, it should be recalled that I previously determined at summary judgment, upon considering the same evidence and extensive briefing on the issue, that a reasonable jury could find in favor of Abbott's substitution theory—that is, that either through insurance or through cash, every sale of an international box displaced a domestic box one for one. Abbott Lab'ys, 2019 WL 5696148, at *49-50. With all reasonable inferences drawn in favor of Abbott at this inquest, the evidence submitted by Abbott both at summary judgment and at inquest establishes a reasonable basis for the substitution theory.

The H&H defendants' arguments to the contrary are without merit. The H&H defendants note that Dr. Bell's one-to-one displacement theory is based on the fact that 95% of FreeStyle strips are sold to patients covered by insurance, and Dr. Bell errs in "dismiss[ing] or ignor[ing] the possibility that insured patients might purchase the lower price diverted box through cash rather using their insurance." (H&H Opp'n at 32.) It is, however, a reasonable inference to presume that insured test strip users would have purchased U.S. FreeStyle test strips when the H&H defendants

failed at summary judgment to introduce any evidence demonstrating that a single one of their retail pharmacy customers sold a single box of international FreeStyle strips for cash, as opposed to through insurance, and failed to provide concrete evidence in support of this theory in its inquest briefing, (see generally H&H Opp'n).  At best, the H&H defendants point vaguely to sales to certain wholesalers who the defendants claim in turn sold to pharmacies "where patients were clearly cash buyers," (id. at 4), as well as to sales to a handful of Abbott's undercover investigators who purchased international boxes at a discount, (id. at 33-34).  They do not, however, identify any evidence of relevant discounted sales to an actual patient.

That is in stark contrast to the evidence Abbott submitted from pharmacies indicating that sales of international strips to patients were almost exclusively made through insurance and that the stock of international and domestic boxes were comingled.  (See Abbott Mem. at 24-27 (citing exhibits).)  Moreover, record evidence supports Abbott's contention that only a very small portion of FreeStyle test strips were sold over the counter, as opposed to being sold to insured patients, and that these strips were sold at a retail price that was higher than the wholesale price for which the pharmacy had purchased them, not a discount.  (See id.; P7 at 223:5-224:7.)  The record evidence also reasonably supports that pharmacies comingled domestic and international strips, as one pharmacy witness stated he was not even aware he was selling international test strips until he received the notice of litigation.  (P6 at 67:10-14); see also Abbott Lab'ys, 2019 WL 5696148, at *50.

Relatedly, and notwithstanding the evidence that 95% of sales are through insurance, the H&H defendants speculate that the "percentage of consumers purchasing international product in the U.S. without insurance could be much higher."  (H&H Opp'n at 35.)  The H&H defendants support this speculation with the proposition (made without any citation) that the national

uninsured rate in the U.S. ranged between 9% and 13% during the relevant damages period.  (Id.)
That does not sufficiently undermine, though, Abbott's aforementioned claim—supported by
evidence—that 95% of its FreeStyle test strips are purchased by insured patients.  Even if the
general population's uninsured rate increased, the H&H defendants have not put forth evidence to
specifically connect that rate to the population in need of test strips and certainly have not done so
in a way that challenges the reasonableness of Abbott's claim.

In further support of its contention that some cash-paying patients may have been price
sensitive, the H&H defendants further identify 2,590 boxes that were sold to several H&H entity
customers that themselves did not accept insurance.  (Id. at 36.)  They do not, however, provide
any evidence that these middlemen sold to patients rather than other distributors or that patients
made discounted cash purchases from these H&H customers.  Finally, the H&H defendants cite to
various articles in support of their contention that "Dr. Bell's Report and Abbott's damages
submission fail to consider the effects and impact of the Centers for Medicare and Medicaid
Services' (CMS) implementation of a competitive bidding program and national mail order
program, which has lowered Medicare's payment contribution for diabetes test strips and
decreased the amount of beneficiary claims for test strips."  (Id. at 37.)  The H&H defendants argue
that:

> Given changes in the insurance market for diabetes test strips, as well as the
> financial restraints for many diabetes patients and steadily rising co-pays . . . [i]t is
> far more likely that purchasers of diabetes test strips are acutely price-sensitive and,
> but for the infringement, would not have purchased authentic U.S. FreeStyle Strips
> at full price.  Instead, they would have sought out cheaper alternatives.

(Id.)  These arguments are not persuasive.  The H&H defendants do not offer any convincing
evidence that a single consumer of an H&H-trafficked box was motivated or affected by

competitive bidding, let alone that that consumer would have purchased something other than an authentic box of U.S. retail FreeStyle strips in the absence of international strips.

Beyond these standalone reasons to reject these objections, all of them ultimately succumb to the direction in which I must draw inferences from the evidence at this inquest stage. The H&H defendants' challenges to the substitution theory offer speculation and rely on inferences that some international boxes were priced at a discount and purchased at a discount by patients, who (either through insurance or cash transactions) were so price sensitive that they would not have purchased the domestic box at the regular price. Reasonable inferences, however, must here be drawn in favor of Abbott. Indeed, the H&H defendants remarked at summary judgment that "many of [Abbott's damages] arguments depend on inferences drawn in its favor." (D.E. # 1457 at 56.) Abbott now enjoys the benefit of such inferences. The H&H defendants' conjecture may serve to cast some degree of doubt upon Abbott's theory, but it does not undermine that the evidence supports an entirely reasonable basis on which to conclude that but for the H&H defendants' infringing sales of international strips, Abbott would have instead sold a box of domestic strips each time.

## IV.   Set-Off

The H&H defendants seek a set-off to their actual damages in the amount that Abbott has recovered from settling defendants in the same distribution chain. Abbott opposes the request. For the following reasons, I do not award a set-off.

Federal law controls on the question of whether a defendant in a federal action "is entitled to a credit against judgment for the settlement by another party to the dispute." Singer v. Olympia Brewing Co., 878 F.2d 596, 600 (2d Cir. 1989). Generally, "when a plaintiff receives a settlement from one defendant, a nonsettling defendant is entitled to a credit of the settlement amount against

any judgment obtained by the plaintiff against the nonsettling defendant as long as both the settlement and judgment represent common damages." Id.  However, "[m]ost courts in the Second Circuit [] have held that a defendant in default may not invoke the benefits of the set-off rule." Allstate Ins. Co. v. Yehudian, No. 14-cv-4826 (JS) (AKT), 2018 WL 1767873, at *19 (E.D.N.Y. Feb. 15, 2018) (citations and internal quotation marks omitted), report and recommendation adopted, 2018 WL 1686106 (E.D.N.Y. Mar. 31, 2018).  That said, there appears to be at least some split of authority within the Second Circuit on whether a defaulting defendant may ever benefit from the set-off rule, Vargas v. Premiere Staff Agency, No. 17-cv-4280 (VSB) (HBP), 2019 WL 10632865, at *7 n.5 (S.D.N.Y. July 18, 2019), report and recommendation adopted, 2020 WL 5663412 (S.D.N.Y. Sept. 23, 2020), and the majority of decisions denying a set-off to a defaulting defendant do so on the basis that the defaulter failed to satisfy its burden to establish a set-off by virtue of their failure to appear, see 2019 WL 10632865, at *7 (collecting cases).  The H&H defendants argue that the cases in which set-off has been denied to defaulting defendants are distinguishable because, despite being in default, the H&H defendants have appeared in the action and are actively seeking a set-off at inquest.

There is, however, authority for denying a set-off in just such circumstances.  In State Farm Mutual Automobile Insurance Co. v. Grafman, certain defendants were placed in default because of their litigation misconduct and, although in default, argued at inquest that they were entitled to a set-off.  968 F. Supp. 2d 480, 483-84 (E.D.N.Y. 2013).  The district judge rejected their argument, concluding that, in light of the defaulters' litigation misconduct:

> [The defaulters] have squandered their opportunities to convince the court that they should be held liable to plaintiff for anything less than the total amount of damages sought by plaintiff.  Far from satisfying their burden of establishing that the failure to apply a set-off will result in a double-recovery or be unjust, the arguments now advanced by these defendants amount to too little, too late.

15

Id. at 484; see also Colon v. City of New York, No. 09-cv-8 (JBW), 2012 WL 691544, at *17 (E.D.N.Y. Feb. 9, 2012) (conduct of defaulting defendants in civil rights action was so egregious that "the need to off-set the settlement received from the damages found by the Court is less compelling").  Considering the H&H defendants' misconduct, I similarly conclude that they are not entitled to a set-off in default.

"Although declining to deduct a settlement amount from a judgment entered against a defaulted defendant poses the possibility of a windfall to the plaintiff, that is not a sufficient reason to set off the amount of the settlements reached by plaintiffs with the other defendants."  Gov't Emps. Ins. Co. v. Sanni-Thomas, No. 13-cv-4966 (MKB) (SMG), 2015 U.S. Dist. LEXIS 135117, at *30 (E.D.N.Y. Sept. 4, 2015); see also Colon, 2012 WL 691544, at *17.  That is because "[t]he law contains no rigid rule against overcompensation [and] [s]everal doctrines . . . recognize that making tortfeasors pay for the damage they cause can be more important than preventing overcompensation."  McDermott, Inc. v. AmClyde, 511 U.S. 202, 219 (1994).  Moreover, my exercise of discretion in refusing Abbott's colorable request for a greater enhancement of actual damages under 15 U.S.C. § 1117(a), see infra Pt. V, mitigates the risk that failing to grant a set-off would produce a windfall for Abbott.  See Grafman, 968 F. Supp. 2d at 484 n.4.

**V.      Damages Enhancement**

Having determined that Abbott is entitled to its requested sum of $13,245,690 in actual damages, I now consider Abbott's request that the actual damages be trebled for an award of $39,737,070.  Although an enhanced damages award is just and appropriate here, imposition of treble damages would produce a $26,491,380 enhancement ($39,737,070 less $13,245,690), yielding an award that more closely approximates an impermissible penalty, 15 U.S.C. § 1117(a), or disfavored "lottery-level windfall," 4 Pillar Dynasty LLC v. N.Y. & Co., 933 F.3d 202, 214 (2d

16

Cir. 2019).  For the following reasons, I determine that doubling the actual damages for a total award of $26,491,380 is the appropriate enhancement.

Section 35 of the Lanham Act provides that "the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount."  15 U.S.C. § 1117(a).  Abbott seeks treble damages, the maximum enhancement, on the bases that: Abbott's actual damages calculation is conservative and significantly understates Abbott's lost profits; Dr. Bell's calculations do not and cannot calculate the unquantifiable harm to Abbott's good will; intangible benefits accrued to the H&H defendants as a result of their trademark infringement and false advertising; and enhanced damages are particularly appropriate where deterrence (pertaining to both the underlying willful infringement and litigation misconduct) is needed.  (Abbott Mem. at 29-34.)  Considered together, most of these factors weigh in favor of an enhanced award, but do not support treble damages.

An enhancement "shall constitute compensation," 15 U.S.C. § 1117(a), and courts have concluded that enhancements are warranted to properly compensate a plaintiff where the measure of damages is "conservative" and otherwise understates the award.  AW Indus. v. Sleepingwell Mattress, Inc., No. 10-cv-4439 (NGG) (RER), 2011 U.S. Dist. LEXIS 111889, at *21 (E.D.N.Y. Aug. 31, 2011); see also Getty Petroleum Corp. v. Bartco Petroleum Corp., 858 F.2d 103, 110 (2d Cir. 1988) (noting that enhancement provision "enable[s] courts to redress fully plaintiffs whose actual damages [may be] difficult to prove.").  Here, the record plainly contains support for Abbott's contention that Dr. Bell's actual damages calculation utilized several conservative assumptions that had the effect of understating Abbott's damages calculation.  (See, e.g., P611 ¶ 3 n.2 (explaining how altering one such assumption in Dr. Bell's report from the most defendant-

friendly possibility to even just the median price point would increase the damages calculation by approximately two million dollars).)

Abbott further seeks enhanced damages in light of other difficult-to-calculate factors like the loss of good will and the accrual of intangible benefits to the H&H defendants. "Damages may be enhanced [] to compensate the plaintiff for harm that is difficult to quantify, including for loss of goodwill . . . ." Church & Dwight Co. v. SPD Swiss Precision Diagnostics GmbH, No. 14-cv-585 (AJN), 2018 WL 4253181, at *16 (S.D.N.Y. Sept. 5, 2018) (citation and internal quotation marks omitted). Dr. Bell's calculation of actual damages did not account for the difficult-to-quantify loss of good will, although the fact that Abbott suffered some lost good will is "credible and not speculative," Mobius Mgmt. Sys., Inc. v. Fourth Dimension Software, Inc., 880 F. Supp. 1005, 1025 (S.D.N.Y. 1994), considering the H&H defendants' sale of infringing products that violate FDA regulations and contain language and symbols confusing to the U.S. consumer. (See P21 at 246:19-247:5, 247:17-248:6; P13 at 380:10-380:18.) Enhancements that compensate for lost good will have previously been awarded, see e.g., Mobius Mgmt. Sys., 880 F. Supp. at 1025-26, and some enhancement is supported here by that loss, especially given that Abbott's loss of good will is both non-speculative and a factual allegation of harm pleaded in the operative complaint, which is deemed admitted upon default.

However, Abbott's reliance in seeking enhancement on the "intangible benefits" that the H&H defendants obtained is not persuasive. Abbott notes that the H&H defendants' "sale of millions of infringing FreeStyle strips in the United States has created an equivalent deprivation of Abbott's legitimate market share." (Abbott Mem. at 31.) To the extent that Abbott is identifying its lost profits from these sales, that loss is reflected in the actual damages award. To the extent that Abbott is basing this particular argument on Merck Eprova AG v. Gnosis S.p.A., 901 F. Supp.

2d 436, 460 (S.D.N.Y. 2012), where the court enhanced damages to account for defendant's "usurpation of [plaintiff's] market share," the citation is inapposite. In <u>Gnosis</u>, the court concluded that an enhanced award was needed "to fully compensate [plaintiff] for the improved market position [the competitor-defendant] enjoyed solely as a result of its false advertising," since the competitor-defendant's deception allowed it to enter the market in which the plaintiff had theretofore been the only participant, and therefore the defendant's "sales in that market even after it corrected its advertising—and therefore after the window for accounting—stemmed from its initial deception." <u>Id.</u> The H&H defendants have not deprived Abbott of its market share in the sale of domestic strips in a manner that is not already reflected in the actual damages, nor gained any lasting competitive foothold in a formerly monopolistic market. The circumstances here do not warrant enhancement on the basis of the "intangible benefits" identified in <u>Gnosis</u> (though <u>Gnosis</u> is relevant to the considerations that follow).

Finally, Abbott seeks treble damages on the grounds that the H&H defendants must be deterred from future wrongful conduct. In support, Abbott points to the H&H defendants' pattern of trademark infringement, willful infringement, and litigation misconduct. Because any enhancement must "constitute compensation and not a penalty," 15 U.S.C § 1117(a), the "Lanham Act does not authorize an additional award of punitive damages for willful infringement of a registered trademark." <u>Getty</u>, 858 F.2d at 113. That said, "decisions by the Second Circuit suggest that deterring further infringement is a proper purpose of enhancement." <u>4 Pillar Dynasty LLC v. N.Y. & Co.</u>, 257 F. Supp. 3d 611, 624 (S.D.N.Y. 2017), <u>vacated in part on other grounds</u>, 933 F.3d 202 (2d Cir. 2019). Indeed, the Court in <u>Getty</u> held that "[s]o long as its purpose is to compensate a plaintiff for its actual injuries—even though the award is designed to deter wrongful conduct— the Lanham Act remains remedial" and, "[t]o the extent that deterrence of willful infringement is

needed, the statutorily provided remedies of § 35 are sufficient: a district court is empowered to enhance a monetary recovery of damages or profits . . . ."  858 F.2d at 113.  Since <u>Getty</u>, the Second Circuit has reaffirmed that "enhanced damages may also be awarded under Section 35 where 'deterrence of willful infringement is needed.'"  <u>Merck Eprova AG v. Gnosis S.p.A.</u>, 760 F.3d 247, 263 (2d Cir. 2014) (quoting <u>Getty</u>, 858 F.2d at 113).  Because an enhancement must serve a compensatory purpose, however, "enhanced damages awarded <u>solely</u> for purposes of deterrence are an impermissible penalty."  <u>Merck Eprova AG v. Brookstone Pharms., LLC</u>, 920 F. Supp. 2d 404, 430-31 (S.D.N.Y. 2013) (citation omitted).  The H&H defendants' conduct has been willful and egregious, and the deterrent effect of an enhancement that fully compensates Abbott is a relevant consideration in this inquest.

A "default constitutes an admission of the allegation in the complaint that defendant acted at all relevant times willfully and intentionally, with knowledge of plaintiff's trademark rights."  <u>Strippit, Inc. v. Coffee</u>, No. 09-cv-509A, 2009 U.S. Dist. LEXIS 99996, at *12-13 (W.D.N.Y. Oct. 27, 2009).  In addition to that principle, which is applicable here to the H&H defendants, I am in the unusual position at default of having already determined at summary judgment that H&H "willfully infringed Abbott's trademarks as a matter of law."  <u>Abbott Lab'ys</u>, 2019 WL 5696148, at *25.  Moreover, many of the facts underlying that conclusion reflect a similar "deceptive and willful conduct—manifested by [] stubborn persistence" that the Second Circuit relied on (in part) when affirming the district court's award of treble damages in <u>Gnosis</u>, 760 F.3d at 263.  In that case, deterrence supported enhancement because the defendant "continued [its unlawful conduct] for two years after [plaintiff] commenced suit against [defendant], and two years after [plaintiff] settled a separate false advertising suit against [defendant's distributor, which] itself ceased to distribute [defendant's mislabeled] product."  <u>Id.</u> (emphasis omitted).  Similarly, prior to the instant

litigation, H&H was sued by Johnson & Johnson for the exact same conduct at issue in this case: selling diverted international test strips. See Abbott Lab'ys, 2019 WL 5696148, at *24. Although that matter was resolved in a 2014 settlement that did not require H&H to admit liability, I concluded that the prior suit gave H&H notice that a manufacturer may view this exact scheme of international diversion as unlawful and supported a finding of willfulness in the instant litigation. Id. Moreover, H&H further manifested a stubborn persistence and indifference to Abbott's rights when it "sold its entire inventory of international strips after it received notice of Abbott's lawsuit but before this Court entered a restraining order." Id.

Additionally, Abbott relies on the H&H defendants' discovery misconduct as a basis for imposing treble damages, citing primarily to Gnosis, 901 F. Supp. 2d at 459. In assessing the propriety of disgorgement, the Gnosis court concluded that "false testimony, coupled with the other findings of Gnosis's knowing conduct, confirms that Gnosis's false advertising was willful." Id. The court did not expressly mention litigation misconduct in its discussion of enhanced damages, although it did there recognize that deterring willful conduct was a relevant consideration in the enhancement analysis. And at least one court has subsequently declined to impose treble damages on the basis that, inter alia, the case before it did not involve "egregious litigation tactics." See Church & Dwight Co., 2018 WL 4253181, at *16. The H&H defendants' discovery misconduct is recounted at length in the R&R recommending sanctions, (D.E. # 1545), which I adopted, (D.E. # 1613). Suffice it to say here that the conduct was egregious in that the H&H defendants engaged in "deliberate and strategic non-compliance with discovery, [] selective withholding of responsive documents, and [] perjury as well as deceptive and evasive deposition testimony." (D.E. # 1545 at 29.) This conduct further underscores the H&H defendants' willfulness and thus the need for an enhanced award that fully compensates plaintiff, thereby

deterring such conduct.[4]  Where (1) Abbott has suffered an otherwise unaccounted for loss of good will; and (2) the actual damages reflect myriad conservative assumptions that were (a) necessitated by the defendant's failure to provide adequate data, and (b) likely to seriously understate the total actual damages, it is "no small matter that [the H&H defendants] may be deterred from again engaging in such brazen behavior by being required to fully account for [their] actions."  See Gnosis, 901 F. Supp. 2d at 461 (citing Getty, 858 F.2d at 113).

However, the determination of a proper enhancement involves "a case-specific inquiry," and treble damages need not necessarily be awarded simply because actual damages are inadequate compensation and the H&H defendants' conduct was "willful" and "egregious."  Gnosis, 760 F.3d at 263.  Indeed, in the similar context of assessing an award of a defendant's profits, the Second Circuit has instructed district courts to "attend closely to the need to fashion a remedy that may sufficiently deter willful misconduct without giving plaintiffs a lottery-level windfall."  4 Pillar Dynasty LLC, 933 F.3d at 214.  And courts have declined to impose treble damages where a substantial actual damages award is "both adequate compensation [] for all harm done and adequate deterrence . . . ."  Church & Dwight Co., 2018 WL 4253181, at *16.  Here, the failure of the actual damages award to fully compensate Abbott coupled with the need to deter willful, egregious misconduct supports enhanced damages but not treble damages.  The award of actual damages here is substantial; tripling such a sum would likely produce a figure greater than the award needed to fully compensate Abbott and deter further conduct.  See id. (denying treble damages and distinguishing another case where "the actual damages calculated were quite modest,

---

[4] Abbott points to H&H's continued importation of counterfeit strips after and in violation of this Court's injunction as further evidence of a pattern of unlawful conduct and need for deterrence.  The allegations underlying that claim are the subject of a separate action before me, Abbott Laboratories v. H&H Wholesale Services Inc., No. 17-cv-3095 (E.D.N.Y.), wherein H&H and Howard Goldman have stipulated to importing counterfeit boxes but deny that they knew they were buying counterfeits.  See id. D.E. # 77.  Accordingly, I do not rely on these allegations of wrongful conduct in determining the just award in this action.

and thus the court found it necessary to award treble damages of roughly $63,000 in order to more fully compensate the plaintiffs for the goodwill lost when defendant disparaged them, and to provide proper deterrence").  Moreover, Abbott's repeated reliance on Brookstone and Gnosis does not persuade me to enter treble damages, because as already noted, the district court in those cases placed significant emphasis on a fact that is absent from this action: that the defendant was a competitor in the infringing product and gained a lasting foothold through unlawful conduct in a market which the plaintiff had formerly occupied alone.  Notably, the Second Circuit also repeatedly emphasized that very fact in affirming the award in Gnosis and warned that "cases that present less egregious, willful conduct on the part of the infringing party may not warrant" treble damages.  Gnosis, 760 F.3d at 263.  Finally, the need for any further deterrent effect as it relates to the litigation misconduct is here blunted to some extent by the fact that I have already entered case-ending sanctions against the H&H defendants for that conduct.

## VI.   Attorneys' Fees and Costs

Abbott also seeks attorneys' fees and costs.  Under the Lanham Act, the court "may award reasonable attorney fees to the prevailing party" in "exceptional cases." 15 U.S.C. § 1117(a). When evaluating whether a case is "exceptional," district courts have "wide latitude" to "engage in a 'case-by-case exercise of their discretion, considering the totality of the circumstances.'"  4 Pillar Dynasty LLC, 933 F.3d at 215 (quoting Octane Fitness, LLC v. ICON Health & Fitness, Inc., 572 U.S. 545, 554 (2014)); see also Sleepy's LLC v. Select Comfort Wholesale Corp., 909 F.3d 519, 530-31 (2d Cir. 2018) (confirming that the Supreme Court's Octane Fitness decision for fee applications under the Patent Act also applies to fee applications under the Lanham Act). However, "[b]ecause Octane Fitness establishes no presumption—rebuttable or otherwise—that cases involving willful infringement are necessarily 'exceptional,'"  4 Pillar Dynasty LLC, 933

F.3d at 216, courts should exercise their equitable discretion "in light of the considerations [the Supreme Court] ha[s] identified,'" <u>Manhattan Rev. LLC v. Yun</u>, 765 F. App'x 574, 577 (2d Cir. 2019) (summary order) (quoting <u>Octane Fitness</u>, 572 U.S. at 554). Stated otherwise, courts should engage in a "case-by-case exercise of their discretion, considering the totality of the circumstances" in determining whether the case is "one that stands out from others," <u>4 Pillar Dynasty LLC</u>, 933 F.3d at 215-16, and "[w]illful infringement by itself does not entitle a plaintiff to recover attorney's fees," <u>BBK Tobacco & Foods, LLP v. Galaxy VI Corp.</u>, 408 F. Supp. 3d 508, 522 (S.D.N.Y. 2019). The non-exhaustive list of relevant considerations includes "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." <u>4 Pillar Dynasty LLC</u>, 933 F.3d at 215 (quoting <u>Octane Fitness</u>, 572 U.S. at 554 n.6).

As stated above, the H&H defendants' willfulness is established by the pleadings upon default. Moreover, consideration of the totality of the circumstances and relevant factors confirms that this case stands out from the others and is indeed exceptional. Particularly, and for the reasons discussed in the preceding section, (1) the need for deterrence is manifest; and (2) the H&H defendants' litigation misconduct was objectively unreasonable and added substantially to the costs and fees associated with this case.

Abbott also seeks from the H&H defendants the costs necessary to investigate and prosecute the infringement. "The Lanham Act . . . provides for the award of costs in all cases [and] [o]ut-of-pocket litigation costs are generally recoverable if they are necessary for the representation of the client." <u>Tri-Star Pictures, Inc. v. Unger</u>, 42 F. Supp. 2d 296, 306 (S.D.N.Y. 1999) (citing 15 U.S.C. § 1117(a)); <u>see also</u> <u>Prot. One Alarm Monitoring, Inc. v. Exec. Prot. One Sec. Serv., LLC</u>, 553 F. Supp. 2d 201, 210 (E.D.N.Y. 2008) ("Courts generally award costs to

prevailing parties in cases involving violations of the Lanham Act.").   For the same reasons identified in the attorneys' fee award, I conclude that Abbott is also entitled to recover reasonable costs.

In sum, I conclude that this an "exceptional case" and that Abbott is entitled to reasonable attorneys' fees and reasonable costs, including investigative fees and costs.  The determination of Abbott's reasonable attorneys' fees and costs is respectfully referred to Magistrate Judge Bloom.

### VII.   Prejudgment Interest

Abbott also seeks an award of prejudgment interest on its actual damages.  In determining whether prejudgment interest is proper, courts should undertake the same analysis for assessing an award of attorneys' fees to determine whether the case is "exceptional."  4 Pillar Dynasty LLC, 933 F.3d at 216.  In addition to those factors described in the preceding section, courts may also consider "other factors generally relevant to awards of prejudgment interest, such as (i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court."  Id. at 216 n.12 (citation and internal quotation marks omitted).  For the reasons stated in the previous section, this is an exceptional case and prejudgment interest should be awarded.  The award is particularly appropriate where judgment comes long after the initiation of this action, a delay in part attributable to the H&H defendants' litigation conduct.  To otherwise avoid granting the defendants an essentially interest-free loan and to fully compensate Abbott, the award of prejudgment interest is proper in this exceptional case.

Abbott seeks application of the New York state rate of nine percent per annum, compounded annually, though it recognizes that some courts have instead applied the lower rate

provided by federal statute in trademark cases.  (See Abbott Mem. at 37-40.)  "When calculating prejudgment interest in connection with violations of the Lanham Act, it is within the trial court's discretion to choose what rate to apply."  GTFM, Inc. v. Solid Clothing, Inc., No. 01-cv-2629 (DLC), 2002 WL 31886349, at *4 (S.D.N.Y. Dec. 26, 2002).  Given that the damages award has already been doubled and nine percent is a high interest rate, I conclude that the prejudgment interest shall be set at "the sum of (A) the Federal short-term rate . . . plus (B) [three] percentage points," compounded annually.  See 26 U.S.C. § 6621(a)(2); see also Melodrama Publ'g, LLC v. Santiago, No. 12-cv-7830 (JSR) (FM), 2015 WL 2380521, at *7 (S.D.N.Y. May 19, 2015), report and recommendation adopted, 2015 WL 7288639 (S.D.N.Y. Nov. 16, 2015); Gnosis, 901 F. Supp. 2d at 461; Manzo v. Sovereign Motor Cars, Ltd., No. 08-cv-1229 (JG) (SMG), 2010 WL 1930237, at *12 (E.D.N.Y. May 11, 2010) (compounding annually).  In addition, prejudgment interest will apply only to that portion of the award representing Abbott's conservative estimate of actual damages ($13,245,690), not the doubled portion awarded to primarily address factors such as loss of good will, the risk of under-compensation, and deterrence for willful misconduct.

In reaching a "fair figure," district courts also have discretion in determining the date from which interest accrues.  See Chandler v. Bombardier Cap., Inc., 44 F.3d 80, 84 (2d Cir. 1994). Through a supplemental report of Dr. Bell, Abbott has offered prejudgment interest calculations that apply prejudgment interest once per year for the relevant years of 2010 through 2015, applying each year's interest at the midpoint of the year (June 30).  (See P611 ¶¶ 3-4.)  The H&H defendants have opposed entry of prejudgment interest in the abstract but have neither offered any arguments on the issue nor challenged Dr. Bell's methodology.  I find Dr. Bell's methodology and parameters for calculating interest to be appropriate.

In his report, Dr. Bell applies his methodology using various rates.  In P611 at Exhibit C-3, Column G, Dr. Bell applies the methodology to Abbott's actual damages amount of $13,245,690 using the lower interest rate that I have found should apply in this case—the Federal short-term rate plus three percent—compounded annually.  That methodology will thus guide the determination of prejudgment interest, which should accrue until the date of judgment.  Dr. Bell's calculations in P611 at Exhibit C-3, Column G calculate prejudgment interest of $4,107,908 through the date of his report, January 29, 2021.  Once judgment has been entered, Abbott is instructed to provide the Court with an updated report that uses the same methodology to calculate prejudgment interest through the date of judgment.

## CONCLUSION

For these reasons, I conclude that (1) Abbott has satisfied its burden at this inquest to establish actual damages, and I thus award actual damages against the H&H defendants in the amount of $13,245,690; (2) the H&H defendants are not entitled to a set-off; (3) Abbott's actual damages shall be doubled under § 1117(a) for a total damages award of $26,491,380; (4) Abbott is entitled to recover from the H&H defendants their reasonable attorneys' fees and reasonable costs; (5) the application for fees and costs is respectfully referred to Magistrate Judge Bloom to determine the proper sum; (6) Abbott is entitled to recover prejudgment interest from the H&H defendants, which shall be set at the rate provided in 26 U.S.C. § 6621(a)(2) and compounded annually, following the methodology set forth in Dr. Bell's submission at P611, Exhibit C-3, Column G; and (7) once judgment is entered, Abbott is instructed to provide the Court with an updated report that calculates prejudgment interest through the date of judgment.

SO ORDERED.

Dated: December 27, 2022
Brooklyn, New York

s/Carol Bagley Amon

Carol Bagley Amon
United States District Judge

28