UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
ABBOTT LABORATORIES, ABBOTT
DIABETES CARE INC., and ABBOTT
DIABETES CARE SALES CORP.,

                      Plaintiffs,

   -against-

H&H WHOLESALE SERVICES, INC.,
HOWARD GOLDMAN, and LORI
GOLDMAN,

                      Defendants.
-------------------------------------------------------x

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
No. 15-cv-5826 (CBA)

**AMON, United States District Judge:**

      In October 2015, Plaintiffs Abbott Laboratories, Abbott Diabetes Care Inc., and Abbott Diabetes Care Sales Corp. (collectively, "Abbott") brought this action for trademark infringement against hundreds of defendants—including distributors, pharmacies, importers, online sellers, and their principals—for unlawfully diverting the international version of Abbott's FreeStyle blood glucose test strips for the purpose of selling them on the United States gray market. (ECF Docket Entry ("D.E.") # 1.)  The defendants who are implicated in this Memorandum & Order are H&H Wholesale Services, Inc. ("H&H"); Howard Goldman ("Goldman"), President of H&H; and Lori Goldman, who is both Goldman's wife and an H&H employee (together "the Goldmans" and, collectively with H&H, "the H&H Defendants").  Abbott now moves for an asset freeze and injunction against the Goldmans themselves and two trusts affiliated with the Goldmans: the Howard B. Goldman Irrevocable Trust ("HG Trust") and the Lori M. Goldman Irrevocable Trust ("LG Trust"), both Michigan Domestic Asset Protection Trusts ("DAPTs"), the latter of which owns a 98% interest in SGE I, LLC ("SGE," collectively with the HG Trust and the LG Trust, "the Trusts").  The Court has orally denied Abbott's motion for an injunction, and the Goldmans have

1

consented to the imposition of an asset freeze on their personal assets. For the reasons set forth below, the Court GRANTS Abbott's motion for an asset freeze as to the HG Trust and SGE but DENIES it as to the LG Trust.

## BACKGROUND

The parties' familiarity with the lengthy history of this case is presumed, so I will only briefly summarize the procedural background that is relevant to my determination of this motion.

### I.     The Judgment

On December 21, 2018, after uncovering widespread discovery fraud by the H&H Defendants, Abbott filed a motion for case-ending sanctions against the H&H Defendants. (D.E. ## 1521 (motion), 1524 (supporting memorandum).) On January 14, 2019, I referred the motion to the Honorable Lois Bloom, United States Magistrate Judge, for Report and Recommendation ("R&R"). (Text Entry dated January 14, 2019.) On May 2, 2019, Magistrate Judge Bloom issued her R&R, finding that the H&H Defendants engaged in "deliberate and strategic non-compliance with discovery, [] selective withholding of responsive documents, and [] perjury as well as deceptive and evasive deposition testimony." (D.E. # 1545 at 29.) Given the H&H Defendants' "egregious" misconduct, Magistrate Judge Bloom recommended that I grant Abbott's motion for case-ending sanctions and enter a default judgment against the H&H Defendants. (Id. 29-31.) On March 24, 2020, I adopted Magistrate Judge Bloom's R&R and entered a default judgment against the H&H Defendants. (D.E. # 1613.) On March 24, 2023, I entered judgment for Abbott in the total sum of $33,471,224.[1] (D.E. # 1724.)

---

[1] This sum includes actual damages ($13,245,690) (D.E. # 1708 at 28), statutory double damages under 15 U.S.C. § 1117(a) ($26,491,380) (id.), attorneys' fees and costs stipulated at $1,500,000 (D.E. # 1718), and prejudgment interest in the sum of $5,479,844 (see D.E. # 1719, Ex. B (Supplemental Declaration of Gregory K. Bell, Ph.D. Regarding Prejudgment Interest on the Award Against the H&H Defendants)).

2

## II.     The Goldmans' Dissipation of Assets and Abbott's Motions

With a judgment in hand, Abbott has taken preliminary steps to begin collecting from the H&H Defendants.  Abbott first requested that the H&H Defendants disclose the location of all of their assets.  Then, on May 2, 2023, following the expiration of the automatic 30-day stay on post-judgment discovery under Federal Rule of Civil Procedure 62(a), Abbott began serving restraining notices on the Goldmans personally as well as on all entities that Abbott believes—based either on the Goldmans' disclosures or on their own investigations—are holding assets belonging to the Goldmans.  (D.E. # 1919 ("TRO Mot.") 2-3.)

Abbott's collection efforts have not been going smoothly, and Abbott has reason to suspect that the Goldmans have been dissipating their assets in an attempt to evade this Court's judgment.  As one egregious example, Abbott has alleged that the Goldmans gambled over $1 million combined over the twelve-week period after Abbott began serving the Goldmans and their affiliates with restraining notices.  (TRO Mot. 3-4 ("In a single visit on July 29, Howard Goldman lost over $73,000 gambling at the MGM Detroit").)[2]  Abbott further alleged that, over the same period, Howard Goldman colluded with Ryan Rapaski ("Rapaski"), his business associate and investment manager, to gamble additional tens of thousands of dollars on poker websites.  (Id. 5-6 (detailing communications in which Rapaski pleaded with Goldman by text message to "give it a break," "give it a rest," and "plz delete app," citing the "capital intensi[ty]" of Goldman's gambling habit and Goldman simply responded "send it").)  Abbott has supported these allegations with detailed casino records and text logs.  (See TRO Mot. Ex. 4 (excerpts of win/loss statements

---

[2] I do not credit Goldman's protestations at the September 5, 2023 oral argument that all of the money he gambled at the casino was from his $100,000 credit line at the MGM Grand Casino (see D.E. # 1937 Ex. 32 ("Sept. 5, 2023 Hr'g Tr.") 7:17-21; 8:14-16; 9:25-10:1).  Abbott reports that Andrew Sweet ("Sweet"), formerly the General Manager of H&H, disclosed to Abbott through his counsel that "on two occasions in July 2023, [Goldman] personally handed [Sweet] bags containing tens of thousands of dollars in cash, and instructed [Sweet] to take that money to the MGM Grand Detroit Casino and use it to pay off [Goldman]'s markers—i.e., his debt to the casino."  (D.E. # 1936 ("Abbott Reply") 2-3.)

3

produced by MGM Grand Detroit); id. Ex. 5 (excerpts of the Goldmans' player records produced by MGM Grand Detroit); id. Ex. 6 (excerpts of daily log summary reports produced by MGM Grand Detroit); id. Ex. 7 (excerpts of text messages between Goldman and Rapaski).)  This and other misconduct[3] led Abbott to file successive motions for an asset freeze and then for a temporary restraining order freezing all the Goldmans' assets, including assets held by the Trusts.  (See D.E. ## 1862 ("Abbott June 2023 Mot."), 1907 ("Abbott Mot."); TRO Mot.)[4]

After oral argument on Abbott's TRO motion, on September 7, 2023, I issued a temporary restraining order subject to a carveout allowing Lori Goldman to spend as she sees fit any income she receives as commissions in her employment as a real estate agent.  (See D.E. # 1931.)[5]

At oral argument on Abbott's motion on October 26, 2023, the Goldmans consented to the imposition of an asset freeze on their personal assets with carveouts for living expenses, leaving outstanding only Abbott's request that I freeze the assets of the Goldmans' respective Trusts.[6]  (D.E. # 1974 ("Oct. 26, 2023 Hr'g Tr.") 4:18-5:18.)

---

[3] In addition to the gambling allegations, Abbott has alleged other misconduct by the Goldmans, such as (1) the below-market sale of their home and transfer and dissipation of part of the proceeds (Abbott Mot. 7-10); (2) spending money out of accounts at Synchrony Bank that had purportedly been restrained (id. 4-6); (3) transfers to the HG Trust and use of LG Trust funds for personal expenses after restraining notices had been issued (id. 11-15); and (4) failure to disclose a bank account and certain stock holdings (id. 15).  I need not address these allegations and the Goldman's (partial) defenses to them (see generally D.E. # 1922 ("H&H Opp'n")) in detail, as I believe the gambling misconduct is more than sufficient to justify Abbott's concerns regarding further dissipation of assets.

[4] Abbott's first motion included a request that I order the Goldmans to deposit all of their disclosed assets into an account overseen by the Clerk of Court.  (Abbott June 2023 Mot. 27-30.)  I denied that motion "without prejudice to refile a narrower proposed asset freeze order."  (Minute Entry dated June 14, 2023.)  Abbott subsequently filed a renewed motion for an asset freeze, based on the other misconduct detailed in note 3, supra, without requesting that the Goldmans deposit funds with the Clerk of Court.  (Abbott Mot. 3.)  After discovering the gambling activity, Abbott filed their motion for a temporary restraining order.  (TRO Mot.)

[5] The parties subsequently consented to the TRO being extended sine die until I resolved Abbott's motion for a permanent asset freeze.  (See D.E. # 1959.)

[6] Lori Goldman consents to the asset freeze on condition that the carveout for her real estate agent income in the TRO carries over to the asset freeze.  Howard Goldman consents on condition that provision is made for his living expenses, the details of which will be ironed out by the parties.  (Id.)

**DISCUSSION**

This motion raises a series of issues to be resolved: (1) the necessity of a court-imposed asset freeze in this case, notwithstanding the outstanding restraining notices appropriately issued by Abbott (infra § I); (2) whether an asset freeze is an accepted remedy, or, as the H&H Defendants argue, is "frowned upon" in this circuit (infra § II; see H&H Opp'n 4); (3) whether Abbott has established that the Goldmans have an interest in the Trust assets that warrants the imposition of an asset freeze on those assets (infra § III(a); see D.E. ## 1918 ("Trusts' Opp'n"), 1976 ("SGE Supp. Ltr.")); and (4) whether I have personal and subject matter jurisdiction to issue a freeze that would impact the Trusts (infra § III(b)-(c); see Trusts' Opp'n 4-6; D.E. # 1956 ("LG Trust Supp. Br.") 2-3.).

**I.     The Necessity for a Court-Issued Asset Freeze**

The restraining notices Abbott has issued to the Goldmans and all entities it believes to be holding assets belonging to the Goldmans restrain the receiving parties from "any interference with" any property in which the judgment debtor has an interest. N.Y. C.P.L.R. § 5222(b); (TRO Mot. 10 ("Abbott validly served asset restraining notices on the Goldmans themselves, as well as on their banks, business partners, and their counsel.").)  Nevertheless, Abbott has requested that I issue a separate asset freeze order.

Abbott offers a compelling rationale for its request, arguing that "[w]hen Abbott itself serves asset restraints, and the recipient violates that restraint, Abbott's recourse is to seek relief against the restrained party to recover the assets transferred in violation of the restraint.  That provides no deterrent effect against the Goldmans, who already owe Abbott the funds they continue to conceal and dissipate." (Abbott Mot. 22 (internal citation omitted).)  With an asset freeze, by contrast, "further violations w[ould] be punishable as an act of contempt against an order

of this Court." (Id.) I agree with Abbott that, given the egregious and brazen misconduct detailed above, a court-ordered asset freeze would be useful in this case for the purpose of impressing upon the Goldmans and anyone acting in concert with them the gravity of the asset restraints and the potential consequences of violating them.

## II. Statutory Authority for an Asset Freeze

I now turn to an analysis of the statutory authority for my asset freeze order.[7] Courts in this circuit have ordered post-judgment asset freezes in trademark cases, relying on Federal Rule of Civil Procedure 69 and New York law. See WowWee Grp. Ltd. v. Haoqin, No. 17-cv-9893 (WHP), 2019 WL 1316106, at *6 (S.D.N.Y. Mar. 22, 2019); Ideavillage Prods. Corp. v. Aarhus, No. 1:18-cv-02739 (JGK) (SDA), 2019 WL 2290514, at *6 (S.D.N.Y. May 7, 2019), report and recommendation adopted, 2019 WL 2287726 (S.D.N.Y. May 28, 2019); Ideavillage Prods. Corp. v. Shenzen City Poly Hui Foreign Trade Co., No. 17-cv-8704 (JGK) (BCM), 2019 WL 12339638, at *10-11 (S.D.N.Y. Dec. 12, 2019). Under Rule 69, "[t]he procedure on execution—and in proceedings supplementary to and in aid of judgment or execution—must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies." Fed. R. Civ. Pro. 69(a)(1). In this case, "the procedure of the state where the court is located" is CPLR § 5222. Section 5222 "permits a judgment creditor to serve a restraining notice on a judg[]ment debtor, which prohibits the judgment debtor from 'mak[ing] or suffer[ing] any sale, assignment, transfer or interference with any property in which [it] has an interest.'" Cengage Learning, Inc. v. Nguyen, No. 1:20-cv-00769 (JGK) (SDA), 2022 WL 18231654, at *6 (S.D.N.Y.

---

[7] Although the Goldmans themselves have conceded to the imposition of a freeze on their personal assets, impliedly waiving the arguments they have earlier made as to my authority to impose one, I address their arguments for the sake of completeness, considering that the Trusts may have relied on the presentation of these arguments by the Goldmans' counsel.

Nov. 21, 2022), report and recommendation adopted, 2023 WL 159739 (S.D.N.Y. Jan. 11, 2023) (quoting N.Y. C.P.L.R. § 5222(b)).

The H&H Defendants contend that a post-judgment asset-freeze order pursuant to Rule 69 "is frowned upon" in this circuit, but the cases cited by the H&H Defendants do not support their position. In Gucci America, Inc. v. Bank of China, 768 F. 3d 122 (2d Cir. 2014), the plaintiffs were seeking a pre-judgment asset freeze injunction pursuant to the court's equitable authority to issue injunctions under Federal Rule of Civil Procedure 65. The court held that, because "the general availability of injunctive relief [is] not altered by [Rule 65] and depend[s] on traditional principles of equity jurisdiction," a district court can only issue a pre-judgment asset freeze in cases where such relief was "traditionally accorded by courts of equity," i.e., where the relief sought by defendants was equitable rather than legal in nature. Id. at 130-31 (quoting Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 318-19 (1999) (alterations in original)). In this case, by contrast, Abbott is seeking a post-judgment, rather than pre-judgment, asset freeze. I am not utilizing my equitable powers under Rule 65, but my power to enforce a judgment through "proceedings supplementary to and in aid of judgment or execution" in "accord[ance] with the procedure of the state" of New York under Rule 69. Fed. R. Civ. Pro. 69(a)(1).

The H&H Defendants do not cite any caselaw for the proposition that I cannot order, pursuant to my power under Rule 69, that parties served with valid restraining notices pursuant to CPLR § 5222 comply with those restraints on penalty of contempt of court. In one case cited by the H&H Defendants as an example of the court declining to issue a post-judgment asset freeze, the court subsequently clarified that it had "ordered an asset freeze under Rule 69 and state law" and was only declining to issue "a broader asset freeze pursuant to [Rule] 65, the Lanham Act, and

7

the Court's inherent []equitable powers." WowWee Grp. Ltd. v. Meirly, No. 18-cv-706 (AJN), 2020 WL 70489, at *2 (S.D.N.Y. Jan. 7, 2020). Indeed, Judge Nathan in Meirly cited the court's "inherent equitable power to issue remedies ancillary to its authority to provide final relief[.]" Id.[8] The other cases cited by the H&H Defendants concern requests for an asset freeze and transfer order, which would effectively bypass the procedural requirements of CPLR §§ 5222 and 5225. The courts declined to grant this request, reasoning that such an order would mandate third parties holding any asset of the defendants "to transfer that asset to [the] [p]laintiffs upon the mere request of [the] [p]laintiffs . . . even if another third party had a superior claim to that asset" and "without providing prior notice," a result which "would run counter to the policy" and procedures of CPLR §§ 5222 and 5225. See Spin Master Ltd. v. 158, 463 F. Supp. 3d 348, 383-85 (S.D.N.Y. 2020); see also Allstar Marketing Group, LLC v. 158, No. 1:18-cv-4101 (GHW), 2019 WL 3936879, at *1-4 (S.D.N.Y. Aug. 20, 2019) ("Plaintiff's proposed injunctive relief contemplates a procedure that is the exact inverse of the procedure set forth in C.P.L.R. §§ 5222 and 5225."); Nat'l Fire Prot. Ass'n, Inc. v. Swets Info. Servs. Priv. Ltd., No. 18-cv-6029, 2021 WL 1254424, at *1 (S.D.N.Y. Apr. 5, 2021) (holding that the court "lack[ed] the authority to impose a post-judgment asset restraint and transfer order," citing Allstar and Spin Master). In this case, I've already rejected Abbott's request for a transfer order as overbroad (Minute Entry dated June 14, 2023), and my asset freeze order simply directly orders the Goldmans and anyone in active concert or participation with them to comply with the asset restraints validly imposed on the Goldmans pursuant to CPLR § 5222.

---

[8] To be sure, Abbott maintains that I do have the authority to issue a preliminary injunction pursuant to my equitable power as well, citing Bricklayers Ins. & Welfare Fund v. LaSala, No. 12-cv-2314, 2018 WL 7053375 (E.D.N.Y. Nov. 15, 2018), report and recommendation adopted, 2019 WL 192884 (E.D.N.Y. Jan. 15, 2019). (Abbott Mot. 19-21; D.E. # 1962 ("Abbott Supp. Br.") 16-17.) Because I believe an asset freeze under Rule 69 suffices here, and given the contrary authority cited by the H&H Defendants (see H&H Opp'n 5-6), I decline to do so at this point, without deciding whether I have the authority to do so.

### III. The Trusts' Objections to an Asset Freeze

In the Trusts' opposition to Abbott's motion for an asset freeze, the Trusts make two principal arguments against the imposition of an asset freeze as to the trust assets. (See generally Trusts Opp'n.) First, the Trusts argue that "Abbott cannot simply freeze the assets of a non-party without a determination that a judgment debtor has an interest in the assets." (Id. 5, 11-12.) Second, the Trusts argue, jurisdiction to make the underlying determination regarding whether the Goldmans have an interest in the DAPT Trusts lies exclusively with Michigan Probate Courts under MCL §§ 700.1043 and 700.1042(p). (Id. 5-6.) The Trusts contend that Abbott could only obtain an asset freeze that extends to the assets of the trusts by commencing a separate action in Michigan Probate Court. (Id. 7.) In the LG Trust's supplemental brief, filed after the LG Trust appointed a new trustee, Robert Zawideh,[9] the LG Trust makes a few additional arguments. (LG Trust Supp. Br.) The LG Trust contends that the Court does not have personal jurisdiction over Zawideh, as Abbott has not served him, he is not a party to this case, and he has no contacts with the state of New York that would justify haling him into court in New York. (Id. 2-3.) The LG Trust further argues that this Court may freeze the LG Trust's assets only after Abbott has established that the LG Trust is an alter ego of Lori Goldman or established that certain transfers into the LG Trust were fraudulent conveyances from the Goldmans, which Abbott has not done. (Id. 3-7.) Following the October 26, 2023 oral argument on Abbott's motion, during which I raised the option of freezing the assets of SGE rather than the LG Trust, the parties filed additional letters

---

[9] The previous trustee of both trusts, Janet Wade, resigned. (See Abbott Mot. 2.) Under the terms of the Trusts, the Goldmans became the interim trustees of each other's Trusts upon her resignation. (See, e.g., Trusts' Opp'n Ex. A ("HG Trust Documents") Art. 9, § 4(A) ("If JANET WADE does not accept the appointment as Trustee, dies, resigns, is removed . . . then LORI M. GOLDMAN shall serve as successor Trustee.").) I denied Abbott's motion for an injunction preventing the Trusts from appointing a new trustee to replace the Goldmans. (See Abbott Mot. 23; Minute Entry dated September 26, 2023.) Zawideh was appointed the trustee of the LG Trust, but Lori Goldman remains the trustee of the HG Trust. Additionally, while Abbott's motion was pending, counsel for the Trusts withdrew from its representation of the HG Trust while continuing its representation of the LG Trust and SGE. (See D.E. # 1945; Minute Entry dated Sep. 26, 2023.)

9

disputing whether Abbott has adequately shown that the Goldmans have an interest in SGE and its assets to justify a restraining order pursuant to CPLR § 5222. (See D.E. ## 1973 ("Abbott Supp. Ltr."), 1976 ("SGE Supp. Ltr.").)[10] Counsel for Howard Goldman has also adopted the LG Trust's arguments on behalf of the "identically worded" HG Trust. (D.E. # 2001.) I will address these arguments in logical order rather than the chronological order in which they were made.

### a. Abbott Has Adequately Shown the Goldmans' Interest in the Trust Assets

Contrary to the Trusts' contentions, Abbott has met the standard for demonstrating that the Goldmans have an interest in the assets of the HG Trust and SGE.

### i. HG Trust

It is clear that, under the trust documents, "[t]he Trustee" of HG Trust—currently Lori Goldman—"may . . . distribute as much of the net income and/or principal of the Lifetime Trust as the Trustee . . . may at any time and from time to time determine to . . . the Grantor," namely Howard Goldman. (HG Trust Documents Art. 3, §1(A).) Under section 5222, all that is necessary for restraining property pursuant to a judgment is that the judgment debtor have "an interest" in the property. N.Y. C.P.L.R. § 5222(b). That interest need not be independent and noncontingent; federal courts interpreting CPLR § 5222 have held that "contingent property interests, including trusts that are managed by independent trustees with full control over disbursements to the judgment debtor," can be restrained. AmTrust N. Am., Inc. v. Preferred Contractors Ins. Co. Risk Retention Grp., LLC, No. 16-mc-0340 (CM), 2016 WL 6208288, at *6 (S.D.N.Y. Oct. 18, 2016)

---

[10] As I've mentioned (supra Background § III), Abbott and the LG Trust have filed yet another round of letters focusing on Abbott's accusations that the LG Trust attached documents regarding the SGE assets that it withheld in violation of Abbott's earlier subpoena. (See D.E. # 1992, at 3 ("It is outrageous that in its supplemental letter, SGE filed documentation that Abbott has been seeking for months, and then argued that Abbott's motion was deficient for failing to discuss that documentation.").) SGE responds that SGE did not have possession of the documents in question prior to November 8, 2023 and Abbott could have obtained them from Rapaski. (See D.E. # 1993, at 2-3 ("In sum, to the extent the November 9th Letter contained new information that Abbott had not previously seen, it is Abbott's own fault.").) I need not wade into this particular dispute, as I do not rely on any discovery noncompliance in holding that Abbott has made a sufficient showing to warrant freezing SGE's assets.

(citing Kates v. Marine Midland Bank, N.A., 541 N.Y.S.2d 925, 928 (Sup. Ct. 1989)).  At oral argument, counsel for the LG Trust, the documents of which share the above provision, admitted that "the trustee has discretion to make some disbursements" but argued that the trustee could not "deplete the complete corpus of the trust" (Oct. 26, 2023 Hr'g Tr. 9:6-23), but this effort to limit the discretion of the trustee appears to defy the plain language of the trust documents.  I hold that because Lori Goldman has the ability to distribute as much of the HG Trust's income and principal as she determines to Howard Goldman, Howard Goldman has a contingent interest sufficient to warrant an asset freeze on the assets of the Trust.

### ii.  LG Trust and SGE

Abbott has adequately demonstrated that the Goldmans have an interest in SGE and its assets.  "New York courts have found that a judgment debtor 'has an interest' in an account '[w]here . . . the evidence demonstrates that a judgment debtor regularly has used another's bank account as a 'recipient' of the debtor's personal assets or as a source of payment of the debtor's expenses.'" Major League Baseball Props., Inc. v. Corporacion de Television y Microonda Rafa, S.A., No. 19-cv-8669 (MKV) (GWG), 2023 WL 2625794, at *4 n.4 (S.D.N.Y. Mar. 24, 2023) (quoting Bingham v. Zolt, 647 N.Y.S.2d 220, 221 (1st Dep't 1996)).  In its Supplemental Letter, Abbott points to a long list of transactions from three bank accounts in SGE's name (at Level One, Private Bank, and Chase Bank) to pay off the Goldman's private debts and expenses, including gambling expenses.  (See, e.g., Abbott Supp. Ltr. 4 (stating that "[o]n June 22, 2022, SGE received $945,503.44 which it immediately wired to Howard Goldman's Ally account," and subsequently "the entire $945,503.44 was wired from Howard Goldman's Ally account to the Aria Resort and Casino in Las Vegas.").)  These transactions occurred both before and after restraining notices were served on SGE.  (See id. ("[A]s recently as May 2023, Lori Goldman used funds from SGE's

11

Chase checking account (-8218) to pay her personal credit card bill (account -1433). . . . [I]n August 2023 . . . Ms. Goldman directed Ms. Michels to pay the Goldmans' personal assistant, Andrew Sweet, out of a newly opened SGE account at Huntington Bank, which primarily had been funded by rent checks from SGE's real estate holdings.").)

Counsel for LG Trust points to cases holding that showing that judgment debtors repeatedly used funds in third-party accounts to pay for its own expenses is insufficient to establish that judgment debtors have an interest in those accounts. (See SGE Supp. Ltr. 6 (citing AXGINC Corp. v. Plaza Automall, Ltd., No. 14-cv-4648 (ARR) (VMS), 2018 WL 4771886 (E.D.N.Y. Oct. 2, 2018); JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc., 295 F. Supp. 2d 366 (S.D.N.Y. 2003).)

But the facts of these cases are distinguishable, and their holdings do not require a contrary result here. In AXGINC, the court held that the fact that third-party entities' accounts were used to pay the judgment debtor's various expenses was insufficient to demonstrate the judgment debtor's interest in those accounts because the payments "could simply mean that the owners of the dealerships chose to pay the debtor's legitimate bills and sacrifice their profit as a result." 2018 WL 4771886, at * 5. The court distinguished Bingham, reasoning that in that case "the judgment debtor deposited his own funds in his wife's bank account, used funds from another account to pay his expenses, and personally drew checks on that bank account to satisfy his debts," all of which "[i]n combination" were sufficient to allow restraint of those accounts. Id. The facts of this case are much closer to those in Bingham than to those in AXGINC. Counsel for SGE is not arguing that, as in AXGINC, SGE, as an entity, chose to sacrifice its income to pay the Goldmans' gambling expenses. Rather, SGE concedes that, as in Bingham, the Goldmans, of their own volition, personally controlled SGE and its accounts, and repeatedly used hundreds of thousands

of dollars of its income for their own personal expenses, demonstrating that SGE holds the Goldmans' assets.  (See Oct. 26, 2023 Hr'g Tr. 23:18-24:1 (counsel for SGE conceding that "[t]here was certainly some money that went out of SGE" and "presumably" "that money exceeded some expenses").)

The LG Trust points to language in AXGINC quoting other courts' interpretation of Bingham as "stand[ing] for the principle that a restraining notice can only be issued against a third party's bank accounts if there is evidence that those accounts actually hold 'the assets of a judgment debtor.'"  AXGINC, 2018 WL 4771886, at *6; see also JSC, 295 F. Supp. 2d at 392 (distinguishing Bingham because in that case "the plaintiffs had shown evidence that the accounts held the assets of the judgment debtor").  To the extent that this is necessary, Abbott has shown that the Goldmans have "routinely deposited thousands of dollars of checks made payable to [the Goldmans] individually into SGE's bank accounts" (Abbott Supp. Ltr. 5), and that "Howard Goldman's living trust (of which Howard Goldman is trustee) assigned an investment in Contour Investments II, LLC worth over $1 million to SGE" (id.).   These cases do not appear to require some proportional relationship between the amount of assets deposited into these accounts and the amount of assets restrained; rather, the transfer of the Goldmans' assets into SGE accounts, along with evidence that the Goldmans utilized the funds for their own expenses, in combination demonstrates that the Goldmans have an interest in SGE assets and accounts.[11]

SGE insists that even if Abbott has shown that SGE's bank accounts hold assets of the Goldmans, Abbott has not shown that the Goldmans have an interest in any of the other twenty-

---

[11] Other cases cited by the LG Trust are also unpersuasive.  In Belesis v. Lowery, No. 15-CV-2633 (JSR), 2017 WL 3641709, at *2 (S.D.N.Y. July 31, 2017), the court removed restrictions on a judgment debtor's wife's account in part because the plaintiff's only evidence that the funds in the account were used to pay the debtor husband's expenses was deposition testimony "in which he note[d] that his wife pays his bills, which d[id] not describe whence that money comes."  Here, Abbott has introduced voluminous supporting documents showing, chapter and verse, from whence the money came to pay the Goldmans' various expenses.

13

six non-liquid assets owned by SGE, and that I can only restrain those assets after making a finding that SGE is an alter ego of the Goldmans. I disagree. The purpose of a section 5222 restraining notice is "to preserve the status quo pending further proceedings in which the creditor's ability to reach specific property to satisfy the judgment may be determined." Interpool Ltd. v. Patterson, No. 89 Civ. 8501 (LAK), 1995 WL 105284, *1 (S.D.N.Y. Mar. 13, 1995). SGE represents a substantial portion of the assets disclosed by the Goldmans. (See Abbott Mot. 13 ("The Goldmans have disclosed assets valued at approximately $7 million belonging to SGE.").) At this stage, it is still early in Abbott's execution process and Abbott is attempting to collect discovery materials from the Goldmans. (See, e.g., Sept. 9, 2023 Hr'g Tr. 11:21-12:10 (counsel for Abbott explaining that "[p]art of our problem is, we haven't gotten any discovery, we don't know where the large sums of cash have come from").)

Given the highly unusual circumstances of this case—the substantial irregularities in the management of SGE Abbott has documented thus far, the Goldmans' history of utilizing SGE (including income from its non-liquid assets) to pay their own expenses and bypass the restraining notices, and the egregious misconduct of the Goldmans in violating the restraining notices with other funds the origin of which remains a mystery—the danger that the Goldmans will use SGE to continue dissipating their assets and attempting to evade the Court's judgment is glaringly obvious. Lori Goldman remains in her position as manager of SGE, giving her the opportunity to dissipate assets in the guise of investments or transactions with third parties acting in concert with the Goldmans. (See Oct. 26, 2023 Hr'g Tr. 22:17-23:16 (counsel for SGE stating that Lori Goldman,

---

In Sicom S.P.A. v. Wells Fargo Bank, N.A., No. cv-2204723 (KM) (MAH), 2023 WL 3072685, at *5 (D.N.J. Apr. 25, 2023), the court reasoned that the plaintiff had not "even [alleged] that the judgment debtors use the [third-party] account to pay their expenses," while also noting that this was "found not necessarily sufficient in AXGINC." This comment in dicta does not stand for the proposition that such allegations or evidence would be categorically insufficient, only that, as I've stated, the sufficiency of such allegations would depend on the fact-specific context.

as the manager of SGE, would not require the approval of the trustee to take money out of SGE).) Counsel for SGE has also conceded that, were the Goldmans to continue using SGE as their "piggybank," SGE would have no recourse to collect damages from the Goldmans. (See Oct. 26, 2023 Hr'g Tr. 24:1-8 (counsel for SGE noting that "the trustee should probably think about bringing a lawsuit against Mr. Goldman" but "[t]hat lawsuit might not be a great idea because I don't think Mr. Goldman is going to have any assets").) I conclude, therefore, that Abbott has sufficiently shown the Goldmans' interest in SGE to merit an asset freeze directing that the Goldmans and their affiliates abide by the asset restraints in order to preserve the status quo while Abbott collects information to determine the true extent of the Goldmans' interest in SGE's assets. If, at the turnover stage, Abbott fails to establish that SGE is liable for the Goldmans' judgment as an alter ego, or that the Goldmans have an interest in a particular asset held by SGE, the restraint will be lifted as to that asset.

### b. The Court Does Not Require Personal Jurisdiction Over Zawideh

In light of the foregoing, I need not reach the question of whether I have personal jurisdiction over Zawideh, the new trustee of the LG Trust, to freeze the assets of the Trusts. As to the LG Trust, the only disclosed asset held by the Trust is a 98% interest in SGE, an entity that holds assets valued at approximately $7 million. Because I am satisfied that Abbott has shown that the Goldmans have an interest in the assets of the SGE entity itself, I will directly freeze the assets of SGE, without imposing any freeze on the "parent" Trust entity, obviating the need to exercise jurisdiction over Zawideh as Trustee. Cf. A/S Domino Mobler v. Braverman, 669 F. Supp. 592, 593 (S.D.N.Y. 1987) ("Corporations, of course, are legal entities distinct from their . . . shareholders and have an independent legal existence." (quoting Port Chester Electrical Construction Corp. v. Atlas, 40 N.Y.2d 652 (1976))). I can exercise personal jurisdiction over

SGE because SGE has waived its right to assert any objection to personal jurisdiction by appearing in this Court to request that I lift the restraints on SGE without objecting to personal jurisdiction. (See Trusts' Opp'n 12 (arguing that "the current restraints of SGE's assets must be lifted" without objecting to personal jurisdiction)); Grammenos v. Lemos, 457 F.2d 1067, 1070 (2d Cir. 1972) ("If a party enters a case, makes no objection to jurisdiction, and asks the court to act on its behalf in some substantive way, it will be held to have waived further objection."); United States ex rel. Brumfield v. Narco Freedom, Inc., No. 12 CIV. 3674 (JGK), 2018 WL 5817379, at *2 n.1 (S.D.N.Y. Nov. 6, 2018). As to the HG Trust, Janet Wade has not been replaced by a new third-party trustee and, under the terms of the Trust, Lori Goldman, over whom I have personal jurisdiction, remains the trustee. (See HG Trust Documents Art. 9, § 4(A) ("If JANET WADE does not accept the appointment as Trustee, dies, resigns, is removed . . . then LORI M. GOLDMAN shall serve as successor Trustee."); Abbott Supp. Br. 3-4 (noting that "the Court unquestionably has jurisdiction" over Lori Goldman).)

### c. The Michigan Exclusive Jurisdiction Statutes Are Not Implicated in This Motion

Finally, as to the Trusts' argument that I do not have subject matter jurisdiction over the Trusts based on Section 700.1043 of the MCL (Trusts Opp'n 5, 11-12), I disagree that Abbott's instant motion implicates the Michigan exclusive jurisdiction statutes. Section 700.1043 provides that the Michigan Probate Court "has exclusive jurisdiction over an action that addresses either of the following questions: (a) Whether a transfer is a qualified disposition. (b) The extent of the transferor's interest in, or the income from, a qualified disposition."

Abbott is not asking me to determine that any particular transfers into the Trusts are not qualified dispositions. Although Abbott has, inter alia, submitted evidence of allegedly fraudulent transactions involving the Trusts and argued that the Trusts were "complete and utter shams"

16

(Abbott Mot. 11), Abbott has not requested that I determine the validity of the trusts themselves at this time. Rather, Abbott is using what it asserts are suspect transactions to further its argument that the Goldmans are attempting to utilize the Trust entities to conceal assets and evade Abbott's validly imposed asset restraints, demonstrating that an additional asset freeze order is required to preserve the Goldmans' assets. It is not necessary for me to decide that the assets in the Trusts are not protected from future collections efforts in order to impose an asset freeze. See Interpool Ltd., 1995 WL 105284, at *1 ("While [the defendant] maintains that certain of the property affected by the restraining notice is located in Florida and may be exempt from execution pursuant to Florida law, the only office of a restraining notice or order is to preserve the status quo pending further proceedings in which the creditor's ability to reach specific property to satisfy the judgment may be determined."). The statute's first subcategory is thus not implicated by the instant motion.

The statute's second subcategory, an action that addresses "[t]he extent of a transferor's interest in . . . a qualified disposition," is also inapposite here. The language of the statute indicates that it is concerned with actions that attempt to pierce a DAPT to execute a judgment by requiring a turnover of assets, which would require a final determination of exactly how much of the assets in the trust actually belong to the judgment debtor and are subject to turnover, not with restraining orders that merely preserve the status quo of all assets in which the judgment debtor has any interest until the creditor can collect on its judgment. Here, as I have stated, it is not necessary to make such a final determination, rather, I need only find that the Goldmans have some interest (even if contingent) in some of the assets of the trust. (See supra § III(b).) With respect to the HG Trust, I need only read the HG Trust documents, which plainly allow the Trustee (Lori Goldman), over whom I have jurisdiction, to disburse all assets to Goldman at her discretion, to understand that Goldman has a contingent interest in the HG Trust. As to the LG Trust, I am not imposing a

17

freeze on the Trust itself but only on SGE, so I need not address the extent of the Goldmans' interest in the Trust. I've determined that the Goldmans have an interest in SGE based on the Goldmans' repeated and pervasive utilization of SGE's assets for their own personal expenses. Consequently, resolving this motion also does not implicate the second subcategory of Michigan's exclusive jurisdiction statute, and I need not, at this point, reach the question of whether the Michigan statute can strip the federal court of its jurisdiction over remedies ancillary to enforcing its judgment. (See Abbott Reply at 16-17.)

## CONCLUSION

For the foregoing reasons, Abbott's motion for an asset freeze is GRANTED as to the HG Trust and SGE and DENIED as to the LG Trust. Abbott is directed to submit a proposed order making the asset freeze, encompassing the assets of the Goldmans, the HG Trust, and SGE, permanent, subject to the existing carveouts for living expenses.

SO ORDERED.

Dated: July 17, 2024
Brooklyn, New York

S/ Carol Bagley Amon
_____
Carol Bagley Amon
United States District Judge